Natalie A. Landreth (Bar no. 0405020)
Erin C. Dougherty (Bar no. 0811067)
**NATIVE AMERICAN RIGHTS FUND**
745 West 4th Avenue, Suite 502
Anchorage, Alaska 99501
(907) 276-0680; Facsimile: (907) 276-2466
E-mail: landreth@narf.org
dougherty@narf.org

James Thomas Tucker (*pro hac vice*)
Sylvia O. Semper (*pro hac vice*)
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
300 South Fourth Street, 11th Floor
Las Vegas, Nevada 89101
(702) 727-1400; Facsimile (702) 727-1401
E-mail: james.tucker@wilsonelser.com
sylvia.semper@wilsonelser.com

Richard de Bodo (*pro hac vice*)
**BINGHAM McCUTCHEN LLP**
1601 Cloverfield Boulevard, Suite 2050 North
Santa Monica, California 90404-4082
(310) 255-9055; Facsimile (310) 907-2055
E-mail: rich.debodo@bingham.com

**Attorneys for Plaintiffs**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MIKE TOYUKAK et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>MEAD TREADWELL, et al.,<br><br><br>                    Defendants. | Case No. 3:13-cv-00137-JWS<br><br>**MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY ADJUDICATION REGARDING:**<br><br>**(1)  Section 203 Liability For Failure To Provide Evidence Of Translations Of Voting Materials**<br><br>**(2)  Section 203 Liability For Ineffective Translations** |

1

Defendants have failed to provide limited-English proficient (LEP) Yup'ik-speaking voters and LEP Gwich'in-speaking voters in the Dillingham, Wade Hampton, and Yukon-Koyukuk Census Areas with language assistance and information in violation of Section 203 of the Voting Rights Act of 1965 ("VRA"). Section 203 requires that if a covered jurisdiction disseminates particular voting materials in English, similar written voting materials must be provided in minority languages (in this case, Yup'ik and Gwich'in). Defendants admit that they distributed at least 38 different categories of pre-election voting materials in English, but little, if any, of that information has been provided in Yup'ik to Dillingham and Wade Hampton voters or in Gwich'in to Yukon-Koyukuk voters. It also is undisputed that Defendants fail to provide language assistance at polling places on Election Day as demonstrated by the absence of any Gwich'in audio translations on the voting machine, untrained or absent bilingual poll workers, missing definitions of key election terms, and inaccurate translations. Finally, as a separate and independent basis for liability, the undisputed facts establish that Defendants failed to provide any translations in the Yup'ik dialects spoken in the Dillingham and Wade Hampton regions, placing the burden entirely on poll workers to provide on-the-spot translations. Based on these undisputed facts, *all of which come from Defendants' own testimonial and documentary admissions*, Plaintiffs respectfully request that the Court grant summary judgment on Section 203 liability.[1]

## I.  LANGUAGE REQUIREMENTS UNDER SECTION 203.

In 1975, Congress amended the VRA to require bilingual or multilingual election procedures in certain states. Congress took this action after expressly finding that, "through the

---

[1]  As described in the Amended Complaint, Plaintiffs seek similar language assistance to what the Defendants agreed to provide to LEP Yup'ik speaking voters and other voters in the Bethel Census Area in the 2010 settlement agreement in *Nick v. Bethel*, Case No. 3:07-cv-00098-TMB. The language assistance procedures that the Defendants agreed to provide in *Nick* to resolve their Section 203 violations are not provided to all villages in the Dillingham, Yukon-Koyukuk, and Wade Hampton Census Areas.

use of various practices and procedures, citizens of language minorities have been effectively excluded from participation in the electoral process." 42 U.S.C. § 1973aa–1a(a). To remedy this voting discrimination, Congress enacted the Bilingual Election Requirements of Section 203, which provides that when any covered state "provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language." 42 U.S.C. § 1973aa-1a(c).

A violation of Section 203 is akin to strict liability in the torts context. Bruce L. Adelson, *Minority-Language Election Rules and the Public Lawyer*, 15 PUB. LAWYER 1 (2007) (describing Section 203 as "almost strict liability in nature"). The basic rule is that if a covered jurisdiction disseminates any voting materials in English, they must also provide it in the minority language as well. 42 U.S.C. §§ 1973aa-1a(b)(3)(A), 1973aa-1a(c). It is that simple. "Voting materials" is broadly construed to apply to all stages of the electoral process, including "voter registration through activities related to conducting elections, including, for example the issuance, at any time during the year, of notifications, announcements, or other informational materials concerning the opportunity to register, the deadline for voter registration, the time, places and subject matters of elections, and the absentee voting process."[2] 42 U.S.C. § 1973aa-1a(a); *U.S. v. Metro. Dade Cnty.*, 815 F. Supp. 1475, 1478 (S.D. Fla. 1993); 28 C.F.R. § 55.15.

Given Congress's unequivocal requirement for covered states to provide minority language assistance, Defendants' multiple Section 203 violations are thus fairly uncontroversial, as

---

[2]     As the U.S. Department of Justice has explained, "the basic purpose of these requirements is to allow members of applicable language minority groups to be effectively informed of and participate effectively in voting-connected activities." 28 C.F.R. § 55.15. 28 C.F.R. Part 55 encompasses the U.S. Attorney General's Language Minority Guidelines. Subpart D covers Minority Language Materials and Assistance, including the provision of minority language materials and assistance (§ 55.18), written materials, (§ 55.19), and oral assistance (§ 55.20).

3

described in more detail below. Defendants' deficient Yup'ik language assistance and total lack of Gwich'in language assistance for voters in the Dillingham, Yukon-Koyukuk, and Wade Hampton Census Areas has impaired the fundamental right of LEP Yup'ik and Gwich'in voting-age U.S. citizens to participate in the electoral process. Indeed, other federal courts have held that failure to translate *a single voting material* violates Section 203. *See Metro. Dade Cnty*, 815 F. Supp. at 1478 (finding Section 203 liability where one election pamphlet was not translated into the covered language). Furthermore, as the Ninth Circuit has recognized, good faith is no defense. *See Chinese for Affirmative Action v. Leguennec*, 580 F.2d 1006, 1008-09 (9th Cir. 1978) (recognizing there is "no well-defined common law defense of good faith" in federal voting rights claims). Courts ask only whether or not the materials were translated. In other words the test is: (1) is the voting material available in English, and (2) if so, is it translated into Yup'ik and Gwich'in in some form?

This Motion sets forth the numerous voting materials provided in English that are not translated into Yup'ik and Gwich'in in either oral or written form for poll workers. These materials have been set forth in the attached chart which shows what is available in English, versus what is available in Yup'ik and Gwich'in in the census areas in question. Exh. 255. All of the facts are from Defendants' own evidence and are therefore not subject to dispute. Each of these failures is a violation of the VRA. The undisputed evidence clearly shows that Plaintiffs are entitled to summary judgment on Section 203 liability because the Defendants failed to provide any Yup'ik or Gwich'in translations of numerous voting materials. There is no evidence there materials were translated in *any* form.[3] Plaintiffs are also entitled to summary judgment on liability for the few translated materials Defendants do actually produce because those materials

---

[3] The moving party is entitled to summary judgment when "there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c).

4

are so poorly translated they are ineffective. Those materials are dealt with separately in Section III.E. Thus Plaintiffs are entitled to summary judgment; (1) for the failure to provide translations of the materials identified in the chart, and also (2) for the ineffectiveness of the few translated materials actually produced. After these two separate grounds are resolved, the only issues remaining for an evidentiary hearing or trial are the scope of the remedies to cure the State's violations.

## II.    DEFENDANTS' FAILURE TO TRANSLATE PRE-ELECTION INFORMATION.

Section 203 requires that all pre-election information that is provided in English also be provided in Yup'ik and Gwich'in. *See* 42 U.S.C. §§ 1973aa-1a(b)(3)(A); 1973aa-1a(c); 28 C.F.R. § 55.15. This includes all information provided in pre-election materials mailed or otherwise disseminated to English-speaking voters. *U.S. v. Berks County*, 277 F. Supp.2d 570, 583 (E.D. Pa. 2003);[4] *Metro. Dade Cnty*, 815 F. Supp. at 1477-78. In particular, Section 203, applicable regulations, and court decisions require translation of pre-election information including:

- Voter registration notices, forms, and instructions, *see* 42 U.S.C. §§ 1973aa-1a(b)(3)(A); 1973aa-1a(c); 28 C.F.R. § 55.15; *Berks County*, 277 F. Supp.2d at 583; *Torres v. Sachs*, 381 F. Supp. at 309, 312-13 (S.D.N.Y. 1974); *Arroyo v. Tucker*, 372 F. Supp. 764, 767-68 (E.D. Pa. 1974);

- Information and applications for obtaining and absentee ballots, *see* 42 U.S.C. §§ 1973aa-1a(b)(3)(A); 1973aa-1a(c); 28 C.F.R. § 55.15; *Berks County*, 277 F. Supp.2d at 583;

- Information about alternative forms of voting, such as special needs ballots or questioned ballots, *see* 42 U.S.C. §§ 1973aa-1a(b)(3)(A); 1973aa-1a(c); 28 C.F.R. § 55.15; *Berks County*, 277 F. Supp.2d at 583;

- Ballot propositions or measures that appear on the ballot, including information in the official voter pamphlet, *see* 42 U.S.C. §§ 1973aa-

---

[4]    Many of the language assistance decisions such as *Berks County* pertain to claims under Section 4(e) of the VRA, on which Section 203 and its remedies are modeled. *See* S. Rep. No. 94-295, at 32-36 (1975).

1a(b)(3)(A); 1973aa-1a(c); *Metro. Dade Cnty*, 815 F. Supp. at 1477-78; *Arroyo*, 372 F. Supp. at 768; and

- Sample ballots, *see* 42 U.S.C. §§ 1973aa-1a(b)(3)(A); 1973aa-1a(c); 28 C.F.R. §§ 55.15, 55.19(a); *Berks County*, 277 F. Supp.2d at 583; *Arroyo*, 372 F. Supp. at 768.

The undisputed facts show that Defendants have failed to translate and disseminate this pre-election information to the Plaintiffs. Exh. 255. In *Metropolitan Dade County*, the court found that a jurisdiction's publication and dissemination of an English language voter information pamphlet was "covered under the plain language of Section 203 as 'assistance or other materials or information relating to the electoral process.'" 815 F. Supp. at 1478. Therefore, the State Defendants' failure to provide translations for *all of the information* in each pre-election voting material made available in English to voters, as shown through the lack of translations provided for in the *Nick* settlement, violates Section 203.

A.     **No audio and written translations of pre-election voting materials:**

The Official Election Pamphlet is the single most important voting material that the State distributes to voters before the election. At least one copy of the Pamphlet is mailed to each household on the voter registration list in advance of the election. *See* Alaska Stat. § 15.58.010. For the November 2012 General Election, the Pamphlet disseminated in the Dillingham and Wade Hampton Census Areas was 104 pages long and included:

(1) voting information such as polling place locations, acceptable voter identification, questioned ballot procedures, how to mark a ballot, language and voting assistance, voting on the touch-screen unit, assistance for hearing, sight, and other physically impaired voters, and the DOE's contact information to report questions or concerns;

(2) absentee and early voting information such as availability, instructions, applications, and absentee voting locations;

(3) special needs voting information;

(4) <u>candidate information</u> including their names, political party affiliation, statements, and the elected offices for which they are running;

(5) <u>sample ballots</u> that include all of the questions and offices on the ballot;

(6) <u>bond proposition ballot language</u> and the neutral Legislative Affairs summary of what the proposition would do;

(7) <u>ballot measure information</u> about the ballot measures, including their language, neutral Legislative Affairs summary, and the "for" and "against" statements; and

(8) <u>judicial candidate information</u> including a list of candidates, description of the judicial evaluation procedures, results, judicial council members, and their recommendations and reasons for each candidate

[SOF ¶ 7]

Prior to *Nick*, any pre-election information from the Pamphlet was provided through on-the-spot translations. [SOF ¶ 1] Judge Burgess granted the plaintiffs preliminary relief in part because the State "failed to . . . ensure that 'on the spot' oral translations of ballot questions are comprehensive and accurate." Order Granting Pls.' Mot. for Prelim. Inj. at 7-8, *Nick*, Dkt. 327.

The *Nick* settlement agreement required that DOE distribute several pre-election voting materials in Yup'ik, including:

(1) Yup'ik sample ballots, distributed to tribal council and outreach workers 30 days before an election;

(2) Audio and written versions of a "comprehensive Yup'ik/English glossary" of commonly used election terms, distributed to tribal councils;

(3) Radio ads in Yup'ik with information about State-conducted elections;

(4) Video broadcasts in Yup'ik on the Alaska Rural Communications Service (ARCS) with public notices about State-conducted primary and general elections;

(5) Touch-screen voting machines with Yup'ik audio that would provide "a clear, complete, and accurate Yup'ik translation of the English audio ballot";

7

(6) <u>English and Yup'ik text of the DOE's radio ads</u> aired on KYUK and KDLG, "with instructions for the outreach workers to broadcast those announcements over their village's VHF radio";

(7) <u>Yup'ik audio translation of candidate statements</u> except judicial candidates to be provided to tribal councils;

(8) <u>Yup'ik audio and written translations of "for and against" statements and neutral summaries</u> of ballot questions to be provided to tribal councils and outreach workers;

(9) <u>Yup'ik audio translations explaining special needs and absentee voting</u> to be provided to tribal councils 30 days before State-conducted elections;

(10)    <u>Yup'ik audio translations explaining voter registration</u> to the tribal councils; and

(11)    <u>List maintenance announcements in Yupik</u> to tribal councils and to outreach workers to announce over the village VHF radio in places that do not receive KYUK.

[SOF ¶ 4] In summary, the *Nick* settlement agreement identified the translations the State must provide for elections. [SOF ¶ 2]

Rather than simply applying the same scope of translations to other areas covered for Alaska Native languages, including the three areas where the Plaintiffs in this litigation reside, Defendants chose a different path. They limited application of the requirements of the *Nick* settlement agreement solely to the BCA. [SOF ¶ 3] DOE's first language coordinator had "election duties for the Bethel Census Area only" and no similar duties for the Dillingham or Wade Hampton Census Areas. [SOF ¶¶ 8-11] DOE's current language coordinator did not communicate with tribal councils in either of those two areas during his first three months on the job, even though he had election-related communications with villages in the BCA. [SOF ¶¶ 21-24]

Defendants' decision to limit the *Nick* remedies to the BCA has barred dissemination of Alaska Native translations of most pre-election English voting materials to other areas. DOE has

8

made that explicit by telling the language coordinator to send Yup'ik audio and written translations to the "BCA only" and "not other villages." [SOF ¶ 13]  For the 2012 elections, the language coordinator only sent the translations identified in the *Nick* settlement agreement to the BCA. [SOF ¶¶ 14-16, 17]  Permanent Absentee Voting ("PAV") locations were provided with no language assistance other than a sample ballot.[5]  [SOF ¶ 18]  Although the language coordinator sent a letter to PAV locations in the BCA informing them how to receive language assistance, she did not send that letter to other areas.  [SOF ¶ 12]  Audio and written translated versions of pre-election information are not provided before elections.  Instead, just three materials written in Yup'ik were sent to poll workers to use in providing oral translations on Election Day:  the Yup'ik sample ballot, the Yup'ik glossary, and "I voted" stickers.  [SOF ¶ 19]  A CD with an audio translation of the ballot language was also distributed solely for the poll workers to listen to.  [SOF ¶ 20]  Gwich'in-speaking voters and poll workers in Arctic Village and Venetie did not receive <u>any</u> audio or written translations of any voting materials of any kind.  [SOF ¶¶ 100-108]

**B.      No oral translations of pre-election voting materials:**

Oral language assistance at all stages of the registration and voting process is required to comply with Section 203.  *See* 42 U.S.C. §§ 1973aa-1a(b)(3)(A), 1973aa-1a(c); 28 C.F.R. § 55.12(c).  "Helpers," or what has been referred to in this case as "outreach workers" who communicate pre-election information, are persons who "provide oral assistance in the minority language."  28 C.F.R. § 55.20(c).  The State is required to give "sufficient attention to the needs" of LEP Alaska Native voters, ensuring that those voters receive the same voting information as English-speaking voters.  28 C.F.R. § 55.20(b).

---

[5] A Permanent Absentee Voting site is one with no pollworker or actual polling place on Election Day.  Instead, all voters in that location must vote absentee by mail.

9

Defendants' failure to provide audio and written materials has excluded Alaska Native voters outside of the BCA from the *Nick* relief: they receive no translations of voting materials before Election Day, unless a translator fortuitously happens to be available and has the skills to provide an on-the-spot translation for them. [SOF ¶ 25] There is absolutely no evidence that this has occurred anywhere. Outreach workers are supposed to provide complete and accurate translations of all pre-election voting information, including voter registration, absentee voting, ballot information and summaries, and the other topics included in the *Nick* settlement. [SOF ¶¶ 2, 4, 112] That rarely, if ever, happens in Plaintiffs' villages for two reasons.

First, DOE's own records establish that outreach workers have not been available to provide translations of most pre-election information since 2008. For the nine elections beginning with the 2008 General election and ending with the 2012 General election, DOE did not provide a worker to perform pre-election translations: (a) 75 percent of the time for villages in the Dillingham Census Area; (b) 63 percent of the time for villages in the Wade Hampton Census Area; and (c) 69 percent of the time for voters in Arctic Village and Venetie. [SOF ¶¶ 113-115] Defendants did not begin to take translation of pre-election information seriously until after Plaintiffs filed this litigation. For the October 1, 2013 REAA election, which occurred a little over three months after Plaintiffs filed their Complaint [*see* Dkt. 1], DOE provided pre-election translators in 40 percent of the villages in the Dillingham region, 62 percent of the villages in Wade Hampton, and in Venetie. [SOF ¶¶ 116-118] Notably, even with the Defendants' post-litigation efforts, they still failed to provide outreach workers for the 2013 REAA elections in 11 out of the 24 villages in Dillingham and Wade Hampton and in Arctic Village. [SOF ¶¶ 116-118]

Second, even when Defendants made outreach workers available to Plaintiffs' villages, these workers offered very limited pre-election information. The amount of information a voter receives depends entirely on the village in which he or she lives. [SOF ¶ 119] For example, in the

2013 REAA election, voters in Aleknagik (Dillingham area) could view a poster in English that notified voters when the outreach worker was available to provide registration and election information. On the other hand, voters in Hooper Bay (Wade Hampton) received that information *and* VHF announcements about voter registration, registration deadlines, and Election Day information. [SOF ¶ 116-118] None of the voters in Dillingham, Wade Hampton, and Yukon-Koyukuk received other important pre-election information that was translated for voters in the Bethel area, such as "for and against" statements, special needs information, absentee voting information, and VHF announcements about list maintenance (voter purges). [SOF ¶ 8-16, 17-25, 32-37, 39, 42-44, 46, 78-81, 82-84] This glaring dichotomy in how Native voters are treated in different areas is a direct result of Defendants' decision to limit the *Nick* relief to the BCA and to exclude large portions of the State. [SOF ¶¶ 3, 13]

C.    **Lack of pre-election publicity and information by radio:**[6]

Defendants are required to provide publicity about critical election information. *See* 28 C.F.R. §§ 55.18(b), 55.20(a); *Berks County*, 277 F. Supp. 2d at 583-84; *Torres*, 381 F. Supp. at 313; *Arroyo*, 372 F. Supp. at 768. Information that should be publicized includes "the display of appropriate notices, in the minority language, at voter registration offices, polling places, etc., the making of announcements over minority language radio or television stations, the publication of notices in minority language newspapers, and direct contact with language minority group organizations." 28 C.F.R. § 55.18(e). In *Nick*, preliminary injunctive relief was based in part on the State's failure to "provide print and broadcast public service announcements (PSA's) in Yup'ik." Order Granting Pls.' Mot. for Prelim. Inj. at 7, *Nick*, Dkt. 327. Despite this express

---

[6]    Defendants provided some pre-election information in Yup'ik through the Alaska Rural Communications Service. Although Defendants were required to do so under the *Nick* settlement agreement through the end of 2012 [SOF ¶ 4], they discontinued those announcements in 2010.

ruling in *Nick*, Defendants still do not provide pre-election publicity to Yup'ik-speaking voters in Dillingham and Wade Hampton and provide no publicity at all in Gwich'in.

Defendants broadcast public service announcements in Yup'ik on KDLG (Dillingham) and KYUK (Bethel). [SOF ¶ 4] However, a study concluded that 9,000 of the 28,000 residents in the Bethel, Dillingham, and Wade Hampton Census Areas are without public radio coverage. [SOF ¶ 109] At least eight villages reported to DOE that they do not have access to KDLG or KYUK: Chevak, Emmonak, Hooper Bay, Kotlik, Mountain Village, Nunam Iqua, Pilot Station, and Scammon Bay. [SOF ¶ 110] DOE's federal compliance supervisor admitted that if a village does not receive a radio signal from at least one of those two stations, voters in that village "probably wouldn't have information" through the translations they provide, including list maintenance procedures. [SOF ¶ 111] That is particularly true where Defendants fail to make available outreach workers in those villages with audio and written translations of pre-election information. Defendants' failure to provide Yup'ik and Gwich'in translations of pre-election publicity violates Section 203.

## III.    DEFENDANTS' LACK OF ELECTION DAY LANGUAGE ASSISTANCE.

Section 203 also requires that all Election Day information that is provided in English be provided in the covered Alaska Native languages, Yup'ik and Gwich'in. *See* 42 U.S.C. §§ 1973aa-1a(b)(3)(A); 1973aa-1a(c); 28 C.F.R. § 55.15. "One method of accomplishing this is to provide all notices, instructions, ballots, and other pertinent materials and oral assistance in the applicable minority language." 28 C.F.R. § 55.18(d). Besides being given access to the same information provided to voters in English, the Yup'ik and Gwich'in voters must be provided "clear, complete and accurate" translations of the information. 28 C.F.R. § 55.19(b). The undisputed facts show that Defendants have violated Section 203 by failing to provide Alaska

12

Native voters with the same information provided to English-speaking voters and failing to provide clear, complete, and accurate translations.

### A. No Gwich'in audio on touch-screen voting machines:

Ballots, including those on voting machines, must be translated into the covered language. *See* 42 U.S.C. §§ 1973aa-1a(b)(3)(A); 1973aa-1a(c); *see also* 28 C.F.R. § 55.19(d) (describing how translations must be provided on voting machines). In addition, Section 301 of HAVA requires that in elections for federal office, the voting machine must provide accessibility for voters with alternative language needs. Section 301 of HAVA became effective on January 1, 2006. *See* 42 U.S.C. § 15481.

Alaska acquired touch-screen voting units in 2004, purchasing the balance in 2005. The State has provided audio in English on its touch-screen voting units since using them for the primary and general elections in 2006 when there were federal offices on the ballot. Even though the touch-screen voting units are capable of accommodating up to nine languages, Defendants have not included Gwich'in audio on their voting machines for any election in Arctic Village or Venetie. [SOF ¶ 102] Defendants do not provide uniform translations of Gwich'in through other means, such as preparation of Gwich'in "sample ballots for use in the polling booths," 28 C.F.R. § 55.19(d), which could serve as an "aid to poll workers in translating ballot materials and instructions." No sample ballots have been written with Gwich'in translations of all ballot material for all elections held from 2004 through the 2013 REAA election. [SOF ¶¶ 103-108] Defendants' failure to provide audio Gwich'in translations of the ballot information and instructions violates Section 203.

### B. Lack of trained bilingual poll workers:

Section 203 requires the State to hire bilingual poll workers who "speak, read, write, and understand" both English and Yup'ik and, for the Yukon-Koyukuk, Gwich'in. *Arroyo*, 372 F.

13

Supp. at 768; *accord* 28 C.F.R. § 55.20(c); *Berks County*, 277 F. Supp.2d at 583-84; *Torres*, 381 F. Supp. at 313; *Puerto Rican Org. for Political Action (PROPA) v. Kusper*, 350 F. Supp. at 606, 612 (N.D. Ill. 1972). Bilingual poll workers must be trained and instructed in a "uniform way" so they are aware of "their proper functions," "the proper way to offer assistance," and proactive assistance without waiting until "the voter specifically request[s] such assistance." *Coalition for Educ. in Dist. One v. Board of Elections*, 370 F. Supp. 42, 52-53 (S.D.N.Y.).

In *Nick*, Judge Burgess found evidence supporting a Section 203 violation where the State failed to "ensure that at least one poll worker at each precinct is fluent in Yup'ik and capable of translating ballot questions from English into Yup'ik." Order Granting Pls.' Mot. for Prelim. Inj. at 7, *Nick*, Dkt. 327. The undisputed facts show the same is true in this case. DOE's records establish that translators have not been available in-person (that is, physically located in the polling place) during all hours the polls are open. In the primary and general elections held from 2008 to 2012, in-person translators who agreed to serve in that capacity were unavailable during all voting hours 48 percent of the time in the Dillingham Census Area and 22 percent of the time in the Wade Hampton Census Area. [SOF ¶¶ 92-99]

The lack of bilingual poll workers is compounded by the absence of mandatory training for those workers. The law requires that bilingual poll workers must be trained and instructed in a "uniform way" so they are aware of "their proper functions," "the proper way to offer assistance," and proactive assistance without waiting until "the voter specifically request[s] such assistance." *Coalition for Educ. in Dist. One v. Board of Elections*, 370 F. Supp. 42, 52-53 (S.D.N.Y.). Defendants' failure to "require mandatory training of poll workers . . . with specific instructions on translating ballot materials" constitutes a violation of Section 203. Order Granting Pls.' Mot. for Prelim. Inj. at 8, *Nick*, Dkt. 327.

14

DOE's own records show the following percentage of poll workers failed to attend in-person training:

- In the 2008 elections, 69 percent of the poll workers in the Dillingham Census Area and 50 percent of the poll workers in the Wade Hampton Census Area [SOF ¶¶ 85-86];

- In the 2010 elections, 64 percent of the poll workers in the Dillingham Census Area and 37 percent of the poll workers in the Wade Hampton Census Area [SOF ¶¶ 87-88];

- In the 2012 elections, 47 percent of the poll workers in the Dillingham Census Area and 46 percent of the poll workers in the Wade Hampton Census Area [SOF ¶¶ 89-90];

"Not many" of these poll workers may have been provided with some instructions by telephone. However, Defendants have no records of any such calls.[7] [SOF ¶ 91] Therefore, it is undisputed that Defendants failed to provide the required training to approximately half of all poll workers between 2008 and 2012. This absence of mandatory training is further evidence of Defendants' violations of Section 203.

C.    Failure to confirm bilingual poll workers' language abilities:

The State is required "to ensure that at least one poll worker at each precinct is fluent in Yup'ik [or Gwich'in] and capable of translating ballot questions from English into Yup'ik [or Gwich'in]." Order Granting Pls.' Mot. for Prelim. Inj. at 7, *Nick*, Dkt. 327. As DOE's current language coordinator admitted, confirmation of the language of bilingual poll workers is needed "[t]o be sure that the bilingual poll worker is proficient both in English and Yup'ik." [SOF ¶ 50] However, to date Defendants have not confirmed the language abilities of bilingual poll workers other than to "ask them" and "just take their word for it" or to place the onus on tribal councils to

---

[7]    Record keeping is a key obligation for the Defendants under Section 203. *See* 28 C.F.R. § 55.21; Order Granting Pls.' Mot. for Prelim. Inj. at 8, *Nick*, Dkt. 327 (finding that "the State lacks adequate records to document past efforts to provide language assistance to Alaska Native voters").

15

provide proficient translators. [SOF ¶¶ 51-56] Because of Defendants' failure to confirm the abilities of their bilingual poll workers, they have no evidence that the poll workers they used are able to provide "clear, complete, and accurate" translations of voting materials. 28 C.F.R. § 55.19(b).

**D.     Failure to provide bilingual poll workers with translations of election terms:**

DOE's voting materials have a high level of readability, making it difficult to translate those materials and very hard to read. [SOF ¶¶ 70-71] Exacerbating this difficulty, the State does not provide bilingual poll workers with translations of all election terms that they encounter on Election Day. Defendants do not distribute any Gwich'in written materials at all, and therefore have no materials that could be used as translation aids. [SOF ¶ 100] The Central Yup'ik glossary that Defendants give to bilingual poll workers in the Dillingham and Wade Hampton Census Areas was prepared in haste in 2009 and has not been edited since then to add more "'complete' translations." [SOF ¶¶ 65-67] As a result, the Yup'ik glossary does not contain translations for many election terms that appear in English language voting materials and instructions.

The current language coordinator identified several election terms in Election Day materials that he could not translate into Yup'ik because they are missing from DOE's Yup'ik glossary. When asked to translate on-the-spot the absentee vote by mail instructions and questioned ballot instructions—as poll workers currently must do—the language coordinator was unable to find Yup'ik translations for: "gray secrecy sleeve," "return mailing envelope," "identifier," "postmarked," "notary public," "authorized official," "questioned ballot," "regional district," and "counting board." [SOF ¶¶ 68, 72, 74-75] Without those translations, the language coordinator had to say the words in English, which he acknowledged that a Yup'ik voter who only speaks Yup'ik would not understand. [SOF ¶¶ 69, 73]

16

The language coordinator's inaccurate and incomplete translations show the "nearly impossible task" of on-the-spot translations, "especially when dealing with election jargon that does not have equivalent terms in the Yup'ik language." [SOF ¶ 73] For that reason, DOE's language coordinator admitted that a written translation of voting materials would assist bilingual poll workers in providing a complete and accurate translation of those materials, regardless of their own translation skills. [SOF ¶ 77] Defendants' failure to provide translations of any election terms in Gwich'in, and their failure to provide translations of all election terms that bilingual poll workers encounter when they provide on-the-spot translations, violates Section 203. *See generally* Order Granting Pls.' Mot. for Prelim. Inj. at 7-8, *Nick*, Dkt. 327 (finding a likelihood of Section 203 liability where the State failed to "ensure that 'on the spot' oral translations of ballot questions are comprehensive and accurate").

**E.      Inaccurate and Incomplete Yup'ik translations of voting materials:**

The absence of any evidence that pre-election and election day translations occurred *at all* establishes liability on the Section 203 claims. However, Defendants are also liable under Section 203 for failing to provide ***effective*** voting materials in the few instances where they are provided. 28 C.F.R. § 55.2(b)(1). Defendants' materials are not effective for two reasons: (1) the unrebutted evidence by Plaintiffs demonstrates that the translations were defective in numerous respects and (2) Defendants failed to accommodate all dialects, and thus any translations that were made were insufficient and ineffective. Each is discussed separately below, and each serves as a second and separate ground for liability under Section 203.

Under Section 203, "[i]t is essential that material provided in the language of a language minority group be clear, complete and accurate." 29 C.F.R. § 55.19(b). When Defendants have provided written translations for poll workers or voters in Yup'ik, their translations have been

17

inaccurate.[8]  DOE's translations of ballot measures have included typographical errors and literal translations into "Yup'ified English" that most people do not speak or write.  [SOF ¶¶ 78-79]  One ballot measure on the August 24, 2010 ballot included a Yup'ik word that voters would not know was meant to refer to "lobbying," which prevented voters from understanding the subject matter of the measure.  [SOF ¶ 80]  Another translation error on a different measure on that same ballot fundamentally altered the meaning of the measure:

> DOE's Central Yup'ik translation of the 09PIMA ballot measure . . . the parental consent for abortion measure, was inaccurately translated because it did not use the Yup'ik word for "abortion."  Instead, it used the term "before she is pregnant," which made the Yup'ik translation ask "about parental permission *to get pregnant*, not parental permission to have an abortion.  [SOF ¶ 81]

These critical translation errors resulted in large part from DOE's failure to comply with the *Nick* mandate that "[t]he State must consult with Yup'ik language experts to ensure the accuracy of all translated election materials."  Order Granting Pls.' Mot. for Prelim. Inj. at 11, *Nick*, Dkt. 327. Instead of using the entire Yup'ik Translation Panel to confirm the accuracy of translations, which was supposed to be done for actual ballot language, the language coordinator only sent the ballot measures to two Panel members.  [SOF ¶¶ 60, 61-62]

It appears Defendants have not taken their duty to provide accurate translations seriously. The Yup'ik Translation Panel provided for in *Nick* has not met in person to discuss translations or prepare voting materials since March 2009.  [SOF ¶ 59]  DOE does not recall sending the full Panel any sample ballots after 2010 to assist in the translation of those materials.  [SOF ¶ 63]  The current language coordinator had not communicated with any members of the Panel, including about the ballot and voting materials for the October 1, 2013 REAA elections.  [SOF ¶ 64]  No

---

[8]  Defendants have not identified any experts on translating the Yup'ik language, leaving the expert opinions of Dr. Walkie Charles unrebutted.

one reviewed the language coordinator's audio translation prepared for that election before he sent it out to the Dillingham Census Area. [SOF ¶ 58]

Two other disturbing examples illustrate the Defendants' indifference to the requirements under Section 203 and the *Nick* injunction while it was in place. In 2009, DOE's language coordinator admitted that she did not "think I have verified the last [public service announcement] from KYUK," even after she already had executed a sworn affidavit informing Judge Burgess that "I verified PSAs for the REAA run off election." [SOF ¶ 57] Also in 2009, DOE determined that the audio recording of absentee ballot procedures to be aired on KYUK (Bethel) and KDLG (Dillingham) inaccurately translated the term "absentee voting" as "to be voting for a long time." [SOF ¶ 82] DOE's language coordinator and the Yup'ik Translation Panel member who reviewed the translation, agreed that the translation error "throws the meaning of absentee voting off and makes it mean altogether different." [SOF ¶ 83] Despite that admission, DOE aired the erroneous translation anyway. The language coordinator downplayed the error, saying she did not "think it should cause too much confusion … We will be criticized by the plaintiffs if they catch it, but what the heck, it's a similar word and hope that it goes right over their heads! ☺" [SOF ¶ 84]

Defendants may not appreciate the importance of accurate translations, but Congress did in enacting Section 203's mandate. Defendants' failure to provide accurate translations of pre-election and Election Day voting materials and information violates Section 203. *See* 29 C.F.R. § 55.19(b).

The regulations for implementing Section 203 also specifically provide that for languages with more than one dialect, such as Yup'ik, a covered jurisdiction such as Alaska is required to provide translations in all dialects of that language. In particular, "the jurisdiction's obligation is to ascertain the dialects that are commonly used by members of the applicable language minority group in the jurisdiction and to provide oral assistance in such dialects." 28 C.F.R. § 55.13(a).

19

Defendants fail to do so, and the result is that the translations are often meaningless to the person receiving them.

DOE's federal compliance supervisor admits that Alaska "will have to provide assistance in several dialects of the covered language." [SOF ¶ 26] DOE likewise is aware that there is more than one dialect of Yup'ik. [SOF ¶ 27] The Central Yup'ik dialect is most commonly spoken in the BCA. [SOF ¶ 28] The Bristol Bay dialect is the most common dialect spoken in the Dillingham Census Area. [SOF ¶ 29] The Yukon dialect is the most common dialect in the Wade Hampton Census Area. [SOF ¶ 30] DOE officials acknowledge that voters have requested that voting materials and information be translated into dialects other than the Central Yup'ik dialect. [SOF ¶ 31]

Despite those voter requests, DOE "prepares one common written translation for all of [its] Yup'ik material, and that is Modern Central Yup'ik." [SOF ¶ 35] No written translations are provided in either the Bristol Bay or Yukon dialects of Yup'ik. [SOF ¶ 37] Neither of Defendants' language coordinators speaks those dialects, nor have they received any training on dialectical variations or how to identify words that need to be translated differently. [SOF ¶¶ 39-40, 43-44] No member of DOE's Yup'ik Translation Panel speaks the Bristol Bay or Yukon dialects. [SOF ¶¶ 41-42] Defendants require individual translators in the villages to make on-the-spot translations of all voting materials and information into the Yup'ik dialect spoken by voters in their village. [SOF ¶¶ 47-48] The quality of a translation into a different dialect of Yup'ik will depend entirely on the skills of the particular translator. [SOF ¶ 49]

Based upon Defendants' testimony, it is anticipated Defendants will argue they are only required to provide a translation into a single Yup'ik dialect statewide under another federal regulation. That regulation provides:

> *Language minority groups having more than one language.* Some
> language minority groups, for example, Filipino Americans, have more
> than one language other than English. A jurisdiction required to provide
> election materials in the language of such a group need not provide
> materials in more than one language other than English. The Attorney
> General will consider whether the language that is used for election
> materials is the one most widely used by the jurisdiction's voting-age
> citizens who are members of the language minority group.

28 C.F.R. § 55.12(a).

Defendants' argument fails for at least four reasons. First, the plain language of the regulation does not even refer to dialects; it refers to *languages*. It does not apply to the differences in word choice between the Central Yup'ik dialect and the Bristol Bay and Yukon dialects. The regulation's example makes clear in referring to Filipino Americans, that it simply is saying that for a group like Filipinos who may speak two languages—e.g., Tagalog and Spanish— that the covered jurisdiction need only provide written materials in "the one most widely used" by voting-age citizens from that group. *Id.* In sharp contrast, 28 C.F.R. § 55.13 explicitly refers to "dialects."

Second, the regulation makes clear that in identifying what "language" (not dialect) to use, consideration must be given to whether the "language that is used for election materials is the one most widely used by the *jurisdiction's* voting-age citizens who are members of the language minority group." 28 C.F.R. § 55.13(a) (emphasis added). For purposes of that analysis, that does not mean—as Defendants apparently argue—that they only have to use the most commonly spoken Yup'ik dialect in the State. Rather, Defendants must provide translations in the dialect that is "most widely used" by voting-age Alaska Native citizens in each jurisdiction that has been identified in its own right for coverage: the Dillingham Census Area and the Wade Hampton Census Area. *See* Dep't of Commerce, Bureau of the Census, Voting Rights Act Amendments of 2006, Determinations Under Section 203, 76 Fed. Reg. 63,602-63,603 (Oct. 13, 2011). By

Defendants' own admissions, the most common dialects in those areas are the Bristol Bay and Yukon dialects, respectively, and not Central Yup'ik. [SOF ¶¶ 29-30]

Third, Defendants have made it clear that any materials they prepare in written Yup'ik are not to be disseminated directly to voters. Instead, the written Yup'ik sample ballot and other materials such as the Yup'ik glossary are supplements for election workers and others to provide *oral assistance* to voters. [SOF ¶¶ 32-34] If that is true, then the requirements of the oral languages regulation control, and Defendants are required to "ascertain the dialects that are commonly used by members of the applicable language minority group in the jurisdiction and to provide oral assistance in such dialects" using the written aids that they prepare. 28 C.F.R. § 55.13(a). Defendants cannot have it both ways. If the Yup'ik sample ballot is not to be distributed to voters because it is only to provide oral assistance, then it must be provided to the translators offering that assistance in all dialects.

Fourth, Defendants have admitted that they have applied the written translation regulation to oral and audio translations as well. They acknowledge that all of their audio translations on CD are prepared in a single dialect of Yup'ik and not in the dialects spoken in the Dillingham and Wade Hampton villages. [SOF ¶ 36] Touch-screen voting machines likewise do not have audio instructions or ballot information in the Bristol Bay and Yukon dialects of Yup'ik. [SOF ¶¶ 45-46] Highlighting the contradictions in the State's flawed reasoning, Defendants *do* provide audio translations of voting information in at least two different dialects of the Inupiaq language, Seward Peninsula Inupiaq and Northern Inupiaq. [SOF ¶ 38] The reason Defendants do so is clear: because they are required to under 28 C.F.R. § 55.13(a). The same holds true for the Yup'ik dialects spoken in the Dillingham and Wade Hampton areas. Consequently, Defendants' failure to provide translations into those dialects violates Section 203.

## IV. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE IT IS UNDISPUTED THAT DEFENDANTS HAVE VIOLATED SECTION 203.

Six years after Judge Burgess granted LEP Yup'ik speaking voters an injunction against the State for violating Section 203 of the VRA, and four years after the *Nick* litigation was settled, Defendants have failed to follow the legal mandates from that case. Defendant Treadwell and federal compliance supervisor Shelly Growden, two of the key election officials responsible for implementing Section 203's mandate, do not even think they read Judge Burgess's twelve page injunction. [SOF ¶¶ 5-6] Consistent with their indifference to Section 203 and its requirements for LEP voters in other areas of Alaska, Defendants have arbitrarily limited the application of the *Nick* relief solely to the Bethel Census Area. [SOF ¶¶ 3, 8-11] Although evidence of Defendants' discriminatory intent is not needed to establish a violation of Section 203, it nevertheless is useful to explain why it is that many years after LEP voters were forced to sue the State that LEP Yup'ik and Gwich-in voters in other parts of Alaska have had to bring the same claims again in federal court.

The evidence of Defendants' Section 203 violations, which is drawn entirely from their own records and testimony, is overwhelming and undisputed. The recurrence of those violations such a short time after Judge Burgess found the same violations in the Bethel Census Area, as well as the Defendants' motivations behind those violations, should inform the Court's decision on the remedy. The only remaining issue to resolve at an evidentiary hearing is what relief is necessary to eradicate, once and for all, Defendants' violations of Plaintiffs' fundamental right to vote.

Accordingly, Plaintiffs respectfully request the Court enter an Order granting them summary judgment on:

(1) Section 203 liability for failure to provide any translations of the voting materials described in the chart at Exhibit 255 and in sections II and IIIA-D; and

(2) Section 203 liability for ineffective translations of the very few materials that were provided as described in Section IIIE.

All that remains is to schedule a hearing on the appropriate remedies to be imposed.

DATED this 4th day of April, 2014.

Respectfully submitted,

s/nlandreth

s/edougherty

Natalie A. Landreth (Bar no. 0405020)
Erin C. Dougherty (Bar no. 0811067)
**NATIVE AMERICAN RIGHTS FUND**
745 West 4th Avenue, Suite 502
Anchorage, Alaska 99501

James Thomas Tucker (*pro hac vice*)
Sylvia O. Semper (*pro hac vice*)
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
300 South Fourth Street, 11th Floor
Las Vegas, Nevada  89101

Richard de Bodo (*pro hac vice*)
**BINGHAM McCUTCHEN LLP**
1601 Cloverfield Boulevard, Suite 2050 North
Santa Monica, California 90404-4082

**Attorneys for Plaintiffs**

**Certificate of Service**

I hereby certify that on the 4th day of April 2014, a true and correct copy of the foregoing Motion for Summary Judgment was served electronically pursuant to the Court's electronic filing procedures upon the following:

Counsel for Defendants Mead Treadwell, Gail Fenumiai, Becka Baker, and Michelle Speegle:

**Elizabeth Bakalar**
Alaska Department of Law
Office of the Attorney General
P.O. Box 11300
Juneau, Alaska 99811-0300
libby.bakalar@alaska.gov

**Margaret Paton-Walsh**
Alaska Department of Law
Office of the Attorney General
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
margaret.paton-walsh@alaksa.gov

**s/jbriggs**

25