Natalie A. Landreth (Bar no. 0405020)
Erin C. Dougherty (Bar no. 0811067)
**NATIVE AMERICAN RIGHTS FUND**
745 West 4th Avenue, Suite 502
Anchorage, Alaska 99501
Phone:  (907) 276-0680
Fax:       (907) 276-2466
E-mail:  landreth@narf.org
              dougherty@narf.org

James Thomas Tucker (*pro hac vice*)
Sylvia O. Semper (*pro hac vice*)
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
300 South Fourth Street, 11th Floor
Las Vegas, Nevada 89101
Phone:  (702) 727-1400
Fax:       (702) 727-1401
E-mail:  james.tucker@wilsonelser.com
              sylvia.semper@wilsonelser.com

Rich de Bodo (*pro hac vice*)
**BINGHAM McCUTCHEN LLP**
1601 Cloverfield Boulevard, Suite 2050 North
Santa Monica, California 90404-4082
Phone:  (310) 255-9055
Fax:       (310) 907-2055
E-mail:  rich.debodo@bingham.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MIKE TOYUKAK et al,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br><br>MEAD TREADWELL, et al,<br><br><br><br>　　　　　　　Defendants. | Case No. 3:13-cv-00137-JWS<br><br>**Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment** |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT.............................................................................1

II.  UNDER THE VOTING RIGHTS ACT AND RELATED REGULATIONS, THE
     STATE MUST PROVIDE EFFECTIVE LANGUAGE ASSISTANCE. ...........................2

     A.   The State Must Provide Yup'ik and Gwitch'in Language Assistance For All
          Voting Materials In The Wade Hampton, Dillingham, And Yukon-Koyukak
          Census Areas.....................................................................................................2

     B.   Bilingual Language Assistance Must Be Effective In Order To Satisfy
          Section 203.......................................................................................................4

     C.   At A Minimum The State Must Provide The Language Assistance The
          Court Ordered And The Settlement Agreement Set Forth In Nick v. Bethel. ..........7

III. DEFENDANTS HAVE FAILED TO PRESENT UNDISPUTED FACTS
     SHOWING THAT IT HAS IMPLEMENTED AN EFFECTIVE LANGUAGE
     ASSISTANCE PROGRAM..............................................................................9

          1.   Recruitment and training of bilingual poll workers and bilingual
               outreach workers. ..........................................................................11

          2.   Yup'ik voter registration and election announcements and posters............17

          3.   Yup'ik sample ballot and glossary of election terms to be used by
               poll workers...................................................................................21

          4.   Yup'ik translation panel to verify ballot measure translations. .................25

          5.   Yup'ik language assistance toll-free number.............................................28

          6.   Language assistance logs .................................................................28

          7.   Yup'ik audio ballots on touch-screen voting machines .............................30

          8.   Post-election assessments and surveys ..................................................30

          9.   Full-time Yup'ik Language Assistance Coordinator ..................................33

IV.  CONCLUSION...............................................................................................40

Case 3:13-cv-00137-SLG   Document 74   Filed 04/26/14   Page 2 of 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apache County v. United States,*
  Civil Action No. 77-1515...................................................................................2, 3

*Apache Cty. High Sch. Dist. No. 90 v. United States,*
  (D.D.C. filed June 12, 1980) ...................................................................................3

*Barcamerica Intern. v. Tyfield Importers, Inc.,*
  289 F.3d 589 (9th Cir. 2002)...................................................................................9

*Chinese for Affirmative Action v. Leguennec,*
  580 F.2d 1006 (9th Cir. 1978)...................................................................................5

*Doi v. Bell,*
  449 F. Supp. 267 (D. Haw. 1978) ...................................................................................31

*Foster v. Arcata Associates,*
  772 F.2d 1453 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89
  L.Ed.2d 576 (1986) ...................................................................................10

*Nick v. Bethel,*
  Case No. 3:07-cv-00098-TMB ...................................................................................*passim*

*Radobenko v. Automated Equipment Corp.,*
  520 F.2d 540 (9th Cir.1975)...................................................................................10

*U.S. v. Metro. Dade Cnty.,*
  815 F. Supp. 1475 (S.D. Fla. 1993) ...................................................................................4

**Statutes**

42 U.S.C. § 1973aa–1a(a) ...................................................................................2

42 U.S.C. § 1973aa-1a(a) ...................................................................................4

42 U.S.C. § 1973aa-1a(b)(1) ...................................................................................3

42 U.S.C. § 1973aa-1a(c) ...................................................................................2

Voting Rights Act ...................................................................................1

Section 203 of the Voting Rights Act. ...................................................................................*passim*

VRA ...................................................................................1, 2, 4

1

**Other Authorities**

28 C.F.R. § 55.2(b) ...............................................................................................................4

28 C.F.R. § 55.2(b)(1) ...........................................................................................................7

28 C.F.R. § 55.12(a) .............................................................................................................21

28 C.F.R. § 55.13 ..................................................................................................................21

28 C.F.R. § 55.15 ..................................................................................................................4

28 C.F.R. § 55.16 ..................................................................................................................4

28 C.F.R. § 55.17 ..................................................................................................................7

28 CFR. 55.2(c) .....................................................................................................................6

H.R. Rep. No. 102-655, at 9 (1992) ......................................................................................7

http://www.ntia.doc.gov/ptfp/coverage/ak.htm] ...................................................................19

S. Rep. No. 94-295, 1t 69 (1975) ..........................................................................................7

S. Rep. No. 94-295, at 39 (1975) ..........................................................................................7

Case 3:13-cv-00137-SLG   Document 74   Filed 04/26/14   Page 4 of 48

# I. Preliminary Statement.

Defendants have asked the Court to enter summary judgment because they claim they have tried very hard to provide language assistance to Alaska Native voters. But Defendants are wrong that the law only requires a good college try to satisfy the Voting Rights Act ("VRA"). Moreover, Defendants' factual assertions regarding the efforts they have purportedly made are unsupported, distorted, and contradicted. Thus, Plaintiffs respectfully request the Court to deny Defendants' motion in its entirety.

The basic premise of Defendants' motion is that there are no clear standards under the VRA and the State can do whatever it pleases to comply as long as it seems to be making a good effort. This is not true. The regulations and decisions relating to the VRA are clear and unambiguous. They establish a single standard demanding that the State implement programs that are *effective*. Although Defendants cite to the effectiveness standard, they ask the Court to ignore it, as they apparently have in their Motion. Defendants present numerous programs in their opening papers, and detail what the programs entail. But Defendants' motion is bereft of any argument or evidence that these efforts have been effective for limited-English proficient voters. The explanation for that is simple: no such evidence exists. The State's own documents and admissions by its election officials show that the voters in the jurisdictions at issue are not provided with translations for most pre-election and Election Day activities. As such, Defendants are liable under Section 203 because their language program (to the extent there even is one in many villages) is *per se* ineffective.

Plaintiffs are not asking Defendants to reinvent the wheel when it comes to language assistance. The *Nick v. Bethel* case involved the same defendants as here and concerned one of the same Native languages at issue here (Yup'ik). This case concerns in part the two geographic areas adjacent to and in close proximity to (in some cases, just a few miles apart) the jurisdiction at issue in *Nick*. In that case, Judge Burgess granted the plaintiffs' motion for a preliminary injunction, and ordered the State to comply with numerous requirements. A settlement was subsequently reached

1

that provided further detail about the language assistance that should be offered to meet the "effectiveness" standard described in Judge Burgess's preliminary injunction.[1] Inexplicably, Defendants have refused to simply extend the *Nick* relief to other jurisdictions. That essentially is what Plaintiffs are asking this Court to do: to extend *Nick* to the Wade Hampton, Dillingham, and Yukon-Koyukak Census Areas. This will result in a uniform program of language assistance for all Yup'ik and Gwich'in-speaking voters in Alaska.

## II. Under The Voting Rights Act And Related Regulations, The State Must Provide *Effective* Language Assistance.

## A. The State Must Provide Yup'ik and Gwtich'in Language Assistance For All Voting Materials In The Wade Hampton, Dillingham, And Yukon-Koyukak Census Areas.

In 1975, Congress amended the VRA to require bilingual or multilingual election procedures in certain states. Congress took this action after expressly finding that, "through the use of various practices and procedures, citizens of language minorities have been effectively excluded from participation in the electoral process."[2]

To remedy this voting discrimination, Congress enacted the Bilingual Election Requirements of Section 203, which provides that when any covered jurisdiction "provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, ***it shall provide them in the language of the applicable minority group*** as well as in the English language."[3] With respect to "Alaskan natives," if the "predominant language is historically unwritten, the State or political subdivision is only required to furnish oral instructions, assistance, or other information relating to registration and voting."[4]

Even if a language is found to be historically unwritten, a covered jurisdiction such as Alaska must still offer accurate and complete translations of all voting materials at the same time it

---

[1] *Nick*, Docket nos. 327, 788-2.

[2] 42 U.S.C. § 1973aa–1a(a).

[3] 42 U.S.C. § 1973aa-1a(c) (emphasis added).

[4] 42 U.S.C. § 1973aa-1a(c).

disseminates them in English.[5]  In the *Apache County* decision, the three-judge court determined that the Navajo language assistance available at the polls during the election did not provide translations of all voting materials. Publications disseminated in English and Spanish "did not communicate the election or the issues involved to the vast majority of Navajos who do not speak or read either of those languages." *Id.* at 3.  Unlike English language voters, "at no time prior to the date of the election was anyone fluent in Navajo briefed regarding the election issue." *Id.* (emphasis added). "While provisions were made for absentee voting, these provisions were never spelled out in Navajo." *Id.* No one was available to answer questions in Navajo about absentee voting. *Id.* at 3-4. The county did not consider disseminating pre-election information in Navajo. *Id.* at 4.  This "failure to disseminate information regarding the bond election also violated the [Voting Rights] Act." *Id.* at 14. The court observed that "voting" required "all action necessary to make the vote ***effective***." *Id.* (quoting *Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 37 (1978)) (emphasis added).  Failing to provide information orally in the covered Native language at the same time it was provided in English violated the counterpart to Section 203 of the Voting Rights Act.[6] *Id.*  Judge Burgess ordered similar relief in the *Nick* litigation, requiring that written translations be prepared and confirmed by a qualified translation panel to ensure that oral translations were effective.[7]  Regardless of whether a minority group's language is historically written or unwritten, ***all*** covered jurisdictions are required to provide bilingual language assistance: "no covered State or political subdivision shall provide voting materials only in the English language."[8] "Voting materials" is broadly construed to apply to all stages of the electoral process, including "voter registration through activities related to conducting elections, including, for example the issuance, at any time during the year, of notifications, announcements, or other

---

[5] *See Apache County v. United States*, Civil Action No. 77-1515, mem. op. (D.D.C. June 12, 1980) (three-judge court) (included here as Exh. 325).

[6]  *See also United States v. Arizona*, civil action no. 88-1989 (D. Az. Filed May 22, 1989) (describing similar requirements) (included here as Exh. 326).

[7] *See Nick*, Dkt. 327, at 10-11.

[8] 42 U.S.C. § 1973aa-1a(b)(1).

informational materials concerning the opportunity to register, the deadline for voter registration, the time, places and subject matters of elections, and the absentee voting process."[9]

It is undisputed that the Wade Hampton, Dillingham, and Yukon-Koyukak Census Areas are covered jurisdictions under Section 203 subject to the language assistance requirements of Section 203 of the VRA.[10] Thus, Defendants must provide translated voting materials and oral assistance in Yup'ik and Gwich'in for limited-English proficient ("LEP") voters these Census Areas.

**B. Bilingual Language Assistance Must Be *Effective* In Order To Satisfy Section 203.**

Compliance with Section 203 is measured against two standards: "(1) That materials and assistance should be provided in a way designed to allow members of applicable language minority groups to be ***effectively informed of and participate effectively*** in voting-connected activities; (2) That an affected jurisdiction should take all reasonable steps ***to achieve that goal***."[11]

Although Defendants acknowledge that compliance with Section 203 is measured against these two standards, they completely ignore the ***effectiveness*** requirement. Defendants fail to present any evidence in their Motion indicating that the language assistance the State provides is ***effective***. Instead, Defendants' motion concerns only their alleged "reasonable steps" and summarily concludes that their purported efforts to provide language assistance are sufficient to demonstrate compliance with Section 203.[12]

Defendants miss the point. The touchstone for measuring compliance with the requirements of Section 203 is ***effectiveness***. That a covered jurisdiction can show it has made some efforts to comply with Section 203 is not sufficient to show compliance; rather, compliance "is best measured by ***results***" and "effectiveness."[13] As the Ninth Circuit has recognized, even a good faith

---

[9] 42 U.S.C. § 1973aa-1a(a); *U.S. v. Metro. Dade Cnty.*, 815 F. Supp. 1475, 1478 (S.D. Fla. 1993); 28 C.F.R. § 55.15.

[10] *See* Docket 60 at 3, Exhibit A.

[11] 28 C.F.R. § 55.2(b) (emphasis added).

[12] Docket 47 at 16-18, 36-37.

[13] 28 C.F.R. § 55.16 (emphasis added) (standard and proof of compliance with Section 203(c)); *see id.*

4

effort of compliance – what the Defendants have essentially argued in by claiming that they need only take "reasonable steps" – is no defense to federal voting rights claims.[14] Thus, the State's laundry list of its purported language assistance efforts is not enough to demonstrate its compliance with Section 203. Rather, the State's wholesale failure to address whether its efforts are effective requires as a matter of law that the State's Motion be denied.

Judge Burgess described at length that ***effectiveness*** is the polar star for evaluating a Section 203 claim:

> Compliance with the VRA's bilingual provisions is measured by an "***effectiveness***" standard. The critical question is whether materials are provided in such a way that voters from applicable language groups are "effectively informed of and participate effectively in voting-connected activities" and whether a covered jurisdiction has taken "all reasonable steps to achieve that goal." In addition, the U.S. Attorney General has issued regulations on oral assistance and election-related publicity, which state:
>
> > (a) General. Announcements, publicity, and assistance should be given in oral form to the extent needed to enable members of the applicable language minority group to participate effectively in the electoral process.
> >
> > (b) Assistance. The Attorney General will consider whether a jurisdiction has given sufficient attention to the needs of language minority group members who cannot effectively read either English or the applicable minority language and to the needs of members of language minority groups whose languages are unwritten.
> >
> > (c) Helpers. With respect to the conduct of elections, the jurisdiction will need to determine the number of helpers (i.e., persons to provide oral assistance in the minority language) that must be provided. In evaluating the provision of assistance, the Attorney General will consider such facts as the number of a precinct's registered voters who are members of the applicable language minority group, the number of such persons who are not proficient

---

[14] *Chinese for Affirmative Action v. Leguennec*, 580 F.2d 1006, 1008-09 (9th Cir. 1978).

in English, and the ability of a voter to be assisted by a person of his or her own choice.[15]

[16]In describing the clear standard for Section 203 compliance summarized in the Department of Justice regulations, Judge Burgess emphasized that the effectiveness of language assistance – not the extent of efforts taken by a covered jurisdiction – was the "basis standard." *Id.*

Judge Burgess likewise was unpersuaded by the Defendants' contention that whatever steps they took to provide language assistance was controlling and could not be second-guessed by plaintiffs seeking to "interfere" with their choices.[17] In particular, Defendants purported to rely upon Justice Department guidance providing, "The determination of what is required for compliance with section 4(f)(4) and section 203(c) is the responsibility of the affected jurisdiction. These guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction."[18] Judge Burgess rejected the Defendants' argument, citing to the effectiveness standard and evidence similar to what has been presented here of Defendants' lengthy history of failing to meet it. As Judge Burgess explained in granting plaintiffs' motion for a preliminary injunction, "the evidence of past shortcomings justifies the issuance of injunctive relief to ensure that Yup'ik-speaking voters have the means to **fully participate** in the upcoming State-run elections".[19] "Effectiveness," not the "reasonable steps" taken to achieve the goal of effectiveness, is what controls.

---

[15] ***The basic standard is one of effectiveness.***

[16] *Nick* Dkt. 327, pp. 6-7 (emphasis added) (citing to 28 §§ CFR 55.2, 55.20)

[17] *Nick* Dkt. 249, at 3-4, 6, 18

[18] 28 CFR. 55.2(c)

[19] *Nick* Dkt. 327, pp. 8-9 (emphasis added)

6

Defendants also suggest that "targeting" is part of the standard for assessing compliance under Section 203.[20] "Targeting" is one measure that can be used in certain circumstances to identify the location of LEP voters who need language assistance. Targeting allows a covered jurisdiction to comply with the bilingual election requirements by providing bilingual materials and assistance "only to the language minority citizens and not to every voter in the jurisdiction."[21] However, targeting does not alter the overarching standard of effectiveness. As the Senate Judiciary Committee made clear in its 1975 report, targeting is permissible <u>if it provides language minorities with **effective assistance**</u>.[22] The House Judiciary Committee similarly explained that the touchstone for targeting is whether "it is designed and implemented in a manner that ensures that all members of the language minority who need assistance, receive assistance."[23] As the Justice Department regulations explain, "a targeting system will normally fulfill the Act's minority language requirements if it is designed and implemented in such a way that language minority group members who need minority language materials and assistance receive them."[24] Thus, while targeting may be one measure that a jurisdiction takes to identify and provide language assistance, it does not supplant the controlling standard that assistance must be offered for all voting materials such that limited-English speaking voters are "effectively informed of and participate effectively in voting-connected activities."[25]

---

[20] Targeting is a red-herring in this case because Defendant Baker, the official responsible for administering language assistance in the Dillingham and Wade Hampton Census Areas, testified that all villages in those areas require language assistance because they have limited-English proficiency rates of five percent or higher. Exh. 324, Baker Dep., pp. 55-56.

[21] S. Rep. No. 94-295, at 39 (1975).

[22] S. Rep. No. 94-295, 1t 69 (1975) (emphasis added)

[23] H.R. Rep. No. 102-655, at 9 (1992)

[24] 28 C.F.R. § 55.17.

[25] 28 C.F.R. § 55.2(b)(1).

**C.  At A Minimum The State Must Provide The Language Assistance The Court Ordered And The Settlement Agreement Set Forth In *Nick v. Bethel*.**

Defendants admit in their motion that the "bulk of this case is about Yup'ik language assistance that the State of Alaska provides to limited-English proficient voters in the Dillingham and Wade Hampton Census Areas of the state."[26] Thus *Nick*, a Section 203 violation case involving LEP Yup'ik-speaking voters in the Bethel Census Area, is highly instructive here.  Both this case and *Nick* involve the same defendants and similarly-situated plaintiffs.  Moreover, the *Nick* Yup'ik speakers reside in the region immediately adjacent to the Dillingham and Wade Hampton Census Areas at issue in this case.  In fact the two Yup'ik speaking areas at issue in this case are immediately north and south of the Bethel Census Area.

Here, Plaintiffs seek similar language assistance to what Defendants agreed to provide to Yup'ik-speaking voters pursuant to the 2010 settlement agreement in *Nick*.  In *Nick*, Plaintiffs sought a preliminary injunction requiring Defendants to adopt certain measures related to the minority language and voter assistance rights guaranteed under Section 203.  Judge Burgess issued the requested injunctive relief.  In his order, Judge Burgess reiterated that "[c]ompliance with the VRA's bilingual provisions is measured by an '***effectiveness' standard***" and that the "critical question is whether materials are provided in a such a way that voters from applicable language groups are 'effectively informed of and participate effectively in voting-connected activities' and whether a covered jurisdiction has taken 'all reasonable steps to achieve that goal.'"[27]  The *Nick* parties ultimately reached a court-approved settlement that incorporating the specific relief ordered by Judge Burgess.[28]

Inexplicably, the State has refused to extend the *Nick* protections to villages in the Wade Hampton, Dillingham, and Yukon-Koyukak Census Areas.  The State's refusal to provide this language assistance is especially troubling considering the close proximity to and the shared

---

[26]  Docket 47 at 2.

[27]  Order Granting Pls.' Mot. For Prelim. Inj. At 6-7, *Nick*, Docket 327 (quoting 28 C.F.R. §§ 55.2, 55.20).

[28]  *Nick,* dkt. no. 788-2.

Yup'ik language of the "bulk" of the LEP voters in these villages to the LEP voters in *Nick*. There can be no rational basis for treating these similarly-situated LEP Yup'ik-speaking voters differently from the LEP Yup'ik-speaking voters in *Nick*, and the State does not even attempt to explain its disparate treatment of these voters. And although the Native voters in the Yukon-Koyukuk Census Area speak a different language, there would be no rational basis for treating them differently either. In any event, Defendants make no attempt to explain this disparate treatment.

## III.    Defendants Have Failed To Present Undisputed Facts Showing That It Has Implemented An *Effective* Language Assistance Program.

It is commonplace for parties to file cross-motions for summary judgment, as they have done here. What makes this case different from the norm, however, is that virtually all of the evidence cited in support of the Parties' respective motions comes from Defendants. As detailed in Plaintiffs' Motion for Summary Judgment and accompanying Statement of Undisputed Facts, Plaintiffs have drawn nearly every salient fact from Defendants' records and the testimony of Division of Elections officials. The testimony of Plaintiffs is superfluous and is sparingly used.[29]

Against the weight of their own documents and sworn testimony establishing their liability, Defendants purport to avoid summary judgment by two tactics. First, Defendants' counsel makes at least fifteen broad factual statements without any factual support whatsoever. Such unsupported statements cannot be considered. "[T]he arguments and statements of counsel 'are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment.'"[30] [31]  Second, Defendants have submitted an affidavit from the Division's

---

[29]    For the court's convenience Plaintiffs have identified the few instances where their own testimony is cited in the accompanying Statement of Disputed Facts with an asterisk (*). All documents without an asterisk are Defendants' own.

[30]    *Barcamerica Intern. v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) (quoting *Smith v. Mack Trucks*, 505 F.2d 1248, 1249 (9th Cir. 1974) (per curiam))

9

Federal Compliance Supervisor, Shelley Growden, which contains statements for which Ms. Growden admitted under oath that she lacked personal knowledge and which contradict the testimony of her own subordinates. Such a "sham affidavit" intended to contradict prior sworn testimony of Defendants' witnesses with personal knowledge is insufficient as a matter of law to create a disputed question of fact.[32] Quite simply, Defendants cannot create a factual dispute to defeat Plaintiffs' well-founded Motion for Summary Judgment by disagreeing with themselves. The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.[33] "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of **summary judgment** as a procedure for screening out sham issues of fact."[34] The same rationale applies when the supervisor purports to replace the testimony of her subordinates.

Failing to identify any disputed questions of fact that are based upon admissible evidence, Defendants assert that there is a disputed question of law. Plaintiffs have asked the Court to apply the clear legal standard employed by this Court in the *Nick* case and in all other Section 203 cases: effectiveness, as described in detail above. In sharp contrast, Defendants seek to manufacture their own legal standard – and one which they did not even suggest in *Nick* – that would lower the

---

[31] Also for the Court's convenience, all counsel statements in the Statement of Disputed Facts are paired with the following notation: "NO CITATION. Statements of counsel are not evidence."

[32] *See Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.,* 397 F.3d 1217, 1225-6 (9th Cir. 2005) (describing "sham affidavit" in context of deposition corrections).

[33] . *See Foster v. Arcata Associates,* 772 F.2d 1453, 1462 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 543-44 (9th Cir.1975).

[34] *Foster,* 772 F.2d at 1462; *Radobenko,* 520 F.2d at 544(quoting *Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969)).

Section 203 standard to merely "reasonable efforts." Resolving this singular disputed question of law requires consideration of no evidence. Rather, the Court simply needs to apply the legal standard already set forth by Judge Burgess and then examine the extent to which, if any, the relief agreed to in *Nick* is being offered in the Wade Hampton and Dillingham Census Areas. That standard can be readily applied using the undisputed evidence provided by Plaintiffs from Defendants' own documents and testimony.

Application of the correct legal standard to the admissible evidence provided by Defendants themselves establishes that in each of the nine categories of requirements raised by Defendants, Plaintiffs have established liability. At a bare minimum, Defendants have failed to establish the absence of a disputed fact entitling them to summary judgment. Each of those areas will be discussed in turn.

**1. Recruitment and training of bilingual poll workers and bilingual outreach workers.**

In *Nick*, the Court found that in order for the required "voting materials" to be "uniform, complete and accurate," they had to be in writing.[35] Written sample ballots, text of radio ads, a glossary of election terms, and translations of the pro/con and neutral summaries accompanying ballot measures were required, and agreed to, specifically because it was shown to be impossible for a poll worker to translate these and other election materials on the spot. In *Nick,* Jude Burgess saw first-hand just how differently a ballot measure translation could turn out if you asked two people to translate it on-the-spot.[36] [37] Plaintiffs unrebutted expert in this case, Dr. Walkie Charles,

---

[35] *See e.g. Nick,* case no. 3:07-cv-00098 (TMB), Order Granting Preliminary Injunction, dkt 327.

[36] *See Nick,* case no 3:07-cv-00098 (TMB), Pls.' Exh. 177, Leonard Dec. ¶¶ 85-86 and Attachs. J, L-O.

agrees. Exh. 328, Charles Depo. at 140-141 (describing how you would translate a ballot measure). Consequently, the question of whether having bilingual poll workers alone is enough is a dead issue. It is not. Effective language assistance is not provided by the mere presence of a bilingual poll worker, particularly one who is untrained, inexperienced in translations, and who may not even be physically present in the polling place.

Despite Judge Burgess's rulings in *Nick*, Defendants persist in asserting that training is mandatory and untrained workers are the exception and not the rule. Defendants' own records tell a far different story. In 2008, fully 69 percent of the poll workers in the DCA and 50 percent of those in the WHCA did <u>not</u> attend training. In 2010, the numbers improved marginally to 64 and 37 percent, respectively. In 2012, the DCA improved to 47 percent not trained but the WHCA declined to 46 percent not trained. DSOF ¶ 2. Defendants have contended that the number is more favorable because of phone training or video training, but they have maintained no records – despite the admonishment by Judge Burgess of the import of such records in *Nick* – that support their assertion. Moreover, the video "training" itself contains a mere 6 minutes on language assistance. DSOF ¶ 1.

Defendants do not fare any better in staffing the polls with bilingual outreach workers before Election Day. According to the Defendants' own records and described in detail with supporting Bates numbers in Exhibits 221-229, from the 2008 General Election to the 2012 General Election, a translator was <u>not</u> provided to offer translations of pre-election voting materials and information 75 percent of the time in the DCA. DSOF ¶ 4. The same statistic for the WHCA is 63 percent. DSOF ¶ 4. This means the vast majority of the time there was no bilingual outreach worker to help voters register, read any radio ads in Yup'ik (if even provided),

---

[37] For the Court's convenience, Plaintiffs are attaching these materials here as Exhibit 327. Plaintiffs have included at the front three pages from their oral argument Powerpoint that place the ballot measure language side by side.

translate ballot measures or any of the accompanying information, read candidate statements or help secure absentee ballots.

Defendants' Election Day staffing of bilingual poll workers likewise is grossly deficient. From 2008 to 2012, translators were not available at DCA polling places in-person during all hours of the election 48 percent of the time. DSOF ¶ 6. From 2008 to 2012, in the WHCA, in-person translators were unavailable during all election hours 22 percent of the time. DSOF ¶ 6. Under any standard, the lack of pre-election and Election Day trained translators violates Section 203. DSOF ¶ 1-9.

| 1. | "In 2010, the Division developed training videos about language assistance that are included with all election supplies sent to poll workers to that poll workers who do not attend in-person training can be trained by video." (MSJ p. 20) | • DISPUTED<br>• The DOE does not keep records about who, if anyone, has watched or been trained by the video instead of attending in-person training. At least, no such records have been provided.<br>• This segment about language assistance in this video is 6 minutes long and contains little information. Exh. 299. Instead it tells the workers to refer to the language assistance packets. *Id.*<br>• Training video used "mostly in the Bethel Census Area." Exh. 301 (SOA 011322). |
|---|---|---|
| 2. | "Although in-person training attendance is mandatory for all pollworkers, including bilingual poll workers …" (MSJ at 20) | • DISPUTED<br>• In 2008, 69 percent of DCA poll workers and 50 percent of WHCA poll workers did not attend in-person training. Exh. 217<br>• In 2010, 64 percent of DCA poll workers and 37 percent of WHCA poll workers did not attend in-person training. Exh. 219<br>• In 2012, 47 percent of |

| | | DCA poll workers and 46 percent of WHCA poll workers did not attend in-person training. Exh. 220 |
|---|---|---|
| 3. | "bringing workers to various rural hub locations for in-person training in early May of every even-numbered year; the difficulties involved in bringing poll workers to in-person training due to weather" (MSJ at 21) | • DISPUTED<br>• No evidence of any in-person trainings in WHCA. Exh. 302, Baker Dep. 117:1-3.<br>• Only training in entire Yup'ik speaking area of the state is Bethel. *Id.*<br>• Only training in DCA is in Dillingham. *Id.*<br>• The language coordinators and other DOE employees have not traveled to any of the villages in the Dillingham and Wade Hampton Census Areas to provide election outreach or to be present in precincts on Election Day. Exh. 303, Wassilie Dep., 56:2-9, 178:7-13, 179:3-8; *see also* Exh. 302, Baker Dep., 67:11-68:7, 75:21-76:22; Exh. 304, Fenumiai Dep., 41:4-13; Exh. 305, Growden Dep., 38:17-39:11, 69:7-10, 79:24-80:13, 91:13-93:8; Exh. 306, Jackson Dep., 83:18-84:4; Exh. 307, Speegle Dep., 87:1-7.<br>• Plaintiffs' unrebutted expert has recommended actual hub trainings in locations such as Emmonak and Chevak for reasons explained in his declaration. Exh. 143, para 26. |
| 4. | "The Division provides all bilingual outreach with the text of [election announcements] in both Yup'ik and English, and has done so for each state-conducted election since 2010." (MSJ at 22) | • DISPUTED<br>• As late as 2012, Becka Baker admitted in an email, "I'm pretty sure that I only sent the Yup'ik ads and samples to the BCA outreach workers." In this same email chain, Sheley Growden says of Emmonak, "since they are not in BCA, Dorie |

| | | doesn't send them anything." Exh. 308 (SOA 005846). |
| | | |
| | | <u>Both Yup'ik language assistance coordinators testified that they performed almost no work at all for the WHCA or DCA:</u> |
| | | • When the first language coordinator was told to send voting and outreach materials to the Bethel Census Area only, then those materials were "for BCA only" and "not other villages." Exh. 303, Wassilie Dep., 51:21-52:1, 159:16-161:17 & Exh. 195] |
| | | • DOE's first language coordinator does not recall spending any time working on language assistance in villages located in the Dillingham and Wade Hampton Census Areas. Exh. 303, Wassilie Dep., 58:3-10; *see also* Wassilie Dep., 32:15-20. |
| | | • DOE's first language coordinator had "election duties for the Bethel census area only." Exh. 303, Wassilie Dep., 133:19-23; *see also* Wassilie Dep., 133:1-5. |
| | | • DOE's first language coordinator did not have any election duties for either the Dillingham Census Area or the Wade Hampton Census Area. Exh. 303, Wassilie Dep., 134:13-19. |
| | | • The current language coordinator had not contacted any villages in the Dillingham or Wade Hampton Census Areas to perform outreach similar to what he had done in the Bethel Census Area. Exh. 306, Jackson Dep., 41:14-42:9. |
| | | • The current language |

| | | |
|---|---|---|
| | | coordinator has spent "none" of his time on election-related issues in the Dillingham Census Area. Exh. 306, Jackson Dep., 83:18-23. <br> • The current language coordinator has not spent "very much" of his time on election-related issues in the Wade Hampton Census Area, "other than making spreadsheets for contacts." Exh. 306, Jackson Dep., 83:24-84:4. <br><br> It would not matter if election announcements were sent with Yup'ik text in many locations because there was no translator for that village: <br> • According to DOE's records for 9 elections from the 2008 General through the 2012 General, a translator was not provided by DOE to offer translations of pre-election voting materials and information 75 percent of the time in villages in the DCA. Exh. 221-229 <br> • According to the DOE's records for 9 elections from the 2008 General through the 2012 General, a translator was not provided by DOE to offer translations of pre-election voting materials and information 63 percent of the time in villages in the WHCA. Exh. 221-229 |
| 5. | "The Division has used bilingual outreach workers in the Dillingham and Wade Hampton Census Areas for each state-conducted election since 2008." (MSJ at 22) | • DISPUTED <br> The DOE's own records establish pre-election or outreach workers were not available a majority of the time: <br> • According to DOE's records for 9 elections from the 2008 General through the 2012 General, a translator was not |

| | | provided by DOE to offer translations of pre-election voting materials and information 75 percent of the time in villages in the DCA. Exh. 221-229<br>• According to the DOE's records for 9 elections from the 2008 General through the 2012 General, a translator was not provided by DOE to offer translations of pre-election voting materials and information 63 percent of the time in villages in the WHCA. Exh. 221-229 |
|---|---|---|
| 6. | "In addition to performing outreach duties, the bilingual outreach worker serves as the language assistance worker on Election Day at the polling place." (MSJ at 22) | • NO CITATION. Statements of counsel are not evidence.<br>• DISPUTED<br>• From 2008 to 2012, translators were not available at the polling places in the DCA 48 percent of the time. Exh. 217, 219 and 220.<br>• From 2008 to 2012, translators were not available at the polling places in the WHCA 22 percent of the time. Exh. 217, 219 and 220. |
| 7. | "In March 2010, the Division developed a training handbook specifically designed for Alaska Native bilingual outreach workers, including those in the Dillingham and Wade Hampton Census Areas." (MSJ at 23) | • NO CITATION. Statements of counsel are not evidence. |
| 8. | "Exhibit K includes this handbook, a sampling of bilingual outreach worker certificates of outreach for workers in the Wade Hampton and Dinnilguage Census Areas, the bilingual text of the radio announcements *made by these workers;* and a list of the recruited election workers for 2012 in the Dllingham and Wade Hampton Census Areas." (MSJ at 23) (emphasis added) | • DISPUTED<br><u>Announcements could not have been made in the many places where there was no bilingual outreach worker:</u><br>• From 2008 to 2012, translators were not available at the polling places in the DCA 48 percent of the time. Exh. 217, 219 and 220.<br>• From 2008 to 2012, translators were not available at the polling places in the WHCA |

17

| | | 22 percent of the time. Exh. 217, 219 and 220. |
|---|---|---|
| | | • According to DOE's records for 9 elections from the 2008 General through the 2012 General, a translator was not provided by DOE to offer translations of pre-election voting materials and information 75 percent of the time in villages in the DCA. Exh. 221-229 |
| | | • According to the DOE's records for 9 elections from the 2008 General through the 2012 General, a translator was not provided by DOE to offer translations of pre-election voting materials and information 63 percent of the time in villages in the WHCA. Exh. 221-229. |
| | | • The DOE is also aware that there are instances in which outreach workers performed no duties at all. Exh. 305, Growden Dep., 81:13-17, 82:10-15. |
| 9. | "The record shows that the Division has verified and confirmed the Yup'ik and English language ability of bilingual poll workers in communities in the Dillingham and Wade Hampton Census Areas by having the local village council confirm language ability." (MSJ at 23) | • DISPUTED |
| | | • The DOE, and not the village council, is responsible for ensuring the language ability of pollworkers, and it is aware of this. Exh. 309 (SOA 021190). |
| | | • From 2008 to 2012, translators were not available at the polling places in the DCA 48 percent of the time. Exh. 217, 219 and 220. |
| | | • From 2008 to 2012, translators were not available at the polling places in the WHCA 22 percent of the time. Exh. 217, 219 and 220. |
| | | • According to DOE's records for 9 elections from the 2008 General through the 2012 General, a translator was not provided by DOE to offer |

| | | translations of pre-election voting materials and information 75 percent of the time in villages in the DCA. Exh. 221-229 |
| | | • According to the DOE's records for 9 elections from the 2008 General through the 2012 General, a translator was not provided by DOE to offer translations of pre-election voting materials and information 63 percent of the time in villages in the WHCA. Exh. 221-229. |

### 2. Yup'ik voter registration and election announcements and posters.

Defendants maintain that they provide announcements "on the candidate filing deadline, voter registration information and deadline[s], absentee voting information, Election Day information and procedures, and the Division's toll-free Yup'ik language assistance hotline." Defs. Mot. for Summary Judgment at 24-25. Their implication is (1) we air them in Yup'ik, and (2) we send them to the bilingual poll workers to read over the VHF if they don't get radio signals, so all voters in a given region are receiving this information. That is clearly not the case.

According to Defendants' own village surveys, radio stations do not reach almost one third of the voters in either the DCA or the WHCA. DSOF ¶ 11-12. Although it appears that outreach workers in the BCA do receive the text of these radio ads to read over their VHF radio, that same information is <u>not</u> sent to the DCA or WHCA. Defendants now maintain that "all" bilingual poll workers receive them, but their own documents categorically refute their self-serving conclusion. In the 2012 election cycle, in response to a complaint about language assistance from the village of Emmonak, Defendant Becka Baker wrote, "I'm pretty sure that I only sent the Yup'ik ads and samples to the BCA outreach workers." DSOF ¶ 12, 43. In the same e-mail chain, Ms. Growden admitted, "since they are not in BCA, Dorie doesn't send them anything." DSOF ¶ 43. In

addition, the poll workers who testified in this case have said they do not receive the Yup'ik text of pre-election announcements. DSOF ¶ 12-13. This is because, as Defendant's own pre-litigation records establish, the election announcements and related information is simply not sent to them – "since they are not in BCA." DSOF ¶ 43.

Furthermore, although Defendants now claim that voter purge notices (euphemistically called "list maintenance announcements") were provided, Ms. Growden said the exact opposite at her deposition in October 2013. DSOF ¶ 15. Defendants cannot create a question of fact by contradicting their own prior sworn testimony.

| 10. | "For every state-conducted election since 2008, the Division has prepared text for several election-related public service announcements to be aired on the radio." (MSJ at 24) | •     DISPUTED<br>•     "In the Wade Hampton, Bethel, and Dillingham census areas, about 9,000 of the 28,000 residents are without public radio coverage. FM stations only provide coverage to about 1,300 residents while AM stations serve 17,131 people in this region...." [http://www.ntia.doc.gov/ptfp/coverage/ak.htm]<br>•     In response to DOE's surveys, the following villages reported that they do not receive radio signals from the KDLG and KYUK, the stations DOE uses to broadcast election-related information in Yup'ik: Chevak, Emmonak, Hooper Bay, Kotlik, Mountain Village, Nunam Iqua, Pilot Station, and Scammon Bay. Exh. 310 (SOA 00405-00408, 00417-419, 00616, 00618)<br>•     St. Mary's, one of the largest villages in the WHCA, does not receive KYUK. Exh. 311, Paukan Dep. 83:7-12.* |
| 11. | "The announcements air in Central Yup'ik on KYUK and KDLG twice a day for five days, and provide information on the candidate filing deadline, voter registration information and deadline[s], absentee voting information, Election Day information and procedures, and the Division's toll-free Yup'ik language assistance hotline." (MSJ at 24-25) | •     DISPUTED<br>•     "In the Wade Hampton, Bethel, and Dillingham census areas, about 9,000 of the 28,000 residents are without public radio coverage. FM stations only provide coverage to about 1,300 residents while AM stations serve 17,131 people in this region...." [http://www.ntia.doc.gov/ptfp/coverage/ak.htm]<br>•     In response to DOE's surveys, the |

| | | |
|---|---|---|
| | | following villages reported that they do not receive radio signals from the KDLG and KYUK, the stations DOE uses to broadcast election-related information in Yup'ik: Chevak, Emmonak, Hooper Bay, Kotlik, Mountain Village, Nunam Iqua, Pilot Station, and Scammon Bay.  Exh. 310 (SOA 00405-00408, 00417-419, 00616, 00618).<br>•     St. Mary's, one of the largest villages in the WHCA, does not receive KYUK.  Exh. 311, Paukan Dep. 83:7-12.* |
| 12. | "As noted above, the Division provides all bilingual poll workers with the Yup'ik and English texts of these ads, and has done so for every state-conducted election since 2010."  (MSJ at 25) | •     DISPUTED<br>•     See disputed fact number 8, *supra* and disputed fact number 43, *infra*.<br>•     Manokotak poll worker Vincent Nicketa said he did not receive Yup'ik text or audio of election announcements. Exh. 312, Nicketa Dep. 66:10-15.*<br>•     Nunam Iqua poll worker Irene Camille testified that she also did not receive Yup'ik test or audio of election announcements.  Exh. 313, Camille Dep. 61:3-6.* |
| 13. | "For those communities in the Dillingham and Wade Hampton Census Areas that do not receive KYUK and KDLG, bilingual election workers read these announcements over VHF radio." (MSJ at 25) | •     DISPUTED<br>•     See disputed fact number 8, *supra* and number 43*, infra.*<br>•     Manokotak poll worker Vincent Nicketa said he did not receive Yup'ik text or audio of election announcements. Exh. 312, Nicketa Dep. 66:10-15.*<br>•     Nunam Iqua poll worker Irene Camille testified that she also did not receive Yup'ik test or audio of election announcements.  Exh. 313, Camille Dep. 61:3-6.*<br>•     Instead, poll worker Brenda Tall described the simple announcements she made on the radio herself, just "tell[ing] the people that the polls are open." Exh. 314, Tall Dep. 41:2-23. |
| 14. | "Once preclearance was no longer required, the audio was distributed on CD in 2013 to Yup'ik-speaking tribal councils, including those in Dillingham and Wade Hampton." (MSJ at 26) | •     DISPUTED<br>•     See disputed fact number 43, *infra*. |
| 15. | "Also in 2013, when preclearance was no longer required, the Division sent | •     DISPUTED<br>•     Villages in the Bethel Census Area |

| | |
|---|---|
| list maintenance announcements to bilingual outreach workers in villages that do not receive KYUK with instructions to broadcast those announcements over VHF radio." (MSJ at 27) | receive outreach materials on DOE's annual list maintenance procedures; villages in the Dillingham Census Area and the Wade Hampton Census Area do not. Exh. 305, Growden Dep., 147:10-17, 148:2-15 & Exh. 7.<br><br>• If a village does not receive a radio signal, then voters in that village "probably wouldn't have information" that DOE transmits by radio about list maintenance procedures. Exh. 305, Growden Dep., 184:14-25. |

### 3. Yup'ik sample ballot and glossary of election terms to be used by poll workers

The question of what oral language is required for translating voting materials presents a legal issue sufficient for the court to determine now. Simply put, the sample ballot and glossary are presented in just one dialect of Yup'ik and that dialect is the one spoken by people in the BCA. DSOF ¶ 18. This is despite the fact that Defendants have received complaints that the dialect differences make the ballots and glossary difficult to understand and almost useless in the DCA and WHCA. DSOF ¶ 17-18. Indeed, one of Defendants' own witnesses on the Yup'ik Translation Panel said that when they were reviewing the ballots they "were aware that the dialect might not be, you know, understandable in parts of the Yukon Yup'ik, Bristol Bay, Chevak and Mekoryuk." DSOF ¶ 18.

Plaintiffs have already discussed the legal standards at length in their Motion for Summary Judgment, pages 17-22, and will not repeat those arguments here. Defendants' failure to accommodate all Yup'ik dialects through translation into a single dialect is contrary to the State's own practice in providing translations into more than one dialect of Inupiaq. Docket no. 55, at p. 10, para. 38. It is premised upon a fundamental – and novel – misreading of 28 C.F.R. § 55.12(a). The correct regulation is 28 C.F.R. § 55.13, which is specific to the translations that must be provided in different dialects. Plfs. Motion for Summary Judgment at 21-22. That is a legal issue

ripe for decision. There is no disagreement that Defendants accommodate only one dialect of Yup'ik and that is not the one spoken in the DCA or WHCA. DSOF ¶ 18.

Defendants also attempt to manufacture a dispute regarding whether there are different dialects of Yup'ik based solely on the statements of counsel and some pages from an atlas. Defs. Motion for Summary Judgment at 6-8. Defendants' ill-conceived efforts merit little response other than to state that there is only <u>one</u> Yup'ik language expert in this case who met all the court ordered deadlines and requirements: Dr. Walkie Charles. Dr. Charles explained at length the nature and importance of dialectical differences and their impact on voting materials in particular, as shown by the number of times he used the word "dialect" in his deposition. Exh. 328, Charles Dep. At 6 (word index). Moreover, Dr. Charles addressed and explained some of the very atlas pages now cited by Defendants. Exh. 328, Charles Dep. At 40-41, 49-51, 53-54. Counsel's citation to pages of an atlas is no substitute for an expert witness. The unrefuted facts proffered by Dr. Charles are: (1) there are eleven dialects, Exh. 328, Charles Dep. At 49; (2) Defendants write their materials in only one of those dialects, DSOF ¶ 18; and (3) the dialect differences are interfering with the voters' understanding of the voting materials DSOF ¶ 16-24. Defendants cannot avoid Section 203 liability through novel misconstructions of Justice Department regulations unsupported by admissible evidence.

| 16. | "[A written Yup'ik translation of ballot measure text] was distributed to all tribal councils in Yup'ik speaking villages – including those in the Dillingham and Wade Hampton Census Areas – for input and comment, and all of the councils responded that it would be useful." (MSJ at 27) | • DISPUTED<br>• See disputed fact number 43 *infra*.<br>• No evidence it was distributed to WHCA and DCA councils<br>• Certainly no evidence that "all councils responded that it would be useful." |
|---|---|---|
| 17. | "Beginning with the 2009 REAA election, the Division has prepared and distributed a written Yup'ik sample ballot for every state-conducted election held in the Bethel, Dillingham and Wade | • NO CITATION. Statements of counsel are not evidence. |

| | | |
|---|---|---|
| | Hampton Census Areas." (MSJ at 28) | • DISPUTED<br>• DOE does not provide any written translations in either the Bristol Bay or Yukon dialects of Yup'ik. Exh. 303, Wassilie Dep., 85:8-86:20, 138:8-11; *see also* Exh. 305, Growden Dep., 27:17-28:2; Exh. 306, Jackson Dep., 76:5-8.<br>• The DOE does apparently take steps to accommodate at least two different dialects of Inupiaq. DOE has provided audio translations of a general election announcement and voter registration deadlines in at least two dialects of Inupiaq, Seward Peninsula Inupiaq and Northern Inupiaq. Exh. 303, Wassilie Dep., Exh. 177.<br>• Even if distributed, not used in WHCA and DCA because the dialect differences made it useless for poll workers in those census areas. Exh. 313, Camille 64:18-65:17;* Exh. 312, Nicketa 65:13-18;* Exh. 314, Tall 47:10-21.* |
| 18. | "The Yup'ik sample ballot is written in Central Yup'ik because the Division determined that the Central Yup'ik dialect is the primary and most commonly spoken and written dialect of Yup'ik." (MSJ at 28) | • DISPUTED<br>• A YTP member said "And I remember being – we were aware that the dialect might not be, you know, understandable in parts of the Yukon Yup'ik, Bristol Bay, Chevak and Mekoryuk. You know, they have totally different dialects." Exh. 315, Chingliak Dep. 13:1-5.<br>• DOE admits that it "will have to provide assistance in several dialects of the covered language." Exh. 305, Growden Dep., 169:1-19 & Exh. 11.<br>• DOE is aware that there is more than one dialect of Yup'ik. Exh. 302, Baker Dep., 140:5-23, |

| | | |
|---|---|---|
| | | 140:11-23; Exh. 305, Growden Dep., 28:3-20; Exh. 303, Wassilie Dep., Exh. 180]<br>• Dialect has "been brought up at every Bethel outreach meeting." Exh. 302, Baker Dep., 141:7-10.<br>• Voters have requested that voting materials and information be translated into dialects other than the Central Yup'ik dialect. Exh. 305, Growden Dep., 61:13-62:2, 63:1-9; Exh. 303, Wassilie Dep., Exh. 178.<br>• The most common dialect of Yup'ik spoken in the Dillingham Census Area is the Bristol Bay dialect. Exh. 303, Wassilie Dep., 84:1-4.<br>• The most common dialect of Yup'ik spoken in the Wade Hampton Census Area is the Yukon dialect. Exh. 303, Wassilie Dep., 85:12-22. |
| 19. | "[The Yup'ik sample ballot] is also distributed to the tribal councils in the Bethel, Wade Hampton and Dillingham Census Areas." (MSJ at 28) | • DISPUTED<br>• No evidence the ballot is sent to WHCA and DCA tribal councils, likely only to poll workers. In fact, both language assistance coordinators denied performing work in the WHCA or DCA. See disputed fact number 43, *infra*.<br>• Not useful or effective in WHCA or DCA where dialect spoken is different. See disputed facts 17- 18 *supra*. |
| 20. | "The glossary was distributed to all Yup'ik speaking tribal councils, including those in the Dillingham and Wade Hampton Census Areas, along with a survey form for the tribal councils to offer feedback on the glossary." (MSJ at 29) | • NO CITATION. Statements of counsel are not evidence.<br>• DISPUTED<br>• DOE's first language coordinator solicited feedback on the Yup'ik glossary from villages in the Bethel Census Area, but |

| | | |
|---|---|---|
| | | did not solicit feedback from villages in the Dillingham Census Area or the Wade Hampton Census Area. Exh. 303, Wassilie Dep., 99:23-100:15. |
| 21. | "All responses that the Division received indicated that the tribal councils agreed with the translations and that the terms and phrases were understandable." (MSJ at 29) | •     DISPUTED<br>•     During the Nick litigation, plaintiffs' expert identified many, many errors and even made up words in the glossary. *Nick v. Bethel,* case no. 3:07-cv-00098 (TMB), docket no. 555, ¶¶ 4-11.<br>•     DOE's language coordinator, who chaired the Yup'ik Translation Panel, explained that when the Panel "had our meetings last year updating the glossary translations, the time was cut a little short, we felt being rushed and felt that we would have to have more time to get more 'complete' translations done." Exh. 303, Wassilie Dep., 156:9-157:4 & Exh. 193.<br>•     After the Yup'ik Translation Panel completed the initial version of the Yup'ik glossary of election terms in 2009, it did not make any further changes to it or meet about the glossary. Exh. 305, Growden Dep., 122:2-11; Exh. 303, Wassilie Dep., 13:22-14:12.<br>•     The current language coordinator was unable to find Yup'ik translations for several words or phrases that are on DOE's absentee voting by mail instructions: "gray secrecy sleeve," "return mailing envelope," "identifier," "postmarked," "notary public," "authorized official," "questioned ballot," "regional district," and "counting board." Exh. 306, |

| | | Jackson Dep., 94:20-95:15, 102:1-103:2, 104:22-105:2, Exh. 81]<br>• According to the current language coordinator, election terms that are not in the DOE's Yup'ik glossary "would be difficult to translate, and it would take a while to actually explain the meaning of the word in Yup'ik." Exh. 306, Jackson Dep., 95:6-15.<br>• The current language coordinator testified that he would have to use English words for election terms that he did not know and which were not in the Yup'ik glossary, such as "questioned ballot," but that a Yup'ik voter who only speaks Yup'ik would not understand that English term. Exh. 306, Jackson Dep., 102:1-103:2, 105:3-11. |
|---|---|---|
| 22. | "The Division has distributed the printed Yup'ik glossary of election terms to bilingual poll workers and outreach workers, including those in the Dillingham and Wade Hampton Census Areas, for each state-conducted election since 2009." (MSJ at 29) | • NO CITATION. Statements of counsel are not evidence<br>• DISPUTED<br>• See disputed fact number 43, *infra*.<br>• One poll worker in the WHCA said of the glossary "some [words] I don't understand because these are not from our area." Exh. 314, Tall Dep. 93: 11-16. |
| 23. | "The written glossary was also distributed to tribal councils in the Dillingham and Wade Hampton Census Areas in 2009 and again in 2013." (MSJ at 29) | • DISPUTED<br>• See disputed fact number 43, *infra*.<br>• See also disputed fact number 21, *supra*. |
| 24. | "In November 2009, the audio version of the glossary was placed in CD and distributed to tribal councils in the Dillingham and Wade Hampton Census Areas." (MSJ at 30) | • NO CITATION. Statements of counsel are not evidence.<br>• DISPUTED<br>• See disputed fact number 43, *infra*. |

| | | •     See also disputed fact number 21, *supra.* |
| --- | --- | --- |

### 4. Yup'ik translation panel to verify ballot measure translations.

Plaintiffs have already described in their Motion for Summary Judgment and the accompanying statement of undisputed facts how Defendants have failed to convene or use the YTP to translate voting materials. Docket no. 55, SOF ¶¶ 59-64. It is now clear how this panel operated: the Language Coordinator, Dorie Wassilie, translated the voting materials and during 2009 only the entire YTP may have reviewed her translations. However, as time went on, Ms. Wassilie stopped sending materials to the YTP. Beginning in 2010, she only sent her translations to one or two persons for "verification." DSOF ¶¶ 25-29. In 2012, there is no evidence that anyone on the YTP was consulted at all about the election materials and ballot. Quite simply, the YTP fell into disuse as the *Nick* case oversight wound down. Defendants cannot avoid these undisputed facts – drawn from their own records and sworn testimony – through the unsupported and self-serving assertions of their attorneys. Defendants' failure to use the YTP not only calls into serious question their compliance with the *Nick* preliminary injunction and resulting settlement agreement in the BCA, but helps establish their violations of Section 203 in the DCA and WHCA.

| 25. | "In May 2010, the Yup'ik Translation Panel members met to discuss and finalize the Yup'ik sample ballot measure language for ballot measures appearing on the 2010 primary and general election ballots." (MSJ at 30) | •     NO CITATION. Statements of counsel are not evidence <br> •     DISPUTED <br> •     DOE has not used the full Yup'ik Translation Panel to translate actual ballot language: "Basically Dorie [Wassilie] would write it. She would send it to one of the translation panel members. They would converse back and forth, and the ballot measure would become |
| --- | --- | --- |

| | | |
|---|---|---|
| | | finalized." Exh. 305, Growden Dep., 31:24-32:2. |
| | | •       According to the records produced by DOE, in 2010, only two Panel members, Frank Chingliak and Alice Fredson, reviewed the ballot language translation before it was finalized. Exh. 303, Wassilie Dep., Exh. 188-189. |
| | | •       DOE did not use the full Yup'ik Translation Panel to translate the neutral summaries and pro/con statements for ballot questions in 2010. Instead, DOE's first language coordinator was directed to translate them "and then have one of the [Panel] members verify for understanding." Exh. 303, Wassilie Dep., 145:22-147:6 & Exh. 187. |
| | | •       DOE's first language coordinator does not recall sending the full Yup'ik Translation Panel any sample ballots after 2010 to assist in the translation of those materials. Exh. 303, Wassilie Dep., 94:17-95:17. |
| | | •       About the 2010 ballot measure neutral summaries, Shelley Growden said to Dorie Wassilie: "Again, I don't need the YTP to translate these, I would like you to translate and then have one of the members verify for understanding." Exh. 316 (SOA 020408). |
| 26. | "A Yup'ik Translation Panel member also verified the accuracy and comprehensibility of the Yup'ik translation of the ballot measures for the 2012 primary election, the only election on which ballot measures appeared that election cycle." (MSJ at 30) | •       NO CITATION. Statements of counsel are not evidence. <br> •       DISPUTED <br> •       DOE's first language coordinator does not recall sending the Yup'ik Translation |

| | | Panel any sample ballots after 2010 to assist in the translation of those materials. Exh. 303, Wassilie Dep., 94:17-95:17. |
|---|---|---|
| 27. | "The Division is in the midst of convening the Yup'ik Translation Panel to discuss and finalize ballot measures for the 2014 primary election ballot, the only election on which ballot measures will appear in this election cycle." (MSJ at 30) | •      NO CITATION. Statements of counsel are not evidence<br>•      DISPUTED<br>•      As of October 31, 2013, the current language coordinator had not had any communications with any members of the Yup'ik Translation Panel and has not worked with them. Exh. 305, Growden Dep., 155:18-20; Exh. 306, Jackson Dep., 78:13-17. |
| 28. | "The Division has sent letters to all panel members asking if they will serve on the panel for the 2014 elections but has not heard back from all members at this time." (MSJ at 31) | •      NO CITATION. Statements of counsel are not evidence.<br>•      DISPUTED<br>•      As of October 31, 2013, the current language coordinator had not had any communications with any members of the Yup'ik Translation Panel and has not worked with them. Exh. 305, Growden Dep., 155:18-20; Exh. 306, Jackson Dep., 78:13-17. |
| 29. | "The Division is trying to convene the panel in early May 2014 if members' schedules allow." (MSJ at 31) | •      DISPUTED<br>•      As of October 31, 2013, the current language coordinator had not had any communications with any members of the Yup'ik Translation Panel and has not worked with them. Exh. 309, Growden Dep., 155:18-20; Exh. 306, Jackson Dep., 78:13-17.<br>•      Two YTP members, Frank Chingliak and Alice Fredson, have been deposed in the past two weeks and neither person mentioned this. |

### 5. Yup'ik language assistance toll-free number

The undisputed facts also refute Defendants' argument that they have offered a toll-free number at all times to provide language assistance. The broad statement by their counsel that it is "maintained to this day" is unsupported by evidence and is directly contradicted by the nine month period after the *Nick* oversight ended when no one staffed the line. DSOF ¶ 30. Defendants conveniently revived the toll-free number with a Yup'ik speaker only after this lawsuit began. DSOF ¶¶ 30, 41. Moreover, the testimony of some of Defendant's own poll workers show that the number, which was advertised only in English, was ineffective. Poll workers should among those familiar with the toll-free number and most likely to use it; nevertheless, their testimony showed that they either had not heard of it or found it was not useful. DSOF ¶ 30.

| 30. | "In 2008, the Division established a Yup'ik language assistance toll-free number and maintains it to this day." (MSJ at 31) | • NO CITATION. Statements of counsel are not evidence. • DISPUTED • Several of the State's own poll workers had never heard of this. *See, e.g.,* Exh. 312, Nicketa Dep. 67:21-25.* • *See also* disputed fact number 41, *infra.* |
| --- | --- | --- |

### 6. Language assistance logs

Defendants created language assistance logs, purportedly to track language assistance. However, they are of limited utility however for two reasons. First, they are not a reliable source of how many persons were actually assisted because poll workers testified they simply "forget" to fill them out. DSOF ¶¶ 32, 34. Second, even when the logs are at least partially completed, they tell nothing about the voter's experience of whether any assistance that may have been provided allowed them to understand all voting materials and information needed to register to vote or cast their ballot. DSOF ¶¶ 34-35. To the extent that the language assistance logs tell the Court

anything, it is just how inconsistent Defendants' language assistance practices are, probably because of the lack of poll worker training.

| 31. | "These logs have been distributed to each precinct election board in each state-conducted election since 2008." (MSJ at 31) | ▪ NO CITATION. Statements of counsel are not evidence. ▪ DISPUTED ▪ See disputed fact number 43, *infra*. |
|---|---|---|
| 32. | "The Division maintains a statewide spreadsheet showing the number of language assistance requests that each precinct records at each election." (MSJ at 31-32) | ▪ DISPUTED ▪ Language assistance logs are not a reliable source of how many persons were assisted because poll workers testified they sometimes "forget" to fill them out. Exh. 314, Tall Dep. 56:22-57:4*; Exh. 313, Camille Dep. 47:15-25; 52:11-15; 82:8-14*; Exh. 312, Nicketa Dep. 53:10-54:8*. |
| 33. | "The poll worker training includes an explanation of how workers should maintain these language assistance logs." (MSJ at 32) | ▪ NO CITATION. Statements of counsel are not evidence ▪ DISPUTED |
| 34. | "Exhibit R includes the statewide spreadsheets for language assistance requests in the Dillingham and Wade Hampton Census Areas during the 2012 primary and general elections." (MSJ at 32) | ▪ DISPUTED ▪ Language assistance logs are not a reliable source of how many persons were assisted because poll workers testified they sometimes "forget" to fill them out. Exh. 314, Tall Dep. 56:22-57:4*; Exh. 313, Camille Dep. 47:15-25; 52:11-15; 82:8-14*; Exh. 312, Nicketa Dep. 53:10-54:8.* |
| 35. | "It also includes a small sampling of language assistance logs from the Wade Hampton Census Areas – including documentation of language assistance received by plaintiff Fred Augustine in 2008 and 2009." (MSJ at 32) | ▪ DISPUTED ▪ Language assistance log entries do not mean that the assistance provided was effective. *See, e.g.* Declaration of Fred Augustine, Exh. 300.* |
| 36. | "It also includes documentation of language assistance provided in Chevak in the Wade Hampton Census Area in the Cup'ik dialect of Yup'ik since 2008." (MSJ at 32) | ▪ DISPUTED ▪ *See supra* disputed fact number 35. |

### 7. Yup'ik audio ballots on touch-screen voting machines

Defendants' arguments in this section relate largely to their separate discussion (in section 3, *supra*) and in Plaintiffs' Motion for Summary Judgment regarding dialects. It is true that Defendants' touch-screen voting machines, purchased at the cost of millions of dollars of federal funds, are sparingly used by only one to two percent of all voters. Indeed, a poll worker from the WHCA said she had never even seen the voting machines and was unaware of them. DSOF ¶ 37. The larger issue here is the same as with the ballots, glossary and announcements: the oral dialect simply must be adjusted in order to ensure the voters in the WHCA and DCA understand what they are hearing. Providing Yup'ik-speaking voters touch-screen audio in a dialect they do not speak is ineffective as a matter of law. Failing to provide any audio translations on the touch-screen machines in Athabascan/Gwich'in likewise violates Section 203.

| 37. | "Although this touch-screen equipment is used only by about one percent of Alaska's voters, in spring of 2012, the Division sought and received preclearance to include a Yup'ik audio translation of the complete ballot on touch screens used in polling places in the Wade Hampton and Dillingham Census Areas for the 2012 primary and general elections and all future elections with a race on the ballot." (MSJ at 33) | •     NO CITATION. Statements of counsel are not evidence.<br>•     DISPUTED<br>•     One witness in the WHCA said they had never seen this. Exh. 311, Paukan Dep. 63:12-17.*<br>•     Another poll worker in the WHCA said the dialect was so different it was useless and the voters refused to use it. Exh. 314, Tall Dep. 49:2-11 |
|---|---|---|

### 8. Post-election assessments and surveys

The Division of Elections sends out various surveys and appears to rely upon them. Plaintiffs have raised three issues regarding those surveys. First, as discussed in Plaintiffs' motions *in limine*, some questions in those surveys are entirely inappropriate, such as asking for a legal conclusion like "was the language assistance effective?" *See* docket no. 51.

Second, Defendants apparently accept survey responses from anyone – whether the respondent is an administrative assistant, "finance manager," or any other person who happened to complete it. DSOF ¶ 39. Defendants have not established that the surveys offer anything more than the opinion of the person who completed it, and have no binding effect on the tribe or village as a whole. Defendants cannot avoid that result by shifting the burden, as they are wont to do, to the tribal councils themselves. *See generally* Defs. Mot. for Summary Judgment at 34 ("the Division has never received any information from any tribal council that anyone corresponding with the Division was not authorized to do so"). They do not explain how a tribal council is supposed to have knowledge of the survey, much less of the responses provided in it. This is the very sort of effort that another federal court has warned to be wary of in analyzing Section 203 claims.[38]

Third, and most importantly, Defendants attempt to use these surveys as evidence that their language assistance efforts are "generally successful." Defs. Mot. for Summary Judgment at 35. This ignores the fact that some respondents indicated that there are problems in their villages, including one who astutely pointed out that the Defendants' efforts were "severely unconstitutional" but thanked them for "trying anyway." DSOF ¶ 40. The larger point is this: Defendants do receive complaints and other indications of problems but if they are not detailed in one of their surveys, Defendants contend that no problems exist.

DSOF ¶ 40. Far from being a vehicle of providing language assistance, Defendants use their surveys as a means to deny it.

| 38. | "In early 2008, the Division developed a language assistance survey and distributed it to the regional | • NO CITATION. Statements of counsel are not |
|-----|--------------------------------------------------------------------------------------------------------|-----------------------------------------------|

---

[38] *See generally Doi v. Bell*, 449 F. Supp. 267, 272-274 (D. Haw. 1978) (criticizing a similar arbitrary approach that raised potential questions of "man's ingenuity in seizing upon every possible technicality to circumvent the Congressional intent").

| | | |
|---|---|---|
| | election offices for regional supervisors to send to every tribal council in a Section 203-covered area, including those in the Dillingham and Wade Hampton Census Areas." (MSJ at 33) | evidence<br>• DISPUTED |
| 39. | "And the Division has never received any information from any tribal council indicating that anyone corresponding with the Division was not authorized to do so." (MSJ at 34) | • DISPUTED<br>• DOE receives survey responses signed by persons identifying themselves as "finance manager" (SOA 000417), "administrative assistant" (SOA 000652), and "office assistant" (SOA 000420). Exh. 317.<br>• Shelley Growden admitted she does not know whether the person filling out the survey is authorized to speak on behalf of the tribe. Exh. 305, Growden Dep. 175:13-176:20<br>• Common sense dictates, and the plaintiff tribal council representatives confirmed, that tribal leadership such as presidents and tribal administrators (with council or president approval) would be authorized to speak on behalf of a tribe. Exh. 318, Joseph Dep. 34:2-17, 37:21-38: 24, and 95:15-25.* Exh. 319, Logusak Dep. 58:7-15. * |
| 40. | "The assessments returned to the Division indicate that the Division's language assistance efforts are generally successful, and neither of the tribal councils for plaintiff villages expressed dissatisfaction with the Division's language assistance program prior to filing this lawsuit." (MSJ at 35) | • DISPUTED<br>• The Division actually has received many complaints about language assistance: Kotlik (SOA 006942), Kalskag (SOA 015610), St. Michael (SOA 017874), Emmonak (SOA 022505, SOA 022545), Nunapitchuk (SOA 022512), Alakanuk (SOA 017872), Pitka's Point (SOA 017873), Stebbins (SOA 017878, who referred to the DOE's efforts as "severely unconstitutional"), Kobuk (SOA 017879), Brevig Mission (SOA 017880), |

| | | Anaktuvik Pass (SOA 017881), Kipnuk (SOA010842), Quinhagak (SOA 010845), and Lower Kalskag (SOA 019441). Exh. 320. |
| | | • The DOE knows of these complaints and negative comments. See above. *See also* Exh. 320 (SOA014039-010441). |
| | | • Dorie Wassilie said to the former tribal administrator at Emmonak that "when I call to the villages, some respond so rudely and obnoxious when I tell them who I am and that I work in the Division of Elections … How can we help them if we don't know what they want and they only complain?" Exh. 320 (SOA 009231). |

### 9.  Full-time Yup'ik Language Assistance Coordinator

The undisputed facts establish three problems with Defendants' Yup'ik language assistance coordinator.  First, they only have maintained one when there is an active lawsuit.  DSOF ¶ 41.  Ms. Wassilie left her post in December 2012, at the exact same time that court oversight ended in *Nick*.  Her successor, Bryan Jackson, was not installed until August 2013, after the present lawsuit began.  DSOF ¶ 40.  Again, although Defendants purport to identify these facts as being contested, they are not subject to dispute.

Second, Defendants' language coordinator has not been allowed to work full-time on language assistance, despite being funded by federal funds solely for that purpose.  The language coordinator spends sometimes only half their time on actual language assistance.   DSOF ¶ 42.  This makes absolutely no sense given the large percentage and number of Native language speakers in Alaska and the significant need for assistance as determined by the Census.  So much more could be done if Defendants would allow their language assistance coordinator to actually

work only or mostly on just language assistance – consistent with the basis under which Defendants obtained federal funds to completely pay for the position.

Third, the evidence establishes that Defendants have not used the language coordinator to provide language assistance outside of the BCA. Plaintiffs allege in their Complaint that the relief afforded to the voters in the BCA is not afforded to those in the DCA or WHCA. Defendants claim in their Motion they are already doing this, contrary to their own records and sworn testimony of the coordinators, who admitted that they only work on the Bethel Census Area. DSOF ¶ 43.

The record is replete with examples of documents annotated "BCA." DSOF ¶ 43. Ms. Growden is also clearly aware of this. When discussing a complaint by Emmonak aired over the radio she said "since they are not in the BCA, Dorie doesn't send them anything." DSOF ¶ 43 (SOA 005846). She has admitted the ultimate issue: the language assistance coordinator only works on the Bethel Census Area.

Time and again, Plaitniffs' counsel tried to ask what materials specifically went to the BCA versus what went to the DCA and WHCA. The answer was a categorical I have "election duties for the Bethel Census Area only." DSOF ¶ 43. Therefore, nothwithstanding any statements to the contrary by Defendants' counsel or in Ms. Growden's sham affidavit, Defendants own documents and admissions demonstrate that Plaintiffs have been right all along; what is being offered to the BCA is not being extended to the same Yup'ik speaking voters north and south of the imaginary census line. These facts are not truly disputed.

| 41. | "Ms. Wassilie fulfilled these duties until her retirement from state service on December 28, 2012." (MSJ at 35) "Mr. Jackson accepted the offer and started as the Division's Yup'ik Language Assistance Coordinator on August 5, 2013." (MSJ at 36) | • DISPUTED Only maintained when there is a lawsuit going on: • The first year that DOE had a full-time employee who spoke Yup'ik fluently was 2008. Exh. 302, Baker Dep., 70:13-22; Exh. 305, Growden Dep., 86:5-11. |
| --- | --- | --- |

| | | |
|---|---|---|
| | | • DOE hired Dorie Wassilie as its language coordinator on July 1, 2008. Ms. Wassilie left the DOE in December 2012. Exh. 305, Growden Dep., 78:19-24.<br>• For the seven months between January 2013 and August 5, 2013, DOE did not have a language coordinator. Exh. 305, Growden Dep., 21:8-18, 121:21-24. |
| 42. | "In July 2008, the Division hired Dorie Wassilie to serve as the full-time Yup'ik Language Assistance Coorodinator." (MSJ at 35) | • DISPUTED<br>The position does not work full time on language assistance:<br>• "That position could do regular election work when not language-related work." Exh. 321 (SOA 011333, 011341).<br>• DOE's federal compliance supervisor has concluded that "language assistance work is not full time. In odd number years, she expects the language coordinator will spend 50 percent of his time performing election functions other than language assistance. In even number years, about 75 to 80 percent of their time is on language assistance. Exh. 305, Growden Dep., 156:4-158:3, 163:1-164:2.<br>• DOE's first language coordinator performed tasks other than language assistance, including working on voter registration and voter history, which was data entry. Exh. 303, Wassilie Dep., 107:22-108:12, 112:6-24 & Exh. 170-172.<br>• At the time of his deposition on October 31, 2013, the language coordinator had been spending nearly all of his work time during the preceding two weeks doing data entry for voter registration forms in the Region II office. Exh. 306, Jackson Dep., 39:22-40:11.<br>• At the time of his deposition on October 31, 2013, the language coordinator had been trained on voter registration and data entry for voter registration forms, but had not been trained yet on providing language assistance in voting. Exh. 306, Jackson Dep., 59:3-18. |
| 43. | (separated to address implication that Yup'ik Language Coordinator is there to | • DISPUTED<br>Only works on Yup'ik language accessibility |

| | |
|---|---|
| assist all Yup'ik speaking voters) | in Bethel Census Area: |
| | • DOE's first language coordinator does not recall spending any time working on language assistance in villages located in the Dillingham and Wade Hampton Census Areas. Exh. 303, Wassilie Dep., 58:3-10; *see also* Wassilie Dep., 32:15-20. |
| | • DOE's first language coordinator had "election duties for the Bethel census area only." Exh. 303, Wassilie Dep., 133:19-23; *see also* Wassilie Dep., 133:1-5. |
| | • DOE's first language coordinator did not have any election duties for either the Dillingham Census Area or the Wade Hampton Census Area. Exh. 303, Wassilie Dep., 134:13-19. |
| | • DOE's first language coordinator sent a letter/flyer to village councils in Permanent Absentee Voting (PAV) communities in the Bethel Census Area to inform voters how to receive language assistance, but did not send a similar letter to any other census areas. Exh. 303, Wassilie Dep., 98:10-99:1. |
| | • DOE's first language coordinator solicited feedback on the Yup'ik glossary from villages in the Bethel Census Area, but did not solicit feedback from villages in the Dillingham Census Area or the Wade Hampton Census Area. Exh. 303, Wassilie Dep., 99:23-100:15. |
| | • "[T]he only reason why" DOE is "having this outreach meeting is specifically it was part of the *Nick* settlement agreement and it limited it to Bethel…. So we have these meetings, but we're having them specifically because of the settlement in *Nick*." Exh. 305, Growden Dep., 128:14-23, 130:4-6; *see also* Exh. 302, Baker Dep., 61:25-62:4. |
| | • DOE has not invited villages in the Dillingham Census Area or the Wade Hampton Census Area to participate in outreach meetings. Exh. 305, Growden Dep., 135:17-136:10, 187:16-20; Exh. 303, Wassilie Dep., 125:6-13. |
| | • DOE does not conduct in-person |

| | | |
|---|---|---|
| | | outreach meetings about language assistance with voters or the tribal councils in the Dillingham Census Area or the Wade Hampton Census Areas.  Exh. 302, Baker Dep., 58:23-17, 60:11-13; Exh. 305, Growden Dep., 128:14-18. |
| | | • The language coordinators and other DOE employees have not traveled to any of the villages in the Dillingham and Wade Hampton Census Areas to provide election outreach or to be present in precincts on Election Day.  Exh. 303, Wassilie Dep., 56:2-9, 178:7-13, 179:3-8; *see also* Exh. 302, Baker Dep., 67:11-68:7, 75:21-76:22; Exh. 304, Fenumiai Dep., 41:4-13; Exh., 305, Growden Dep., 38:17-39:11, 69:7-10, 79:24-80:13, 91:13-93:8; Exh. 306, Jackson Dep., 83:18-84:4; Exh. 307, Speegle Dep., 87:1-7. |
| | | • At the time of his deposition on October 31, 2013, the current language coordinator had been employed by DOE for approximately three months.  Exh. 306, Jackson Dep., 26:1-7. |
| | | • REAA elections were held in the Bethel, Dillingham, and Wade Hampton Census Areas on October 1, 2013. |
| | | • The current language coordinator sent outreach material to the Bethel Census Area for the REAA election on October 1, 2013. Exh. 306, Jackson Dep., 27:23-28:4. |
| | | • The current language coordinator did not send outreach material to the Dillingham or Wade Hampton Census Areas for the REAA election on October 1, 2013.  Exh. 306, Jackson Dep., 28:5-29:16. |
| | | • The current language coordinator did not send out any sample ballots to the Dillingham or Wade Hampton Census Areas for the REAA election on October 1, 2013. Exh. 306, Jackson Dep., 29:17-22. |
| | | • The current language coordinator prepared audio materials about the voter registration deadline for the October 1, 2013 REAA election that was sent to the Dillingham Census Area, but not to the Wade Hampton Census Area.  Exh. 306, Jackson |

Dep., 76:9-77:21.

- After the October 1, 2013 REAA election, the current language coordinator did not send language assessments to either the Dillingham or Wade Hampton Census Areas. Exh. 306, Jackson Dep., 81:23-82:19.

<u>Shelly Growden knows that information is not sent outside the BCA:</u>

- As late as 2012, Becka Baker admitted in an email, "I'm pretty sure that I only sent the Yup'ik ads and samples to the BCA outreach workers." In this same email chain, Shelley Growden says of Emmonak, "since they are not in BCA, Dorie doesn't send them anything." Exh. 322 (SOA 005846).

<u>There are a significant number of documents noted "BCA" or "BCA only" yet none that say "WHCA" or "DCA":</u>

- "BCA" voter registration, absentee and spcial needs voting text for ads. Exh. 322 (SOA 019851).
- 34 "voter info" CDs, only enough for BCA villages. Exh. 322 (SOA 020106).
- "BCA Voter Information CD Mailing List" Exh. 322 (SOA 020312).
- "ballot measures and sample ballot letter to BCA VCs" Exh. 322 (SOA 020863).
- "2010 REAA in BCA" Exh. 322 (SOA 021230).
- "BCA 10PRIM LA Assessment Letter" Exh. 322 (SOA 021331).
- Email about CDs only going to 36 precincts Exh. 322 (SOA 021371).
- Candidate statements and ballot measure pro/con and neutral sumamries "for distribution to BCA village councils." Exh. 322 (SOA 021890).
- Letters that say "BCA" only at top. Exh. 322 (SOA 019940, 019942, 019944, 019946).
- "BCA CD Candidate Statements letter" Exh. 322 (SOA 019943)
- "BCA" voter registration and "BCA"

Absentee and Special Needs Voting Summary. Exh. 322 (SOA 019816)
- "BCA CD Yup'ik Sample ballot letter" Exh. 322 (SOA 019945).
- Four draft letters all noted "BCA" Exh. 322 (SOA 019949).
- "BCA Letter Voter Information" Exh. 322 (SOA 020272).
- 2010 voter info CD "was mailed to BCA VCs" Exh. 322 (SOA 020296)
- "BCA villages letter" Exh. 322 (SOA 019780)
- "BCA 5th mailing" Exh. 322 (SOA 022073)
- "BCA 5th mailing – 12 GENR sample ballot" Exh. 322 (SOA 022060)
- Letter "To BCA TCs – but NOT TO PAVs" Exh. 322 (SOA 021848)
- CDs only for "BCA precincts" Exh. 322 (SOA 021370).
- CDs sent to "ALL BCA village tribal councils" Exh. 322 (SOA 021986).
- Candidate statements and ballot information for "BCA village councils and bilingual outreach workers" Exh. 322 (SOA 021890).
- "30 packets" of ballot measure information Exh. 322 (SOA 020785).
- "Language assistance tasks for 2010" lists "BCA" 15 times Exh. 322 (SOA 020182-020186).
- "BCA villages letter" Exh. 322 (SOA 019812).
- "BCA village letter" Exh. 322 (SOA 019764)
- 2012 letter "TO BCA TCs" Exh. 322 (SOA 022461).
- "12GENR Audio CDs" only for BCA Exh. 322 (SOA 021988).
- Candidate statements and ballot measure info "to BCA" Exh. 322 (SOA 021895).
- Ballot samples only to cover BCA Exh. 322 (SOA 009687).
- "BCA Village Council letter" Exh. 322 (SOA 020951).

Case 3:13-cv-00137-SLG   Document 74   Filed 04/26/14   Page 46 of 48

| | | • Yup'ik samples to "Bethel Census area" Exh. 322 (SOA 021248).<br>• "BCA" distribution list for 2012 general election Exh. 322 (SOA 022107).<br>• "Dorie should include in her affidavit that she provided the draft Yup'ik glossary to BCA villages for comment" Exh. 322 (SOA 010504). |
| --- | --- | --- |

## IV.    Conclusion

Neither the law nor the facts support Defendants' motion. In addition, there are numerous factual disputes that preclude granting summary judgment.  Thus, Plaintiffs respectfully request that the Court deny the motion in its entirety.

Date: April 25, 2014                    Respectfully submitted,


s/nlandreth

Natalie A. Landreth (Bar no. 0405020)
Erin C. Dougherty (Bar no. 0811067)
**NATIVE AMERICAN RIGHTS FUND**
745 West 4th Avenue, Suite 502
Anchorage, Alaska 99501

James Thomas Tucker (*pro hac vice*)
Sylvia O. Semper (*pro hac vice*)
**WILSON, ELSER, MOSKOWITZ, EDELMAN**
    **& DICKER LLP**
300 South Fourth Street, 11th Floor
Las Vegas, Nevada  89101

Rich de Bodo (*pro hac vice*)
**BINGHAM McCUTCHEN LLP**
1601 Cloverfield Boulevard, Suite 2050 North
Santa Monica, California 90404-4082

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on April 25, 2014, a true and correct copy of the foregoing document was served electronically pursuant to the Court's electronic filing procedures upon the following:

Counsel for Defendants Mead Treadwell, Gail Fenumiai, Becka Baker, and Michelle Speegle:

**Elizabeth Bakalar**
Alaska Department of Law
Office of the Attorney General
P.O. Box 11300
Juneau, Alaska 99811-0300
libby.bakalar@alaska.gov

**Margaret Paton-Walsh**
Alaska Department of Law
Office of the Attorney General
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
margaret.paton-walsh@alaksa.gov

**s/jbriggs**

44