UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

MIKE TOYUKUK; FRED AUGUSTINE; )
NATIVE VILLAGE OF HOOPER BAY; )
and TRADITIONAL VILLAGE OF    )
TOGIAK,                        )
                               )
          Plaintiffs,          )
                               )
     vs.                       )     CASE NO. 3:13-cv-137-SLG
                               )
MEAD TREADWELL, Lieutenant     )
Governor of the State of       )
Alaska; GAIL FENUMIAI,         )
Director of Elections for the  )
State of Alaska; MICHELLE      )
SPEEGLE, Election Supervisor   )
of the Fairbanks Regional      )
Elections Office III;          )
and BECKA BAKER, Election      )
Supervisor of the Nome         )
Regional Elections Office IV,  )
                               )
          Defendants.          )
_____)


TRANSCRIPT OF EXCERPT OF PROCEEDINGS
(Oral Argument On Motion for Summary Judgment)


BEFORE THE HONORABLE SHARON L. GLEASON
FRIDAY, May 30, 2014; 1:30 P.M.
ANCHORAGE, ALASKA


_____

R. JOY STANCEL, RMR-CRR
Federal Official Realtime Reporter
222 W. 7th Avenue
Anchorage, Alaska 99501

1    **FOR THE PLAINTIFFS:**

2         Native American Rights Fund
          BY: NATALIE A. LANDRETH
3         745 West 4th Avenue, Suite 502
          Anchorage, Alaska  99501
4

5         Wilson Elser Moskowitz Edelman & Dicker, LLP
          BY:  JAMES THOMAS TUCKER
6         300 South Fourth Street, 11th Floor
          Las Vegas, Nevada  89101
7

8    **FOR THE DEFENDANTS:**

9         State of Alaska, Department of Law
          BY:  MARGARET A. PATON-WALSH
10        1031 W. 4th Avenue, Suite 200
          Anchorage, Alaska  99501
11

12

13   APPEARING TELEPHONICALLY:

14        Richard de Bodo

15

16

17

18

19

20

21

22

23

24

25

1        (Call to Order of the Court)

2        THE COURT:  Good afternoon.  We are on record in

3   Toyukuk versus Treadwell, and I have, is it Mr. Dougherty?

4   Why don't you identify yourselves, if you would be so kind.

5        MR. TUCKER:  Yes, Your Honor.  James Tucker of

6   Wilson Elser on behalf of the plaintiffs.

7        THE COURT:  And Ms. Landreth?

8        MS. LANDRETH:  Natalie Landreth on behalf of the

9   plaintiffs.

10        THE COURT:  Ms. Paton-Walsh?

11        MS. PATON-WALSH:  Yes, Your Honor, and this is

12   Gail Fenumiai from Division of Elections.

13        THE COURT:  Very good.  Time set for the final

14   pretrial conference and also oral argument on the pending

15   summary judgment motions.  Maybe we can get through a few of

16   these.  Oh, and Mr. De Bodo, are you on the phone, sir?

17        MR. de BODO:  Yes, I am, Your Honor.

18        THE COURT:  Very good.

19        (Proceedings took place that are not included in

20   this excerpt, after which, proceedings continued as

21   follows:)

22        MR. TUCKER:  Thank you, Your Honor.  I thought,

23   just as an additional matter, it might actually be helpful

24   just to put up the language in Rule 56.  Not to remind the

25   Court about the standard because I know you see -- you've

```
1    seen more motions than we ever care to file in terms of
2    summary judgment motions, but in particular, the thing to
3    point out is we're only talking about two separate burdens.
4    One is in terms of the burden in responding to the Rule 56
5    motion, and then of course the other is the burden, who
6    carries the burden of proof with respect to the actual
7    claims.  And what we want to really point out here, again,
8    is if you look at 56(c), that when you are -- when you are
9    trying to have factual assertions that support your
10   position, you have to support them with admissible evidence
11   and one of the things that we briefed extensively is the
12   State has failed to do that.  In many instances, they've
13   submitted affidavits by Ms. Growden that are contradicted by
14   her own testimony, that are contraindicated by people who
15   have firsthand knowledge that she lacks, that are
16   contradicted by their own documents.  That's really what
17   we've done.  I think we laid it out fairly clearly in terms
18   of our briefing in pointing that out.
19           The other thing that is very interesting in terms
20   of the arguments the State has made.  Many of the factual
21   statements they've made are speculative and simply the
22   argument of counsel that are completely unsupported by any
23   citations to the record.
24           So again, consistent with the Rule 56 standards
25   where that is the case, and you go down to 56 -- it's not
```

coming up well, I think it takes a second -- 56(e), when you
fail to properly support the statements that you're making,
it simply leaves the Court with four choices. Choice one is
not really an option because the State has had plenty of
time to develop their record and to oppose the motions
properly. And that really leaves either finding the fact in
favor of the plaintiffs as the moving party or in the
alternative -- and we would suggest that this is the
appropriate thing to do -- to grant the plaintiffs their
summary judgment motion, because we really do fundamentally
think that when you look through the briefing of the
parties, much of what you see isn't really a disagreement of
the facts. It's a disagreement of the law, you know, and
then when you apply the law to the facts, what does that
exactly mean?

          And with that, I think what I'm going to do is I'm
going to go ahead and turn back over to that. And I would
just say at the outset, in interest of full disclosure, one
of the things I do periodically is I actually teach law
students, and it's actually a common misconception about the
Fifteenth Amendment, that it affirmatively grants the right
to vote. It's actually does not. It's written in negative
terms, very strange. It says the right to vote shall not be
denied on account of race, color, or previous condition of
servitude. It is kind of strange because you have that and

```
1    really, in terms of much of what we see in terms of the

2    Voting Rights Act, it was passed pursuant to congressional

3    enforcement powers pursuant to Section 2 of the Fifteenth

4    Amendment that gives Congress broad authority to do that.

5    But again, in anticipation of the Court's questions on the

6    law, we thought we would start off with the plain text of

7    the statute.

8             What I have up there are basically the two

9    provisions of the voting -- Section 203 that lay out what

10   the standard is.  The first is written in negative terms

11   that prior to August 6th, 2032, when Section 203 will sunset

12   unless reauthorized --

13            THE COURT:  I'm sorry, I'm still back at the

14   Fifteenth Amendment.  So the rights of citizens of the

15   United States to vote shall not be denied or abridged by the

16   United States or any state on account of race, color, et

17   cetera.  If a state were to interpret the Voting Rights Act

18   to require it to provide lesser access to election materials

19   for a certain group, is that a violation or not, under your

20   view of --

21            MR. TUCKER:  That would be, in fact, Your Honor,

22   because Section -- the Fifteenth Amendment sets the floor.

23   You cannot affirmatively deny the right to vote on race,

24   color, or previous condition of servitude, but it doesn't

25   affirmatively grant the right to vote.  And a good example
```

```
1   is -- and the thing that actually makes sense, everyone who
2   is a U.S. citizen 18 years and older is eligible to vote but
3   only eligible to vote if they register to vote.  That's an
4   example how the Fifteenth Amendment doesn't include positive
5   grant.  You still have to go to the state elections office
6   and you still have to register to vote.
7             THE COURT:  Thank you.
8             MR. TUCKER:  But then in terms of the language of
9   the statute, the second provision lays out what 203 actually
10  does.  And 203, again, says that whenever the State provides
11  any materials information that pertain to the electoral
12  voting, the electoral process, including voting notices,
13  forms, instructions, assistance, it shall provide them in
14  the language of the applicable minority group as well as in
15  the English language.  So it's very clear.  It's not
16  discretionary.  It doesn't leave the State any leeway.  It
17  shall provide them.  It shall comply with this.
18            THE COURT:  Well, are we getting to the proviso?
19            MR. TUCKER:  I can jump forward to the proviso,
20  yes, Your Honor.
21            THE COURT:  That seems to be the key issue here is
22  what does that provided language mean.
23            MR. TUCKER:  Okay.  Let me -- okay.  So the
24  proviso, the Stevens proviso was added in.  It basically, in
25  terms of the 1975 amendments to the Act, there was some
```

1    testimony and certainly some concern that there were certain

2    languages that were either entirely oral or, in some cases,

3    there might be some languages that had a writing but that

4    writing was relatively new and untested and might not be

5    commonly used, and where that was the case, Congress

6    intended that, again, the same voting information would be

7    provided in the covered language but it would be provided in

8    oral form.

9            THE COURT:  Well and here is where -- why couldn't

10   one interpret this "only" language, only required to furnish

11   oral instructions, assistance, or other information, is what

12   the proviso says, and so if you go back to the language of

13   the first half of the clause, Subsection C, it requires with

14   other -- applicable minority groups with written language

15   that they also get voting notices, forms, and materials?

16           MR. TUCKER:  I'm actually glad you asked that

17   question, Your Honor, and if you -- I'm going to go

18   backwards -- not that we ever want to go backwards.  It's

19   because of another provision of the Voting Rights Act.  It's

20   Section 14 of the Voting Rights Act, which is the definition

21   of voting.  You'll see, again, the language of the proviso

22   includes the word "vote" and the key language here again,

23   first of all, makes it clear all action necessary to make a

24   vote effective.  That's the first part.  The second part of

25   it describes the elections it applies to.  It applies to

1   every public election.  Then it goes on to explain what you

2   need to do, what it does, what else is included.

3   Registration.  When it says listing, it's referring to voter

4   purges, so you have to be listed on the voter

5   registration -- or other action prerequisite to voting.  For

6   example, if you're going to be an absentee voter, that would

7   apply, the definition, broad definition of voting in

8   Section 14 would apply.

9           But the interesting thing is if you actually go

10  down to the bottom, it actually uses the language and

11  propositions for which votes are received in an election.

12  That's referring to ballot propositions, it's not just

13  public offices, but ballot propositions.  That's where, you

14  know, again, consistent with what Judge Burgess found in

15  Nick, that is why it was necessary for the State,

16  notwithstanding the Stevens proviso, still had to provide

17  Yup'ik translations for ballot questions.  It really went

18  farther than that.  The State ended up ultimately agreeing

19  as part of the settlement agreement that it would cover the

20  same information the voter would get in English.  It would

21  include neutral summaries, it would include the pro and con

22  statements, things that are not currently happening in

23  Dillingham or Wade Hampton.  And let me go down a little bit

24  just to highlight this.  I'll go down here.

25           Here what I've done, this is one of the cases we

1    discussed at length, and I really encourage the Court to

2    look at this.  It's a fairly short opinion.  It's a 16 page

3    order that was from the District Court of the District of

4    Columbia and involved a Native language and it was

5    actually -- this is a memorandum opinion.  It's not a

6    consent decree.  This is actually findings by the Court and

7    they describe a very similar situation.

8            In that case, the Court was specifically dealing

9    with a bond question and there, Arizona, Apache County was

10   covered by two languages, by Spanish and Navajo, and they

11   found that the county did everything it was supposed to do

12   for Spanish and provided voters with information in Spanish

13   or English, but it did absolutely nothing for the voters in

14   Navajo other than say we have a bilingual poll worker at the

15   polls on election day.  That bilingual poll worker was

16   untrained.  Voters did not receive information in advance so

17   they had no idea what the bond language was about and then

18   the language I highlighted actually highlights a fundamental

19   issue the Court needs to address here.  What does it mean to

20   have -- is it just enough to have a bilingual poll worker,

21   or if not, what else do you have to do?  There the Court

22   found with a single bond question, it was necessary to train

23   those poll workers for a full week to be able to give those

24   effective, accurate, clear, and complete translations.  And

25   that's part of the problem we're having here where you may

1  have ballot questions that are written in a different

2  dialect.  Even if they get a sample ballot, if it's not

3  written in their dialect -- and you will see instances that

4  we've cited in our brief where the poll workers basically

5  set aside the sample ballot because it's worthless to them.

6  They have to take the English version and try to translate

7  on the spot.  That leads to the very problems that Judge

8  Burgess identified in Nick.  That's why Nick is so important

9  here because this is dealing with -- and I will go down just

10 to kind of highlight because I think geographically, it's

11 important to know what we're talking about.

12          THE COURT:  I'm familiar with it.  I've looked at

13 the map.

14          MR. TUCKER:  If you're familiar with the map --

15          THE COURT:  And I know where the Yukon-Koyukuk is

16 also.

17          MR. TUCKER:  So we're basically talking about --

18 when we're talking about census areas, we're talking about

19 artificial boundaries created by census for their purposes.

20 And so the only thing that really is separating a voter who

21 lives in Bethel from the voter living in Dillingham, Wade

22 Hampton or Yukon-Koyukuk will be an arbitrary line for these

23 purposes, but unfortunately, that line is done a little bit

24 further because the State has actually made a decision that

25 it's going to limit language assistance that it got under

1    Nick to Bethel.  That's it.  Not to Dillingham, not to Wade

2    Hampton, not to Yukon-Koyukuk.  In fact, the reply brief

3    that was just filed yesterday in terms of Gwich'in, and

4    Ms. Landreth may speak to this more, is the State recognizes

5    the State is doing nothing for Gwich'in other than providing

6    poll workers, bilingual poll workers for some elections.

7    Otherwise nothing, and they say that's okay because there

8    really aren't that many people we're talking about.  Again,

9    without citation to any legal authority that allows them to

10   do that.  There is no exception in Section 203 if you talk

11   about a handful of people.

12           In fact, I know by analogy, Section 4(e) of the

13   Voting Rights Act, which again, this was actually based --

14   Section 4(e) was part of the original 1965 Act, and it

15   pertained to Puerto Ricans who were schooled overseas in

16   Spanish before the sixth grade, and there, the test actually

17   applied by courts is that one voter, one voter -- you don't

18   have to be covered.  If you have one Puerto Rican voter who

19   speaks Spanish if they went to school in Puerto Rico, you're

20   covered.  There is no section in Section 203 if you have a

21   low number of people.  In fact, there are jurisdictions

22   covered for Native languages in the Lower 48 with far fewer

23   LEP speakers than what we're talking about in Yukon-Koyukuk.

24           I would point out, for example in Nick, the State

25   used as one of the affidavits, they submitted an affidavit

or declaration from the Director of Elections, or she was --
I'm sorry, she was language coordinator for Maricopa County,
Tammy Patrick, who just served on the presidential election
commission. She specifically talked about they had Tohono
O'odham voters in one single precinct in one very small
corner of Maricopa County and there were only about 20
speakers of that language yet she talked about how they went
to great lengths to create a sample ballot, she created a
glossary and actually have audio recordings of the
information. Just because you're few in number doesn't mean
that your constitutional right to vote is any less
worthwhile or meaningful than places where you may have
10,000 people. The Voting Rights Act doesn't include a
exclusion based upon a small number of voters.

THE COURT: In your mind, what does plaintiff need
to prove to establish a prima facie case? There we are.

MR. TUCKER: Let me throw it up there. Funny you
should ask. The first couple are really not disputed.
First of all, is the jurisdiction covered. There really
seems to be no question there. What I'll do is I'll
actually just quickly walk through these with a little bit
of the evidence to explain it.

The State of Alaska suggestion in terms of its
response on dialect that they think -- they refer to well,
we're allowed to pick one dialect for the entire state. Not

true.  The State of Alaska is not covered for Section 203.
You will note that it's individual political subdivisions or
the equivalent in terms of census areas that are covered and
you'll see I've highlighted the three that we're talking
about here, Dillingham, Wade Hampton, and Yukon-Koyukuk.

Now what does that mean as far as villages there?
Well, the Department of Justice sent a letter.  In fact,
this is actually drawn from the State's own exhibits that
they submitted, where actually they pointed out -- and
again, the key language here as you can see, the
determination by census are as follows, including the names
of the villages that trigger the determinations.  What that
means is that there are -- in Alaska, there are two ways
that a jurisdiction is covered, because the one that is not
applicable is that there are -- there's no jurisdiction
where you have 10,000 or more LEP voters.  So we'll leave
that aside.

The two that do trigger coverage are census areas
or boroughs where five percent or more of the U.S. citizens
of voting age are limited-English proficient in the same
language or same language group, which would be, you know,
for example, Athabascan or Yup'ik.  The other way that the
coverage is triggered is part of what's called the
Reservation trigger.  In Alaska, we don't have reservations,
we have Native villages that have been recognized for the

1    federal government, and with those villages, they have

2    separately triggered coverage.  So in each one of those

3    villages where five percent or more of the U.S. citizens of

4    voting age are limited-English proficient, those villages

5    have triggered coverage.

6             So what does that mean?  You have here the list of

7    all of the villages that the Department of Justice

8    specifically told the State of Alaska, "These villages have

9    separately triggered coverage."  There is no need for the

10   State of Alaska to be sending surveys out to villages

11   asking, "Do you need assistance," when they've already been

12   told census has already made the determination that you have

13   to provide assistance.  And that's highlighted by the -- you

14   know, the quote from the deposition of Ms. Baker where she

15   acknowledges, there are no communities in Dillingham or Wade

16   Hampton that don't meet the trigger, as far as she knows.

17            And then in terms of Arctic Village and Venetie,

18   they're not on the list.  The reason why they're not on the

19   list is that when you have communities that are too small

20   for purposes of American Community Survey, Census cannot get

21   sample data down to that level.  As -- you know, as the

22   State has pointed out quite well in its brief, these are

23   fairly small communities, and Census simply didn't have the

24   sample data that would allow for separate coverage in terms

25   of triggering, but as the State has also said in their brief

that they -- that they have estimated that one-third of all
the LEP voters in Yukon-Koyukuk live in these two villages.
So it's really undisputed that every single one of the
villages we're talking about in Dillingham and Wade Hampton
are covered, as are Arctic Village and Venetie.

So what does that mean?  Second thing, there's
really no dispute in terms of the facts of what information
is provided in English.  We know what information's been
provided in English from the documents and materials that
the State has provided.  And again, I you see this is just a
laundry list that was from the 112 page 2012 official
election guide for the general election.  And again, some of
these are separate forms; you can get them separately.  You
might have absentee voting instructions, you might have
special needs information, but again, you also see other
things that were specifically included in Nick, like for and
against statements, you see the sample ballots.  You know,
when they say language voting and other assistance, that's
basically to tell people that it's available.  Special needs
voting was something else that was required in Nick.  The
reason is because these are all things, you go back to the
definitions of Section 14 of the Voting Rights Act.  Those
are all things that you have to know to be able to make your
vote effective.  If you don't know about a voter
registration deadline, you can't register to vote.  If you

don't register to vote, you're not going to be able to cast
an effective vote on election day.  If you don't know that
your vote is going to be purged because of a list
maintenance procedure, you could be purged -- you will be
purged.  The State of Alaska, generally their own data shows
approximately 30,000 voters are purged every year, and if
you don't get that information and no one tells you what you
have to do to stay on an active list, your vote is not going
to be effective.

I'm not going to spend a lot of time on these
slides because I have -- some of these slides I just wanted
to highlight because we provided them to you.  This was
actually the slide Your Honor requested when we had the
initial scheduling conference.  It lays out side-by-side
what information is available in English, what was required
in Nick, what we understand is being provided in the Bethel
area, what's being provided in Yup'ik, generally, in the
central Yup'ik dialect in Dillingham and Wade Hampton, and
finally in the far right-hand corner, what's been provided
in Gwich'in.

And I'll go through quickly only because you do
have that, but I do want to highlight it for you.  We also
used this exhibit in Nick, and Judge Burgess also found --
there was a motion in limine on whether or not this should
be permitted.  This is a laundry list of all the written

1    materials the State of Alaska translates to Tagalog, or

2    Filipino.

3         That takes us to the third question or third

4    prong.  This is where I'm going the spend most of my time.

5    Are the materials or are the voting information that's

6    provided to voters actually translated to the covered

7    language.  And the answer is -- and this is why we really

8    don't need to go to trial on this -- the State's own

9    documents and admissions during the depositions shows that

10   the answer is know.

11        THE COURT:  Can I back you up and ask, the

12   statute's requirement or indication that when it's

13   applicable to an Alaska Native group that is with a

14   predominant language historically unwritten, then the

15   State's only required to furnish instructions, assistance or

16   other information.  So where does a requirement come to

17   translate, other than orally translate, under the Voting

18   Rights Act?

19        MR. TUCKER:  Well, the problem is, if you had --

20   if everyone -- if every single poll worker out there was a

21   Dr. Walkie Charles and they could translate an effective

22   translation each and every time, the answer would be you

23   don't have to.  If you find -- we haven't disputed that, at

24   least for purposes of this.  We haven't -- we have simply

25   asked for the Nick template to be imposed here.  So we did

1    not intend to re-litigate historically unwritten or not,

2    mainly to streamline the presentation of evidence because

3    what Judge Burgess ordered will get us the same place.

4         THE COURT:  All right.  So you agree that these,

5    the three census areas at issue here, fall within the

6    historically unwritten languages portion of the statute?

7    Are we in agreement there?

8         MR. TUCKER:  We will -- we will -- I don't know

9    that we will agree, but we will say that we are not asking

10   that written materials be provided directly to voters in

11   this litigation.  What we're asking for is that the written

12   translations be provided in advance to the poll workers and

13   those giving assistance, just as Judge Burgess ordered, so

14   that we can make sure we're getting complete, clear,

15   accurate, and effective translations.

16        THE COURT:  I understand your position there, but

17   are you planning to present evidence as to the topic of

18   whether this, the language groups here are historically

19   unwritten?

20        MR. TUCKER:  No, Your Honor, no.  In fact, what

21   we're going to do instead -- I mean, frankly, our time is

22   much better spent and the Court's time is much better spent

23   on what is it you have to give a poll worker or translator

24   to assure they're going to give an effective translation?

25   You know, is training enough?  The answer is no.  You end up

1  running into on-the-spot translations that Judge Burgess

2  specifically said were problematic.  And the reason why

3  they're problematic is because Dr. Charles has said -- and

4  he's the only Yup'ik Ph.D.  Not the only Yup'ik with a Ph.D.

5  but the only person with a Ph.D. in Yup'ik who has

6  specifically said he can't do that.  If you asked him to

7  translate, for example, the upcoming ballot question that's

8  two and a half pages long on the spot, he could not do it.

9        THE COURT:  So how do you read -- let's assume,

10  for purposes of this discussion, that the groups here are

11  all historically unwritten languages.  How do you read the

12  statute -- with the, "Only required to furnish oral

13  instruction, assistance, or other information," how do you

14  read the statute to require that there be written

15  translations?

16        MR. TUCKER:  Oh, sure.  And in terms of oral

17  assistance -- let me just, actually -- it's really -- this

18  gets to the regulation.  This is at least the Department of

19  Justice's guidance.  It, again, goes back to the polar star

20  of effectiveness, so whatever it's going to take to provide

21  effective language assistance.  I would know by analogy.

22  Let's just drop down to the Lower 48 for a moment because,

23  frankly, most of the Native issues that have been litigated

24  under Section 203 have been in New Mexico and Arizona, a

25  little bit in Utah, but primarily the four corners area.  In

each of those places, if you go to Apache County or go to
Coconino County or go to Navajo County or go to Sandoval
County in New Mexico, what you're going to find that they
do, exactly what Judge Burgess ordered, they're getting
sample ballots that are written out phonetically in Navajo
so that the poll worker can read it.  They cannot translate
it on the spot.  The reason is going back to the School
District 90 decision, that I splashed up there, it's not
possible for people -- in many cases, many of these
translators don't read and understand English effectively
enough.  They don't know what it means, themselves, and it's
a product in part of lack of education in some cases, but in
other cases because voting terms, the election terms that
the State of Alaska uses are very, very complicated.  It's
unrefuted in terms of evidence.  Dr. Claudia Dybdahl has
submitted, you know, a declaration, expert declaration doing
a readability analysis saying most of the ballots written in
the State are 14th grade level.  There aren't very many
Yup'ik or Gwich'in speakers who have -- who are now in the
third year of college who have the capability of
understanding that English, much less translating it into
Yup'ik.

        The other complicating factor, of course, is in
Yup'ik and Gwich'in, there are many terms that we take for
granted in election materials that there's simply no

counterpart in the language for that. That doesn't mean
that you don't -- as the State suggested in the reply, it's
too difficult, we're going to throw up our hands, walk away
and say job done, because we can't do it. You cannot do
that.

What you have to do, instead -- and this has been
very effective in New Mexico and Arizona -- you translate
the concept. What is it that you're trying to get across.
The interesting thing about this is, you know, you don't do
what the State of Alaska suggests and what they've done with
some of the translations, which is a literal word for word
translation that comes out frankly as gobbledygook for the
voter, they don't understand it. It's written in Yup'ik
legalese that they do not understand. What you do, and
frankly one of the things that would be very effective here,
is taking that neutral summary -- the State of Alaska gives
it to voters in English. They don't give it to voters,
certainly they don't give it in Dillingham and Wade Hampton
and Yukon-Koyukuk. They do not give it in Native languages.
What does that mean? You may have a two and a half page
ballot question. The neutral summary says, "A yes vote on
this would say that you can only -- seal season is only open
from June 1st to July 30th. A no vote would have the effect
of closing that earlier." It explains it in -- in much
simpler terms. It's not telling the voter how to vote.

1    It's telling them what their vote will mean.

2          THE COURT:  All right.  Well, where I feel we're

3    at now is kind of drifting into what would be the

4    appropriate remedy, assuming the Court were to find a

5    violation.  And so going back to what, in your mind, would

6    constitute a violation of 203(c) that would be helpful.

7          MR. TUCKER:  Well, and what I can do -- and again,

8    this is where I know the State wants to run from the Nick

9    decision, but Judge Burgess was largely quoting, again, from

10   both the statute and the regulations, and here, you see that

11   he's quoting in its entirety the, you know, DOJ's guidance

12   for what is required for oral assistance.  And getting to

13   the point that you asked a few moments ago -- if you don't

14   mind I'll skip ahead one slide.  We will give Your Honor a

15   copy of slides as well as counsel.

16          THE COURT:  All right.

17          MR. TUCKER:  This is what he said in terms of

18   historically unwritten.  Again, you look at the highlighted

19   area.  He said that, "Even though I found that I think

20   Yup'ik is a historically unwritten language, the Court noted

21   that they may need to print some election-related materials

22   in Yup'ik, such as sample ballots, to provide effective

23   language assistance as required by federal regulations in

24   implementing the VRA.  The reason is because the on-the-spot

25   translations are simply too difficult."  Judge Burgess even

said that.  He specifically referred, again in highlight,
these are the findings Judge Burgess made of the violations
that the State had engaged in in terms of violating
Section 203 and you see again, "Ensure that oral
translations of ballot questions are comprehensive and
accurate."  A voter, an English-speaking voter can't do that
if they don't get a comprehensive sample ballot.  It would
be like if I gave you a sample ballot in English and I cut
off two-thirds of it and I said, "Go vote."  It has to be
complete.  It has to be accurate.  The voter getting it has
to get the same concept, the same information that voters
are getting in English in order to be able to cast a vote on
that particular ballot question.

       THE COURT:  So when you look at effectiveness, as
I understand the State's response to that is that, well
then, if that's the path that is one that you're advocating,
then where -- how do you measure effectiveness other than by
having people come in and saying, I got it or I didn't.  I
understood what I was voting for or not.  And I -- how would
you contrast that with, say, the case in Miami where the
issue was the failure of the county to put out a special
election pamphlet to Spanish-speaking voters that were found
to be within this group entitled to language assistance and
the county said, well gosh, it was all in the newspaper and
therefore -- the Spanish-speaking newspaper, and therefore,

```
 1    it didn't matter that we didn't do the pamphlet.  And as I
 2    read that decision, it was, that's not the issue.  It's not
 3    effectiveness.  It's that this law says you have to give the
 4    same materials to everybody.  So where does effective -- I
 5    see Judge Burgess may view the world differently than I do,
 6    but where does effectiveness fit in under 203(c)?
 7          MR. TUCKER:  That's why I threw up the slide that
 8    I did because you don't have to get to the fourth issue, is
 9    it effective, if the translation is never provided to begin
10    with.  For example, the State of Alaska has said, "We admit,
11    we have not done any Gwich'in audio translations on the
12    touch screen voting machine."  If that's true, if a
13    Gwich'in-speaking voter goes in to use that touch screen
14    voting equipment, they're going to get English and they
15    might get -- I don't know if they also make Tagalog
16    available.  They might get it in Filipino or they might even
17    get it in Yup'ik, but they're not going to get it in
18    Gwich'in.  If the translation is not provided in the first
19    place, then it, per se, cannot be effective.  You cannot
20    have something effective if it's not done at all in the
21    first instance.
22          And that's actually what the Attorney General has
23    said in the implementing regulations.  Part of the
24    touchstone of what they look at for a violation is whether
25    or not it's a failure to use the, quote, the applicable
```

1    minority language in the electoral process.  That can be for

2    a single thing.  As Your Honor noted, it could be

3    metropolitan Miami-Dade County where you're talking about an

4    election pamphlet that's not actually sent to a residence.

5    But more particularly, if you're talking about oral, an oral

6    version of that, that's the School District 90 case from

7    Apache County.  There the issue was -- there were other

8    issues.  For example, they had polling place closures.

9    We'll leave that aside, but the 203 issue was they provided

10   in Spanish and English a whole host of information about the

11   ballot questions.  They had community meetings where they

12   talked about what does this mean.  They had people come in

13   and actually talk pro and con, what does this mean.  None of

14   that information was communicated to voters in Navajo, and

15   the District Court of the District of Columbia said, "Well,

16   we read Section 203, we know what it means," and they also

17   specifically relied on the broad definition of voting that I

18   shared with Your Honor from Section 14.  That actually means

19   what it says.  And that where you're doing this in English

20   and Spanish and not doing in Navajo, it is, per se,

21   ineffective.  If you're not training the poll workers to

22   make sure that the translations they are giving are

23   accurate, it's ineffective.

24          We don't have to have a parade of voters taking

25   the stand saying, "I didn't get that."  If they didn't do

it, it wasn't done.  You don't need to have duplicative
evidence that we have confirmed from the State's own
documents.  If the State doesn't have a poll worker in a
polling place for a election, bilingual poll worker, there
can't be assistance there that's being given that is
effective.  The State as actually suggested I think with
respect to Gwich'in, "That's okay.  We'll rely on
Section 208.  They can bring someone in with them."  That
was specifically why Congress passed Section 203 in the
first place because jurisdictions would say, "It's not our
fault.  We may have a discriminatory schooling system that
set up the problem that prevented people from being able to
understand what's on the ballot, but we're going to make
you, the voter, affirmatively bring in somebody here on
election day."

          Congress has already addressed that issue.  They
did it very clear in terms of Section 203.  It shall; you
have to do it.  It's not the burden of the voter, it's not
the burden of the poll worker, it's not the burden of the
tribal council.  If it's not done -- and I don't doubt for a
moment that the State of Alaska has a very difficult time in
providing elections and doing these translations and trying
to get competent, qualified, bilingual poll workers.  I
don't doubt that for a moment.  That's true every
jurisdiction where I've litigated these sorts of cases, but

```
 1    that doesn't obviate the responsibility if it's not done.
 2    If a poll worker fails to show up or they're not trained or
 3    they give a translation that's inaccurate or they're not
 4    given the information to read so they're giving accurate
 5    translation, that's not the fault of the voter, not the
 6    fault of the tribe, not the fault of the poll worker.  It's
 7    the responsibility of the covered jurisdiction in the State
 8    of Alaska.
 9              THE COURT:  I'm going to shift gears on you just a
10    little bit here and ask you to wrap up, but I was concerned
11    about the argument that you had in the -- with respect to
12    the Sandoval case and is it Docket 87?  I can't tell you
13    whether that was a reply or what, but as I read your
14    argument there on the substantial compliance issue, you were
15    asserting that that really only applied, that the
16    three-judge panel there was only looking at the issue of the
17    consent decree.  And I certainly read the -- I read the
18    language very differently, that they repeatedly say VRA and
19    consent.
20              MR. TUCKER:  Yes.
21              THE COURT:  Then why are you making a
22    representation in the brief that's directly contrary to
23    that?
24              MR. TUCKER:  Well the thing is, it is true that
25    the standard for consent decrees is always substantial
```

```
 1   compliance, whether you're going to extend it, which was the
 2   case in Sandoval, or if you're going to terminate it early.
 3   That was what the Court was talking about, but it was also
 4   referring to the fact that that has to be informed by what
 5   the standard is in Section 203.  And the standard is, as
 6   I've thrown it up there, that seems to be something that the
 7   parties agree on.  There may be few things that the parties
 8   agree on.  This may be one of them.  But you know, in terms
 9   of the standards for compliance, the overarching standard is
10   effectiveness.  The interesting thing about this is the
11   State talks about, it's just reasonable steps, reasonable
12   steps.  They forget that goal.  What's the goal?  They -- in
13   fact, they contradict themselves in another portion of the
14   brief where they say, "Plaintiffs are asking us to take all
15   of these steps to do something regardless of whether or not
16   it's effective."
17             THE COURT:  I didn't really hear a response on the
18   Sandoval issue.
19             MR. TUCKER:  Okay.
20             THE COURT:  Would you agree that the Court there
21   extended the concept of substantial compliance to compliance
22   with the VRA?
23             MR. TUCKER:  They did, in the context of consent
24   decree.  Absolutely.  We don't have a consent decree here,
25   Your Honor.  We have a different standard.  The standard is
```

```
 1    the same in terms of 203.  You know, the Court in Sandoval
 2    specifically referred to the very standard I have up on the
 3    screen right now.
 4              THE COURT:  I'm talking about this standard does
 5    not -- I'm reading from the case -- does not demand
 6    perfection but only as the United States describes it,
 7    substantial compliance with Section 203.  And I didn't see
 8    in that discussion, in that paragraph, language discussing
 9    the consent decree.  I simply make that observation and I
10    make it to both sides that I'm very precise on the language
11    and when I have a briefing that makes an assertion that all
12    Sandoval was talking about was a consent decree, no, look at
13    it.  They're talking about federal law.  It's disconcerting.
14    I'll make that observation, but let's move on.
15              MR. TUCKER:  Okay.  Well, in terms of when you
16    talk about from Sandoval the Court doesn't require complete
17    precision, you don't require -- if you happen to have one
18    poll worker that does not show up, that does not a 203
19    violation create.  We agree with that and that's not what
20    we're talking about here.
21              THE COURT:  No, and I understand that.  I do.
22              MR. TUCKER:  Okay.  Let me just go down -- I
23    apologize.  I'm trying to jump around a little bit to help
24    the Court out.
25              THE COURT:  No, that's fine.
```

1            MR. TUCKER:  One of the things I do want to point

2     out, this, for example, highlights the very issue on sample

3     ballot.  This is an email from the State, you know, from

4     Shelly Growden in which she specifically addresses the

5     issues Your Honor just raised in terms of what if you have a

6     voting or sample ballot, what do you have to do?  DOJ told

7     them, "We find it problematic that you're not translating

8     the sample ballot at all into Yup'ik," and they specifically

9     refer to here, you know, Ms. Growden -- well, I didn't

10    exactly do that well.  She talked about having a PSA.  What

11    they're talking about is a public service announcement.  The

12    reason being voters need to be informed, you know, what's

13    going to be on the sample ballot, what they're going to be

14    voting on before they walk into the voting booth on election

15    day.  That's what DOJ found problematic.

16            The thing that's interesting is this directly

17    contradicts the statements that the State has made

18    throughout the brief.  DOJ thinks we're doing a great job

19    because they haven't sued us yet, haven't required us to do

20    a consent decree.  We provided additional examples including

21    what Ms. Landreth talked about earlier, the testimony of

22    both now Governor, then Lieutenant Governor Sean Parnell and

23    then Division of Elections Director Whitney Brewster that

24    they had been contacted by DOJ directly about the problems.

25            What we did here, in terms of the lack of the lack

1  of pre-election information, I've just given you one screen.
2  We've given you all these that are summary tables.  They're
3  summary tables prepared from the State's own documents.  Two
4  sets of documents that were used to prepare this, the
5  outreach worker certificates in which the outreach workers
6  talk about what information they're actually providing and
7  whether or not they did anything, and then of course there's
8  y -- they have a -- I forget what they call it, but it's
9  basically where they actually pay the poll workers
10 afterwards.  I think it's a board worker document that is
11 given.  And what this shows is that if you look at all of
12 the State's own documents, in most instances, voters are
13 getting no pre-election information at all.  That is,
14 per se, ineffective.  You know, again, based upon the
15 State's own evidence, they're not getting information in the
16 covered languages before election day.
17         THE COURT:  I need you to wrap up.
18         MR. TUCKER:  Oh, sure.
19         THE COURT:  All right.
20         MR. TUCKER:  Again, this just highlights -- this
21 is one I do want you to take a look at.  This shows how --
22 you know, the sort of information you get pre-election can
23 actually vary from village to village.  And this also shows
24 again an outreach certificate in which you actually see them
25 saying, "Forgot to do that.  No, didn't do that.  Did not

1      provide any."

2             This also highlights another problem we have in

3      many villages.  If you don't have an outreach worker there

4      giving the translations in advance, they don't get a radio

5      signal, so it's simply impossible for them, for them to get

6      that.

7             Kind of the last thing I want to say before I kind

8      of wrap up is in terms of what's translated, the other key

9      thing here that's really kind of striking is the State of

10     Alaska has made a decision that it's only going to offer the

11     language information and materials both pre-election and

12     election day.  They're going to offer it just in the Bethel

13     census are only.  You see eight out of ten categories of

14     items they are doing.  Actually, there are some not

15     highlighted that should be.  Eight out of ten categories are

16     in BCA only.  The outreach meeting you see there, again

17     they've done three outreach meetings since 2007 in Bethel.

18     They haven't done any outreach elsewhere.

19             THE COURT:  We're really straying far into facts.

20             MR. TUCKER:  Okay.  Let me just go ahead wrap up

21     then.  In terms of -- I apologize, my mouse is --

22             THE COURT:  It's okay.

23             MR. TUCKER:  I think the last, the last point

24     before I actually talk about this should be the dialect

25     issue.  Again, the regulations show specifically that you

1    have to make sure that the language assistance you provide
2    is effective in the dialect.  It's not enough for the State
3    to identify what dialects they need to provide it in.  They
4    also have to actually provide the language assistance in
5    those dialects.  The facts are uncontradicted.  We have
6    admissions that the State knows what dialects they're
7    supposed to provide assistance in and they're not doing it.
8    So what that leaves us with, when the Court reviews the
9    papers -- and we really commend the Court to look very
10   carefully at the deposition testimony and the State's own
11   documents that we have attached.  We didn't find it
12   necessary to attach much in the way of plaintiffs' testimony
13   because you don't have to get to the fourth question of is
14   it effective if it's not being done at all.

15            And so what that leaves us with at the summary
16   judgment stage is the facts are uncontradicted.  Plaintiffs
17   are entitled to summary judgment based upon the facts, and
18   also based upon the controlling legal standard.  The State
19   has tried to cobble together a new legal standard that would
20   supplement and supplant the standard in Section 203, and in
21   fact, it's somewhat unique because it's an argument that
22   they didn't even make in Nick, and that's why, to the extent
23   that you look through -- in fact, it may be worthwhile to
24   look back at how the State briefed the issue in Nick and you
25   will see that the standard that they are -- that they have

1    come up with is one that they've invented since Nick.

2          So what that leaves us with, really for trial, you

3    know, is it going to be necessary to have a trial?

4    Possibly.  You know, we do agree with Your Honor when you

5    kind of cautioned us at the beginning to restrain it to

6    remedies.  That's really where the focus needs to be.

7          You know the other issue that we have, and this

8    is -- this is one issue of fact that I need to throw out

9    there only because we just became aware of it.  We just

10   learned that the State's Yup'ik language coordinator has

11   resigned, so that just highlights the sense of urgency that

12   we have now no Yup'ik language coordinator and we've got a

13   primary election that's fast approaching.  We need to get

14   the remedy in place soon so that the State has sufficient

15   time to implement the same sorts of guarantees, presumably

16   on a rolling basis.  It's going to be necessary to do

17   something probably very similar to what Judge Burgess did

18   and have some preliminary relief that will be followed by

19   permanent relief based upon, you know, based upon the timing

20   of the election.

21         But the only things left for trial at the end of

22   the day will be the remedy, and if -- if the Court finds

23   it's necessary, we may not need to get to our constitutional

24   claims.  We have the intent claim there only for the

25   purpose, again, of, you know, getting the Section 3 relief,

1    but again, the other thing that's actually very instructive

2    about the Sandoval opinion is that in Sandoval, the Court

3    specifically ordered federal observers to be used in

4    Sandoval based upon the fact that it found that the

5    jurisdiction had only recently begun coming into compliance

6    with Section 203.  They didn't find it necessary to go

7    through a detailed constitutional analysis.  They found

8    there was sufficient basis under the Fifteenth Amendment,

9    and that's it.  I won't talk about remedies.

10            THE COURT:  All right, thank you.

11            MR. TUCKER:  Thank you, Your Honor.

12            THE COURT:  You want to take about a seven minute

13    break and then I'll hear from you Ms. Paton-Walsh?  Are you

14    ready to go or do you want a break?

15            MS. PATON-WALSH:  No, the break is a good idea.

16            THE COURT:  Let's take a short break and we'll go

17    back on record.

18            DEPUTY CLERK:  All rise.  Court stands in recess

19    until three p.m.

20            (Recess from 2:53 p.m. to 3:02 p.m.)

21            THE COURT:  All right, we are back on record ready

22    to proceed.

23            REPORTER:  Excuse me, Your Honor, I am having a

24    technical issue, if I could have one moment?

25            THE COURT:  Of course.

1            (Pause in place)

2            REPORTER:  Thank you, Your Honor.  I'm set.

3            THE COURT:  Ms. Paton-Walsh, looks like we're

4    back.  Go ahead, please.

5            MS. PATON-WALSH:  Good afternoon, Your Honor.

6    This is a unique voting rights case because it's almost

7    completely devoid of voters.  Voters should matter.  Voters

8    should be at the center of this litigation, not shoved off

9    to the side in the way the plaintiffs have suggested they

10   can be.  I want to go immediately to your questions about

11   the language of the statute and try to address the standard

12   that we should be engaged in here.  The language provides --

13   Section 203 establishes a different standard, a different

14   set of materials or different conceptualization of what can

15   be provided in written language assistance and oral language

16   assistance.

17           THE COURT:  Well, that's my -- I'll jump right in,

18   Ms. Paton-Walsh.

19           MS. PATON-WALSH:  Absolutely.

20           THE COURT:  And does that mean, in your mind, that

21   the State can provide less in the way of language assistance

22   to people that are Alaska Native?

23           MS. PATON-WALSH:  I think less isn't the right way

24   to think of it, Your Honor.  I think it's going to be

25   different.  Let me sort of -- let me give you an example to

```
1    try to think about how language assistance works and why
2    written language assistance and oral language assistance are
3    going to be different but not necessarily one better than
4    the other.
5           THE COURT:  And I do understand that, and we'll
6    come back to your example, certainly, but if I looked at
7    the -- and I did look at the relatively small amount of case
8    law out there, but on the people that are under the written
9    component of the statute, so Spanish, for example, as I read
10   the case law, the key is not so much -- well the key, as I
11   understand it, is that everything that the State's putting
12   out in English it has to put out in Spanish.  Would you
13   agree?  If it falls within this LEP, limited-English
14   proficient group and the other statutory requirements?
15          MS. PATON-WALSH:  I'm not sure that I think it's
16   fair to say absolutely everything that a jurisdiction prints
17   in English has to be printed in Spanish.  Various things are
18   not necessarily directed at the voter.  I mean, certainly if
19   you have an official election pamphlet, then you would
20   translate that into Spanish.
21          THE COURT:  My point was -- my statement was too
22   broad.  Anything related to voting and registration needs to
23   be translated.
24          MS. PATON-WALSH:  I think that's -- that's a fair
25   assumption, Your Honor.  Although I think it doesn't
```

1   necessarily mean -- you mentioned Metro Dade County.  In

2   that case, the Court appeared to at least contemplate the

3   possibility of publication in the newspaper could be a

4   better way of delivering election information than

5   translating an election pamphlet.  Everybody in Alaska gets

6   an English version of the official election pamphlet through

7   their door.  Whether anybody reads it is another question.

8           THE COURT:  I read it.

9           MS. PATON-WALSH:  Well, some people probably do,

10   but maybe not cover to cover.  Maybe some people read it

11   cover to cover, but I guess the point is that voters are

12   going to get information, whether in English or in another

13   language, in a whole variety of ways and it might not be

14   that translating a specific thing that's available in

15   English into the target language is the best way to get that

16   information to that language minority, and so I don't think

17   that the law requires this sort of very rigid "it's printed

18   in English it has to be printed in Spanish" rule.  I think

19   as a general principle, it's likely that if you print

20   something in English and you have a written language that

21   people read, that the equivalent method of delivery is going

22   to be translated into written Spanish.  But I think when you

23   move to oral language assistance, when you move to people

24   who aren't going to be able to read something that you've

25   translated into their language even if it's even possible to

1    deliver that assistance to them, then you have an entirely

2    different set of circumstances.  And what the different

3    language of the statute recognizes, and I think that's

4    reflected also through the DOJ guidance and regulations and

5    the case law, is that oral language assistance has to be

6    something completely different.

7         THE COURT:  Does it have to achieve or provide

8    substantially the same amount of information or can the

9    State provide less information if it's an oral language

10    speaker?

11         MS. PATON-WALSH:  I think it can provide the

12    information that the specific voter needs.  One of the

13    things that the election -- the pamphlet you get, as it

14    comes through your door, maybe you read it cover to cover or

15    maybe you turn to the statements of the people who are

16    running in your district.  Maybe you look at ballot measure

17    languages.  Maybe if you're going to be on vacation that

18    year, you're going to look for absentee ballot information,

19    but you're not going to look necessarily about instructions,

20    about question ballots, or lots of other information that

21    might be in the pamphlet.  If you're trying to deliver that

22    kind of targeted assistance, what is it that the voter

23    wants?  If you send a voter a CD with somebody reading the

24    entire pamphlet, they're not going to sit and listen to that

25    thing, or at least if they are, that doesn't mean that

that's the best way to deliver that language assistance to
them.  If there's a person they can contact to ask a
question, "How do I get an absentee ballot," that person can
explain the process to them, that's going to be a much more
effective way of delivering language assistance, and that
also doesn't require a precise translation of the
instructions.

I mean, one of the things they talk about is the
failure of, for example, the election glossary to contain
things like the term for the gray secrecy sleeve.  But you
know, if you have a voter who comes in to vote and they need
to vote a question ballot, the poll worker who's helping
them doesn't need to translate the instructions into Yup'ik
to help that voter.  They just need to understand the
process and they the help the voter do it, explaining it in
Yup'ik in any way, and as long as the voter can effectively
vote, that's good language assistance.

THE COURT:  That's where I'm struggling,
Ms. Paton-Walsh, because back to the people with the written
language there, I read 203 to say any registration or voting
notices, forms, instructions, or assistance must be provided
in the language of the applicable minority group.  So I read
across the board and what I hear you're advocating is, well,
that may be true for written languages, but for Alaska
Natives, we can figure out just what really is important for

them to get and not provide all of the same information that
might -- that people are otherwise entitled to if they have
a written language.

      MS. PATON-WALSH:  Well, I think that's what --
that's the language of the proviso, Your Honor.  I mean, the
statute allows for or the statute contemplates that it is a
very different matter to provide oral language assistance
and written language assistance, and so it essentially
creates the category for oral instructions, assistance, or
other information relating to registration and voting.  How
do we get people who can't read in their language
information that's going to allow them to participate
effectively in the political process?  We need to get them
to register.  We need to help them vote, absentee voting,
question voting, whatever it is.  We need them to understand
what's on the ballot.  That's what's contemplated by this
oral language assistance.

      THE COURT:  So I guess then is -- going back to
the Fifteenth Amendment, and that is if all the English-
speaking people and all the people with a written language
as their predominant language are provided one set of
election materials and all the people that have a
historically unwritten language get a lesser set, they get
just a, whatever, smaller set, how -- how are the Alaska
Natives' rights to materials under the Voting Rights Act,

how are they not being abridged?  What I hear is across the
board, if you're English language, whatever the State
chooses to put out, you get a copy of it, if it's available
wherever it's put out, if you're English language speaking.
And then I hear if you're in this applicable minority group
as defined by the statute, you get everything in your
written language.  Everything that the State puts out in
English is also put out for you in that language.  What I
hear as the State's position is that while that's true for
written language, but oral, we're going to do a smaller
subset.  They're not going to get everything.  We're just
going to give fewer things that we think are the most
important for them, not everything like the Spanish-speaking
people would get.

      MS. PATON-WALSH:  I think it's not just a question
of what we think is most important for them but what they
need.  So I think that there's a difference between -- we
can deliver information and make it available to somebody in
English online, in a pamphlet we put through their door, but
we can't -- there isn't a good oral equivalent of that.  So
an individual voter might get less and only information in
the voter packet, but if they get what they need to vote in
that election -- if what they need to vote in that election
is an absentee ballot and they get that absentee ballot,
then they've been able to participate effectively in the

```
 1    process.  So a voter might get less than all of the
 2    information available in the pamphlet but still get all of
 3    the information they need, just like you might not read the
 4    candidate statements for people running in Southeast because
 5    you don't need that information but you have it, it's in the
 6    pamphlet.  So in terms of -- I'm not sure -- I wanted just
 7    to address the constitutional question, which --
 8              THE COURT:  Right, right.
 9              MS. PATON-WALSH:  Because first of all, this isn't
10    a Fifteenth Amendment issue, Your Honor.  This is a
11    Fourteenth Amendment issue.  The Fifteenth Amendment is
12    race, color, and previous condition of servitude.
13    Protection of language is a Fourteenth Amendment issue, and
14    to the extent that the different standards for written
15    language assistance and oral language assistance creates an
16    equal protection problem, that problem applies far more
17    widely than the distinction between written and oral.
18              So not every jurisdiction in the country is
19    covered by Section 203.  There are triggers.  They have to
20    be a certain level of minority language population to get
21    this coverage.  So if you're a member of a smaller
22    Spanish-speaking population, you don't get any written
23    language assistance.  If you're member of a larger
24    Spanish-speaking population, you get written language
25    assistance.  So equally, if you're a -- if you speak
```

```
 1    Russian, you don't get any language assistance however large
 2    your community is.  It's not a covered language under
 3    Section 203.
 4              So Section 203 treats different language
 5    minorities differently.  If that's a violation of the
 6    Fourteenth Amendment, it applies in a very general way and
 7    would presumably invalidate the entirety of Section 203
 8    rather than -- I mean, I sort of feel like that's an issue
 9    that can't be -- that's not really raised in this case
10    because we don't really -- they haven't made an equal
11    protection argument about written and oral.  And I think
12    that if you're -- if you're going to start to ask that
13    question, that raises a tremendous series of constitutional
14    problems, potentially, with the entire language assistance
15    scheme.
16              THE COURT:  All right.  Fair enough.  Thank you.
17              You were going to give an example, so if you've
18    forgotten it, that's fine, but --
19              MS. PATON-WALSH:  Do you remember what it was an
20    example of?
21              THE COURT:  It was an example of written versus
22    oral communication and the differences in how to convey
23    messages.
24              MS. PATON-WALSH:  Well, I think that I may have
25    already said or given an indication to this, but so the --
```

if you look at something -- if you think about how a
conversation works, a conversation is an exchange of ideas
and information.  If you get a pamphlet through your door,
you read the information, and if you don't understand it,
then you have to go searching for -- you know, you go to the
web site, maybe you'll call the Division of Elections, or
maybe you're just going to give up.  If you're having a
conversation with an election worker and you don't
understand when they said, "Put your ballot in the gray
secrecy sleeve," the election worker can look at you and
say, "Oh, I don't think this person is understanding what
I'm saying.  Here, let me show you the gray secrecy sleeve."

        So an oral translation of the instructions is --
it's going to be -- it may be a closer equivalent to a
written translation but it also may not be the best and most
effective way of providing language assistance.  That's why
language assistance, as provided by individual people, can
actually function more effectively than a written
translation or even an oral recording.  And that, I think,
is particularly important when you're looking at a
language -- languages like Yup'ik and Gwich'in which do not
have words for many of the concepts that are involved in
American politics.  And I think that for the vast majority
of language assistance, that interchange, that give and take
of conversation, is going to create more effective language

assistance than written materials would be.

THE COURT: What if the person that's responsible for conveying the information doesn't understand the electoral process, him or herself, either?

MS. PATON-WALSH: Well, the Division actually has extensive training for election workers in election processes and the -- I mean, those election workers are thoroughly trained in how to provide registration assistance, how to deal with question ballots, how to help, how to provide absentee voting assistance. So there isn't any evidence in the record that there's a problem with election officials and poll workers not understanding the election process. And if you understand the election process, you don't need to be able to translate these instructions into Yup'ik. You can just explain how it works.

The one thing that's different is a ballot measure, and the ballot measure creates a very unique and special set of problems because the Division can't take a position on a ballot measure. The ballot measure is very complicated and that's why we have a translation panel of Yup'ik speakers who have spent this year already, two full days already, and I think another one is scheduled, to try to work their way through the old tax referendum ballot measure to create a text that can be used by poll workers.

1    In an ideal situation, they would be able just to read that

2    ballot measure to the voter, and that's going to put that

3    voter in essentially the same position that an

4    English-speaking voter is when looking at the tax

5    referendum.  How much understanding is involved, that's

6    going to obviously depend a lot on the voter.

7          So the ballot measures are different and unique

8    because there are special rules about what the Division can

9    say about a ballot measure.  The ballot measure summaries

10   are covered by attachments and regulations.  They're often

11   litigated, and the Division doesn't have the ability to

12   tinker with the language that's used.  So they create a

13   unique situation.

14          But in fact, it's by what counsel has told you, a

15   Yup'ik language, Yup'ik sample ballot is provided to every

16   poll worker in the Wade Hampton and Dillingham census areas.

17   They have the same access to the Yup'ik language assistance

18   program and everything that is incorporated in it in those

19   census areas as they do in Bethel.

20          And I think to go to the crux of their argument

21   about Wade Hampton and Dillingham has to do with dialect,

22   but in fact, there's no evidence in this case that dialect

23   differences have mattered to voters, mostly because there

24   are no voters in this case.  But all you have is testimony,

25   the vaguest testimony possible about dialect differences.

Dialect is about prosody and word choice, but the plaintiffs have not identified a word in the general central Yup'ik dialect, which is the most commonly spoken dialect in Alaska, versus some other dialect that they are asking for assistance in. That from a ballot measure, here's the general central Yup'ik version, here's the Bristol Bay version, here's the Chevak version. There's no evidence of that. There's no testimony about that, that that has ever caused a problem. And I think it's -- the absence of that evidence is sort of at the crux of this case because the plaintiffs are essentially trying to avoid the effectiveness requirement or the -- or addressing providing evidence of effectiveness by making this argument that if we don't provide it, it's, per se, ineffective.

First of all, there's a lot of dispute about what is and isn't provided. But more than that, it's not -- it's not -- it's not true that if a particular kind of language assistance isn't provided that a voter is not getting the language assistance they need because the needs of voters are not the same. Not every voter needs exactly the same kind of assistance or help. They don't need the same kind of information and they're not going to be helped in the same way.

THE COURT: And so am I correct that under your analysis of 203, essentially is it fair to say it would be a

per se, if you will, analysis if it were a written language

case and materials were not provided versus, since this is

an oral language case, there's a burden on the plaintiffs to

show the lack of effectiveness?  Am I correctly

characterizing your argument?

        MS. PATON-WALSH:  Almost.

        THE COURT:  Fair enough.

        MS. PATON-WALSH:  So I don't know that I would --

that I would say that without a specific example of what it

was, the written language assistance that you're talking

about that is missing, that I would say that was

necessarily, per se, ineffective.  Not everybody reads the

election pamphlet.  It might be more effective to print

information and put it in the newspaper or to broadcast it

over the radio or provide it in some way that is not an

exact mirror of written assistance in English.  Written

information can be made available in a variety of different

ways.

        THE COURT:  And in fact, the statute doesn't

require it be provided --

        MS. PATON-WALSH:  In exactly same way.

        THE COURT:  Right, for two people with the written

language.  All right.

        MS. PATON-WALSH:  But I think it's obviously for

the same reason that it's much easier to provide a written

language assistance in languages that are widely spoken, if
you need to provide Spanish language assistance, there are
tens -- hundreds of millions of people across the globe who
speak Spanish. Many, many of them have interpreting or
translating credentials and can provide, are available to
provide useful, accurate, comprehensive translations of
Spanish materials. That's not anything like the task of
providing oral language assistance in a language that is
spoken by very few people.

And I want to be very clear here because I feel
like the Division is being characterized as somehow being
dismissive of small groups of language speakers. We have
never taken the position and we do not take the position
because there are not many Gwich'in speakers that they don't
deserve assistance or that they don't matter. The problem
is not that -- the issue is not we don't care about them
because there's only 300 of them. The problem is, when
there are only 300 of them, there are only so many people
who can provide the assistance. You know, the plaintiffs
have complained that we're putting the onus on tribal
councils, we're putting the onus on the minority language
community. But Your Honor, if there are 300 people who
speak Gwich'in in the State of Alaska, and that seems to be
a fairly undisputed proposition, some of those people need
language assistance. The rest of them constitute the only

1  people who can possibly provide this assistance.  That's

2  not -- there's nothing dismissive about that.  That's just a

3  cold reality.

4          THE COURT:  I was actually -- I don't think either

5  of you addressed this, but when I looked up these

6  communities on the map, they're pretty close to Canada.  Are

7  there Canadians that speak Gwich'in?  I was just curious.

8          MS. PATON-WALSH:  There are Canadians who speak

9  Gwich'in.  My understanding from deposition testimony, which

10  could be elicited on the stand I think at trial if you were

11  interested --

12          THE COURT:  No, I just --

13          MS. PATON-WALSH:  Is that the Canadian Gwich'in

14  dialect is quite different and the witness suggested that he

15  wasn't sure how easy it would be for there to be

16  communication.  That's an idea of what he said, I think, as

17  I recall.

18          THE COURT:  You're not testifying.

19          MS. PATON-WALSH:  Okay.  So I think that the --

20  the issue about the number of Gwich'in speakers, it seems to

21  me, goes actually to the second part of what the DOJ has

22  sort of created as a standard, which is all reasonable

23  steps.  But I want to go back to the issue of effectiveness

24  because I think that's sort of at the crux of this.

25          The plaintiffs take the view that there's a thing,

          this per se ineffectiveness, that they can establish by the
          absence of some kind of translation.  If you look at the
          actual language of the statute, the statute doesn't require
          effective language assistance.  It just requires a
          jurisdiction to furnish oral assistance or other assistance
          related to language and voting.  So there's no effectiveness
          standard expressed in the statute.  But obviously, Congress
          must have intended to do some good, right?  So there's an
          effectiveness standard that's spelled out in the
          regulations.  That standard is -- and I think the language
          that the DOJ uses is particularly significant when you're
          trying to understand whether per se effectiveness theory is
          remotely consistent with that interpretation of the law.
          And I don't think that the DOJ's interpretation, the
          regulations can be -- can be reconciled with this
          interpretation in any way.
                  When the -- when you look at the first part, 28
          CFR 55.2, standards for measuring compliance, the first
          standard, assistance should be provided in a way designed to
          allow voters to be effectively informed of and participate
          effectively in voting, voting activities.
                  THE COURT:  Really, I have that here in front of
          me, is the way it reads is, "Materials and assistance should
          be provided."  So at least with regard to the written
          speakers, could one read that language to indicate that the

1    statute requires all materials to be provided, and here is

2    an indication, just as you've said, that it has to be done

3    effectively, but I don't see this language, at least with

4    regard to the written, as indicating you don't have to

5    provide everything.  I think the statute's quite clear on

6    that.

7              MS. PATON-WALSH:  Well Your Honor, I mean, I think

8    the statute does, it seems to me, sort of create a very

9    broad sweep, but if you look at the -- if you're looking at

10   the regulation, that language, "Provided in a way designed

11   to allow," is about -- it makes -- so the materials and

12   assistance should be provided in a way designed to allow

13   voters to participate effectively.  That language should

14   mean something.  Otherwise, they could just say materials

15   and assistance should be provided effectively or I mean, I

16   think that that language there, I mean, our position is that

17   that language essentially goes to the -- this issue of

18   substantial compliance with Section 203.

19             So the Court, in Sandoval, I think, is looking at

20   this language and saying there has to be a systemic problem

21   here.  It can't be a poll worker overslept or is sick.  It

22   has to be that there's a fundamental reason why there are no

23   poll workers who can provide assistance because it's a

24   systemic problem and that comes from this language,

25   "Provided in a way designed to allow," but that key element

1    there is still effectiveness.

2           THE COURT:  But are you reading the regulation,

3    then, in a manner to alter the statute so that you don't

4    really have to provide everything if it's a written

5    language?

6           MS. PATON-WALSH:  No.  I think that the -- what

7    the statute requires is information.

8           THE COURT:  I read it as any registration or

9    voting notices, forms, instruction, assistance, or other

10   materials shall provide them in the language of the

11   applicable minority group.  I read that, at least if it's a

12   written provision, that the -- that whatever -- that the

13   regulations can't trump the statute and say, well, even

14   though that says you have to provide everything, actually

15   you don't, you can pick out what you think is effective.

16          MS. PATON-WALSH:  Well, no, I'm sorry if I was

17   unclear.  I don't mean to suggest that the statute, that the

18   regulation -- certainly the regulations don't trump

19   statutes.

20          THE COURT:  We've got all that down, right.

21          MS. PATON-WALSH:  The statute lays out the

22   materials, I think, provided in a way to allow for.  Written

23   perspective might go, for example, to the Metro Dade County

24   courts providing the possibility that the publication in the

25   newspaper could be more effective than a voter pamphlet.

1    But I think as a general rule, I do think that in the vast

2    majority of cases, written language assistance is going to

3    mean you've got an English piece of paper, you're going to

4    have a Spanish piece of paper, and that's a straightforward

5    thing to do.  It's not -- that's a simple task.

6           It becomes much more difficult when you have a

7    body of voters who basically, even if you could produce

8    that, that piece of paper in their language, that most of

9    them won't be able to read it.  And so when you have an oral

10   language, then you have a different situation.  And so I

11   think that when you're looking at effectiveness, the oral

12   language assistance, you look at the oral regulations also

13   that go to discussing oral language assistance.  I think you

14   can see, too, that the Department of Justice, in looking at

15   this, is understanding practicalities in a way that I don't

16   think they do.  You have to take a different approach.  You

17   have to be a lot more flexible, and it makes sense to figure

18   out what people need and what will work for them.  And when

19   you're trying to figure out the failure to do X, Y, or Z is

20   creating a problem, you really have to have voters who are

21   going to say, "No, I need this kind of help, not that kind

22   of help."

23          We don't have voters here with no -- there's no

24   evidence presented by them to show that the decisions that

25   the Division of Elections has taken are somehow failing

1  people in these languages.

2       And I wanted to point out some of the other

3  regulatory language that indicates that the Department of

4  Justice views this not in a way that's consistent with their

5  per se view, but that's much more consistent with our view

6  that this is a flexible question.  This is a program that

7  needs to be designed for specific minority communities.  So

8  for example -- I'm going to have lost my place now.

9            THE COURT:  Take a moment.

10           MS. PATON-WALSH:   -- okay, so 28 CFR 55.2(c)

11  states, "The determination of what is required for

12  compliance with Section 203(c) is the responsibility of the

13  affected jurisdiction.  These guidelines should not be used

14  as a substitute for analysis and decision by the affected

15  jurisdiction."

16           If there's an absolute requirement about what a

17  language assistance program is going to look like, that

18  regulation is pointless.  That -- that's completely

19  superfluous.  If everybody knows what's required for

20  language assistance, then the determination of what's

21  required for compliance with 203 is not the responsibility

22  of the affected jurisdiction.  There's going -- there's a

23  set of things out there that everybody has to do.

24           THE COURT:  Or could that be read to give the

25  responsibility and authority to the jurisdiction to

1   determine the means of conveying information as opposed to

2   determining what information's conveyed?

3           MS. PATON-WALSH:  Well, I think that the statutory

4   language determines that, the scope of information that has

5   to be conveyed.  So that's instructions, assistance, and

6   other information relating to registration and voting.  So I

7   do think that this is about the means of conveyance, but in

8   fact, the arguments that we're hearing about the things that

9   were not -- actually that we're just supposedly not doing,

10  because there's a lot of dispute about that, that that

11  creates this sort of problem, that goes to this issue of

12  means and this question about these guidelines should not be

13  used as a substitute for analysis and addition by the

14  affected jurisdiction.  That means flexibility.  That means

15  looking at what works on the ground.  That means deciding

16  whether -- so a perfect example of this is this question

17  about announcements, election announcements.  So certain

18  communities have access to radio stations, and in those

19  communities, radio stations can be sent Yup'ik language

20  voter assistance and they can make those announcements over

21  the air.  As it now happens, the Division has contracted

22  with radio stations that cover the entirety of Wade Hampton

23  and Dillingham.  There's a new contract we have with KACY

24  since 2012 that covers those voting areas that were not

25  covered before with radio announcements.  But in the absence

of a radio station signal, how do you reach those people?
That's when you go to VHF radio. But VHF radio is not going
to work in every -- there's no requirement that
announcements be made under VHF radio in any covered
jurisdiction under Section 203. That's a means, a method
that's very focused on what's this community like, what's
this situation like on the ground, how do we get to people.
That's something the Division determined by surveying tribal
councils and saying, "What's the best way to reach your
people? Is VHF a good way?" Then when they say yes, okay,
that's great. We try to do VHF announcements. That's the
type of analysis and decisions we're talking about and in
order to show that those decisions that -- that the Division
has made are failing, there needs to be -- you can't say,
"Well, there's no VHF in the community." Maybe there's a
radio station, or the reverse is true.

In order to demonstrate there's a failure, there
have to be people who are not getting the help they need.
There have to be voters. Section 203 doesn't turn the
burden of proof on its head, Your Honor. The plaintiffs
have to show ineffectiveness. They have to show a failure.
They want to do it by saying, well, we're not doing A, B, or
C. But that's not what's provided for here. They have to
show that assistance is ineffective by providing voters who
are not getting the assistance they need, and they don't

```
 1    have those voters.
 2           I have been paying no attention to the clock, so I
 3    don't know --
 4           THE COURT:  You're doing fine.  Mr. Tucker spoke
 5    for quite a bit.  Take a few more minutes; that's fine.
 6           MS. PATON-WALSH:  If you look at -- there are
 7    other regulations that make this point in exactly the same
 8    way.  Look at 55.20, the regulation governing oral
 9    assistance and publicity.  That's where the Department of
10    Justice says, when you have an unwritten language, you to
11    provide oral assistance and publicity.  That's how they
12    characterize that Section 203 requirement, oral assistance
13    and publicity.  And they have a regulation that describes
14    it, announcements, publicity, and assistance should be given
15    in oral form to the extent needed to enable voters to
16    participate effectively in the electoral process.  Not just
17    announcements must be given, but they should be given to the
18    extent needed to allow people to vote effectively.  Again,
19    implicit in this whole thing, this whole idea is that,
20    what's happening with the voters.  The experience of the
21    voters is going to guide whether this language assistance is
22    effectiveness -- is effective.
23           THE COURT:  I'm having trouble -- maybe if we try
24    this one more time.
25           MS. PATON-WALSH:  Okay.
```

            THE COURT:  Because I'm having trouble getting

past the statute, and I do recognize -- and I appreciated

the cites to the regs, which I've also reviewed, but as I

read the statute, if it's a Spanish-speaking language at

issue, then the goal is or the statute requires that this

minority group get everything.  I mean, shall provide.  And

I agree with you and I appreciated you pointing out the

means are not always required to be writing, but they get

everything if it's a written language that falls within the

applicable group and all the other requirements.  And as I

understand your argument, if you're Alaska Native, you don't

necessarily get everything.  You get whatever the Division

has figured is necessary.  And where am I missing -- because

I'm not hearing the State say you're willing to provide or

that you read that first clause as applicable to Alaska

Natives, but instead read it to pertinent selected materials

to go to this designated minority group whereas minority

groups with written language get everything.  So where --

where is my -- where's my downfall on this, Ms. Paton-Walsh?

            MS. PATON-WALSH:  So I think it has to do with --

I want to say access, but I don't think that's the clearest

term.  So when I -- when you create a written version of

your English voter election pamphlet, you can -- you hand it

to the person, you say, "Here you are, you've got the same

stuff," but actually, whether somebody looks at that stuff,

1    how helpful it is all depends on the extent to which the

2    voter actually engages with the pamphlet.

3            So the Division of Elections is -- the stuff

4    that's in the pamphlet that is -- that is important for

5    allowing an Alaska Native voter to vote effectively is

6    available to that voter in the minority language through

7    oral language assistance from an outreach worker, from a

8    poll worker, from the hotline, voter assistance hotline.

9    The voter has to access it in a different way because

10   there's no written version.  They couldn't read the written

11   version if they had it.  They need oral language assistance.

12   So it might be that if I'm a minority language voter that

13   I'm not going to hear information about what will happen if

14   I have to vote a question ballot unless and until I need to

15   vote a question ballot.  But if I'm an English-speaking

16   voter or Spanish-speaking voter, I'll have the pamphlet that

17   will tell me that if I needed it.  I'm thinking that

18   probably the English-speaking voter probably isn't going to

19   read that until he or she needs it, but it's not that item's

20   not available to the Yup'ik-speaking voter.  The

21   Yup'ik-speaking voter that goes to the polls to vote a

22   question ballot, there will be a bilingual poll worker there

23   to help them do it, vote the ballot and make sure it counts.

24   We're not talking less in -- less in the sense that there's

25   a particular kind of information that the voter would need

```
1    that they can't get anywhere.  Only that because the -- it's
2    a delivery system issue, if you like.  Okay?
3              THE COURT:  So is it fair to say that the goal of
4    the program, then, to the oral assistance program, is to
5    enable access to everything that is available to the person,
6    the minority group with the written language.  The
7    registration, voting notices, forms, instructions,
8    assistance, or materials, everything relating to the
9    electoral process but just in a different format?
10             MS. PATON-WALSH:  That's the goal, Your Honor.  I
11   mean, obviously there are particularly unique difficulties
12   that come with oral language assistance that make it much
13   harder to guarantee -- impossible to guarantee and also much
14   harder to measure, which is why the failure of plaintiffs to
15   provide evidence of failure is so problematic.  I mean, and
16   I think, you know, I don't want to spend a lot of time
17   talking about relief, but if you find a violation, there has
18   to be a way for you to fix it.  And you know, it's like I
19   like to think that federal law is not imposing impossible
20   obligations on the jurisdiction.  So there has to be
21   something that we're not doing that we can be ordered to do
22   and that can be done that's going to make this better.  And
23   that's also, seems to me, that's embedded in the notion of
24   all reasonable steps, and it's also conspicuously absent
25   from the plaintiffs' sort of view of this.
```

```
 1            For example, Mr. Tucker mentioned the fact that we
 2   no longer have a Yup'ik language assistance coordinator on
 3   our staff.  He suggested that in the context of relief.  But
 4   with all due respect, Your Honor, you can't order a
 5   Yup'ik-speaking person to come and work for the Division of
 6   Elections.  When we recruited Mr. Jackson last year, it took
 7   four separate extensions of the advertising period to get
 8   him.  It's not a simple matter for us to find a Yup'ik
 9   language speaking person to work as a coordinator, and that
10   problem can't be solved with an order from the Court.
11            THE COURT:  I read that.  I read that.
12            MS. PATON-WALSH:  Another regulation -- I hope I'm
13   not overwhelming you with the regulations you said you
14   didn't want to hear about.
15            THE COURT:  It's fine.  I have them right here.
16            MS. PATON-WALSH:  55.20(c) talks about poll
17   workers.  The DOJ calls them helpers.  That regulation says
18   jurisdictions have to figure out how many bilingual poll
19   workers they need, and when they do that, they should
20   consider relevant factors, how many people in the precinct
21   speak the minority language, how many of those people need
22   language assistance, and the ability of the voter to be
23   assisted by a person of his or her own choice.  That
24   Mr. Tucker talked about is Section 208 that some voters will
25   prefer it to be assisted by somebody other than the poll
```

worker.  The Department of Justice recognizes that that
could be a legitimate factor in determining how many
bilingual poll workers you provide.  There may be
disagreement, but with all respect, I think the regulations
are a more compelling interpretation and I think you can
understand this by thinking about the different communities
of voters we could be talking about.  Some minority language
voters live in tight knit family dominated communities where
they might have children, grandchildren who are fluent
English speakers who are the people they turn to to help
every time they communicate with the Government where they
fill in forms, or PFD, et cetera.  They get help from their
children, grandchildren, siblings or spouses who speak
English.  Other minority language assistance voters might be
people in a fish processing plant.  They don't have family
connections.  They aren't part of a cohesive community.
Those people might need language assistance from a
jurisdiction in a way people who can rely on family members
don't.

         I want to go back to something Mr. Tucker said
because I think it's flat wrong.  It is not and cannot be
the case that language assistance only counts if it comes
from the jurisdiction, that that has to be the only source,
that if you have a community where people can turn to family
members or whatever, that that is irrelevant, that doesn't

count, because in the end, this statute is surely about
voters and whether voters understand what they're doing.  If
they don't need language assistance from the jurisdiction,
that can't be a violation of the VRA.  It has to be about
the voters.  They're the center of this.  And they haven't
presented any evidence about voters.  Just ignored that and
pretended somehow that the Division has the burden to prove
that this language assistance is effective, while at the
same time I'd like to point out trying to exclude all
evidence of effectiveness that we have collected by
surveying tribes.

       THE COURT:  A little nice segue to the motions in
limine, but that's all right.

       All right, go ahead, please.

       MS. PATON-WALSH:  Well, I think actually that
unless you have further questions, the only other thing I'd
like to say is, you know, Mr. Tucker spent a long time
talking about Nick.  He talked about evidence from Nick and
maybe stuff even that isn't evidence in Nick, a lot of stuff
that isn't even in the record.  What matters on motions for
summary judgment is the evidence in the record and what's
conspicuously absent here is evidence from voters saying
that they haven't been able to vote effectively as a result
of failures of the Division's language assistance program.
And without that evidence, I don't think that the plaintiffs

1  can defeat the State's motion for summary judgment at trial,

2  and just to wrap up with this, we talked about at trial,

3  what should be the rule of law that you're going to apply?

4        THE COURT:  And I read what you proposed, yes.

5        MS. PATON-WALSH:  I think this is appropriate,

6  Your Honor.  It's civil litigation.  The plaintiffs have the

7  burden of proof.  They should have to prove ineffectiveness.

8  I think they should have to do it with voters because I

9  don't see how else that happens.  But at the very least,

10 they have to prove ineffectiveness.

11       And then it seems, Your Honor, they should have to

12 prove that the problem, whatever problem they've identified,

13 can be addressed by the reasonable step the Division hadn't

14 taken.  We can't conscript people to provide us with

15 translations.  So there has to be a reasonable thing that we

16 can do.  You know, the federal law doesn't, one likes to

17 think, impose completely unreasonable requirements.  That's

18 why there's that language in the regulation.  That's why the

19 Department of Justice takes a much more flexible view than

20 the plaintiffs do and there has to be some sort of thought

21 about what it is that the Division is somehow failing to do

22 before there should be any, any violation of the Voting

23 Rights Act found.

24       THE COURT:  All right.  Ten minutes, will that be

25 enough time, Mr. Tucker?  Why don't you wrap up with that.

1          MR. TUCKER:  That should be perfect.

2          THE COURT:  Then I'll give Ms. Paton-Walsh the

3     last word here.  Go ahead.

4          MR. TUCKER:  Thank you, Your Honor.  Just a few

5     points.  Again, part of this -- I'll pick up where

6     Ms. Paton-Walsh left off.  First of all, the question of

7     what reasonable steps need to be taken, she suggests there

8     may be impossible steps.  No, that's not true.  Our

9     Complaint specifically said the reasonable steps we want in

10    place for remedy are the same ones for Nick.  We're not

11    asking for any new ground.  We're simply asking that the

12    remedy and relief provided in the Bethel census area be

13    applied in the other three areas.  That was the product, as

14    we said in the brief, of three years of very intense

15    litigation.  You know, there have been some things that

16    probably haven't worked out quite the way anyone expected

17    from Nick, and those things can certainly be tweaked, but

18    we're not talking about paving any new ground.  We're not

19    talking about coming up with any unique remedies that have

20    not already been addressed.

21         I want to turn to a few slides, and indulge me

22    briefly on one fact question only because Ms. Paton-Walsh

23    raised it.  First of all, Ms. Paton-Walsh said there's

24    nothing in the Voting Rights Act that talks about

25    effectiveness.  Section 14 of the Voting Rights Act says

effective.  It's in the statute.  The section on voting
applies to 203.  It applied to every provision in the Voting
Rights Act, including 203.  That is the standard, that is
the polar star that is what guides us here.  That is the
direction we need to go down.

So the next question is what needs to be
translated.  Again, just kind of going back, I want to
emphasize this slide because, again, were not asking the
Court to pave any new ground.  In the slide that we provided
at 329 at 87-1 in the docket, we have given citations to
other cases that specifically deal with what have been
called unwritten languages, and most of them pertain to
Navajo.  There are also citations to Nick.  And again, we
have the citations to the record so that the Court can see
specifically where each of those voting materials, you know,
each step have been provided.

I think one of the disturbing things, and
Ms. Paton-Walsh kind of walked around it a lot, is that,
fundamentally, what the State's argument is, if you're
Alaska Native, you get less than other voters.  That raises
considerable problems, I think, in that respect.  Perhaps I
didn't connect with you well in the Fifteenth Amendment
issue, but that is deeply disturbing if that is what their
position is.  The statute does not say that.  The statute is
very clear, shall.  Shall means shall.  It doesn't mean it

shall except if you're Alaska Native you don't have to worry
about it.  All of the -- all the Stevens proviso means is
that if it is an oral language or if it's historically
unwritten, you have to provide it orally.  Doesn't mean you
can pick and choose and decide what you think the voter
needs to hear.  There's not that level of patronizing
language written in the Act.  The statute is designed to
give it to the voter to decide what he or she thinks is
important and what they need to know.  It would be
problematic if it were otherwise because you're talking
about a fundamental right and giving the State the
opportunity to pick and choose what it wants to provide.  In
fact, the interesting thing, we provided this, and if you
indulge me for a moment, I'll throw up the slide.  There's
actually an instance where the State did pick and choose
what it wanted to provide and that was in the interest of --
should just take me a second.  For Gwich'in, if you see
here, this is actually an instance in which the State
decided only translate Ballot Measures 1 and 4.  Don't worry
about 2 and 3; they're not all that important.  One of them
actually involved aerial shooting, which obviously any time
you deal with hunting issues and the tribes, subsistence
issues are a very important thing.  That was not translated
into Gwich'in by the State's choice because they decided if
you're Alaska Native and you speak Gwich'in, you're entitled

1      to less assistance.

2              The interesting thing about this, the State talks

3      about what it's doing now.  Everything it's doing it started

4      doing again after this lawsuit was filed.  You will see a

5      gap again between 2008 and 2013, absolutely no, you know, no

6      effort to reach out and try to get things translated into

7      Gwich'in.  And it didn't resume again in earnest until this

8      litigation was filed.  Again, I'd commented -- I won't throw

9      the slide up there again, but the long slide that actually

10     shows all the information voters get in English, Your Honor

11     has pointed out that information needs to be provided in

12     some form in the covered languages.  We can agree to

13     disagree on whether or not everything has to be provided in

14     written form, but at the end of the day, it has to be

15     provided in a form that's going to be effective and that

16     means the translations have to be complete, clear, and

17     accurate.  They have to be translated so that if you're a

18     voter in Gwich'in, if you are a voter who's LEP and speaks

19     Yup'ik, you're getting the same information a voter is

20     getting in English.  And again, it doesn't have to be 112

21     page election pamphlet but you do have to get it.

22              I think one thing striking, very disturbing,

23     Ms. Paton-Walsh made this argument, she said, it's okay, you

24     can go and show up on election day and the bilingual poll

25     worker is going to be there to give you the translation of

1    the ballot.  That's the School District 90 case.  The Court

2    said you can't do that.  If you're giving pre-election

3    information about what's going to be on the ballot in

4    English, you have to give it to the voters in covered

5    languages.  You're not entitled to less just because you

6    happen to be a Native voter.  It's deeply disturbing that is

7    the position the State has taken.

8            I think, moreover, one of the points that is very

9    striking, the State has referred to all of the training that

10   it is -- this comprehensive training it gives.  It's on

11   record to show that 50 percent of its poll workers are not

12   trained.  They've said -- they quibble with that.  They

13   said, "Look at the bilingual poll workers we're doing a

14   better job."  25 percent of them receive no training by the

15   State's own admission in their brief.  That is not effective

16   assistance under any stretch of the imagination.

17           The other slide I want to show you is -- take you

18   to the end and specifically point out, and they talk a lot

19   about voters, and the voters, we have no information about

20   voters.  Let me show you a little bit about voters.  This is

21   in terms -- this in context of dialect.  This is Frank

22   Logusak, a Yup'ik translation panel member.  He stated,

23   "We're aware that the dialect may not, you know, be

24   understandable in parts of the Yukon," and other areas.

25   They have different dialects.  What do they have?  Vincent

Nicketa, the poll worker -- this is one of the people giving translation to the voters, "It's not in our dialect."  Irene Camille, "It's just too hard to read.  Why is it hard?  "Because it's written wrong.  I can't even read it.  I can't read it.  I don't know if it's spelled wrong or it's a different dialect.  It's too hard."

Brenda tall, she actually talked about, "We will make a joke about it," and she said -- and I think most critically for this, they didn't use the sample ballot at all because it was written in central Yup'ik and she was in Hooper Bay.  "I prefer to translate them on my own," basically take an English ballot and do an on-the-spot translation.

That's why there's an issue of dialect.  That's why there need to be dialect-able differences taken into account.  As we say in the briefing, it doesn't have to be onerous.  If it's a different word, you can put a footnote and drop it down, give the correct word in the dialect.  It's not an onerous burden.  Other jurisdictions in the Lower 48, typically the Four Corners area, have done this for a long time and they've been able to do it quite successfully.

THE COURT:  Where does the Fifteenth Amendment tie in?  Do you agree with Ms. Paton-Walsh that it's not really applicable in this case?  I thought you pled it in this

    1    case.

    2           MR. TUCKER:  We did, and she's dead wrong on the

    3    law.  I believe, don't quote me -- although I'm sure you

    4    will -- I believe it actually came up.  It was litigated in

    5    United States versus Blaine County Tribe in Blaine County,

    6    Montana.  Section 2 lawsuit but specifically, Blaine County

    7    said you don't apply to Natives.  It's -- the Fifteenth

    8    Amendment absolutely applies to Native Americans, and other

    9    language minority groups.  There's case law says it also

   10    applies to Mexican-Americans, Spanish-speaking or Latino.

   11    That's the law in the Ninth Circuit, and that's the law

   12    throughout the country.

   13           I would just go through a few more notes and I

   14    think I've got just about what I need, since I know I'm out

   15    of time.

   16           This is not -- again, the fundamental issue here

   17    in terms of oral language assistance, it is a different

   18    form.  You don't get less than what voters get in English.

   19    You get the same information.  You get it in a different

   20    form.  You need to make sure that it's in a dialect that

   21    they understand so that they're going to -- so that it's

   22    actually going to be helpful to them.

   23           I think it's very problematic if you say that you

   24    don't -- just because you happen to be Alaska Native or that

   25    we don't think you really need it because not every voter

1   needs it, because I know there's colloquy about what you

2   might look at in an official voter guide.  Fact is, that's

3   not the State's decision.  That's the voter's decision, and

4   the voter can't make that decision unless they actually have

5   the information provided to them.

6           And let me just see, the other issue, in terms

7   of -- I know she also talked about we need to have a parade

8   of voters come up here.  You know, part of it is if you

9   don't have the translations, they really can't be effective.

10   If they're not being done, it can't be effective.

11           The other issue, of course, is that voters,

12   themselves, may not know what they're missing.  These are

13   voters not getting information.  You're asking them to come

14   up and talk about what they're not getting.  We know from

15   the State's records, we know from the poll workers where

16   they've had poll workers working, who's been trained, what

17   translations they've been given, what materials have been

18   translated.  We know that from the records.  We are going to

19   have some voters who are going to testify at trial.  Does

20   the Court want us to have 60 voters from 40 different

21   villages -- not quite that many in these areas, but 30

22   villages come and testify?  Probably not.  I don't think we

23   need to do that.  We are going to have voters testify at

24   trial.  For purposes of summary judgment, we don't need it

25   because the evidence is undisputed and the facts are

```
1    undisputed, other than Ms. Growden's contradictions of her
2    own statements and their own documents, which she simply
3    cannot do, that plaintiffs have established as a matter of
4    fact in law that the defendants have simply not complied
5    with Section 203.
6            The other thing, again, that's a very important
7    point, and I would commend the Court, I would throw this --
8    I think I can put it up, I do want to highlight this just in
9    terms of what happens if you are going to force a voter --
10   or, I'm sorry, a poll worker to translate something on the
11   spot.  So this is the language.  This is the language of
12   Page 1 of one of the ballot question that's going to be on
13   the ballot next year -- this year.  I'm sorry.  Page 2.  And
14   not enough for Page 2, we now have a Page 3.  It's an
15   impossible burden to ask -- to ask a poll worker to
16   translate on the spot a two and a half page or two and a
17   third page ballot question.  Especially, again, as
18   Ms. Paton-Walsh was just saying many of the words are
19   difficult.  They may not exist.  It's something that you
20   have to provide in advance.  You can't have the voters'
21   information that they rely on to exercise the fundamental
22   right to vote depend upon the particular translation skills
23   of whoever happens to be in the polling place, if there is
24   anyone in the polling place on election day.
25           I think the other point, last point I really
```

1   should conclude with is I don't want the Court to get the

2   wrong impression that we're suggesting that if you have di

3   minumus violation where you happen to not have a poll worker

4   here or there or one piece of material isn't translated,

5   that that would make a 203 violation.  That's not what we

6   have here, and that's certainly not what we're claiming.

7   We're talking about in some villages the wholesale failure

8   to provide it, and other villages, a wholesale failure to

9   provide certain categories of information.  And it's

10  information that voters need to be able to cast their votes.

11  If they don't get it, there's no need to present a vote on

12  that because the State's own admission, they say they didn't

13  provide it.  For example, Gwich'in is probably the best

14  example for that.  The State admitted they don't have a

15  Gwich'in glossary, they don't have Gwich'in sample ballots,

16  they don't have Gwich'in audio.  Why do we need to have --

17  do we need to bring every Gwich'in voter from Venetie and

18  Arctic Village here to testify they didn't get it because it

19  wasn't provided?

20          And the other point, last point I'll conclude on

21  is that the State, in its brief, suggests -- they've

22  actually taken out of context and, frankly, misquoted some

23  of the deposition testimony.  They refer to one of the

24  witnesses from, was it Arctic Village or Venetie -- Arctic

25  Village, who said that everyone here is bilingual.  That's

1    actually not what he said.  He said everyone here speaks

2    Gwich'in, but he said several of our poll workers, our poll

3    workers don't read English and so that's a problem.  You

4    can't say that they're bilingual and capable of serving as

5    translators if they can't understand and speak or read

6    English, themselves.  And with that, I thank you.

7              THE COURT:  Thank you.  Ms. Paton-Walsh, take ten

8    minutes.  I don't know how long Mr. Tucker's was, if he was

9    longer.  Go ahead.

10             MR. TUCKER:  I think I was 13 minutes.

11             MS. PATON-WALSH:  I'm not actually really

12   counting.

13             THE COURT:  I guess I wasn't either.  Go ahead.

14             MS. PATON-WALSH:  I want to start where Mr. Tucker

15   finished up.  We provided the pages of that deposition to

16   Your Honor.  You can look at them.  You can see that

17   Ms. Bakalar clarified with the witness that he was saying

18   they were fluent in both English and Gwich'in.  And I want

19   to -- I want to pick up on other sort of misstatements of

20   fact that I think are designed to create an impression that

21   somehow the Division of Elections is doing nothing.

22   Mr. Tucker gave a dramatic demonstration about how long the

23   oil tax referendum is.  We've had our Yup'ik translation

24   panel convened for two full days.  They're still working on

25   it.  They're going to meet again, to create a Yup'ik

translation of that ballot measure.  That translation will
be provided to every precinct in the Wade Hampton,
Dillingham, and Bethel census areas.  There will not be a
Yup'ik-speaking voter in this state who doesn't go to vote
and find there somebody -- a version of that ballot measure
that can be read to them in Yup'ik.  So the suggestion that
somehow poll workers are going to have to translate that on
the spot is just plain false.

He also told you that the Yup'ik translation panel
has only convened during the litigation.  That's also
completely false.  There is evidence in the record, we
provided it in support of summary judgment, showing that the
panel met in 2010.  They discussed the ballot measures in
2010 and those translations were a product of the panel and
approved by a panel member.  So it's just not true that
people are going to the polling stations in these precincts
and there are not ballot measure translations in Yup'ik for
them.

It's also not true that poll workers are
untrained.  The plaintiffs repeatedly suggest that people
are not being trained.  Because they attend in-person
training every time, and I just want to make the point,
first of all, many people who work as poll workers in these
places have worked as poll workers for years, so they don't
necessarily -- they don't necessarily need training, because

1  they didn't go to Bethel every two years for training or

2  they didn't go to Dillingham every two years for training.

3         The other part of this is that goes back, again,

4  to the issue of reasonable steps.  We can't force people to

5  come to training in Bethel or Dillingham.  The Division

6  tells them they have to come.  We buy them tickets.  We put

7  them up in hotels.  If they don't show up, what is the

8  option that we're supposed to take here?  Not open the

9  polling station at all?  That can't be a better way to help

10  people vote.

11         So I think that it's important to understand that

12  there are practical considerations that are completely

13  missing from plaintiffs' presentation here.

14         I want to say one other thing about dialect and

15  this, the ballot measures.  Mr. Tucker complained we could

16  provide ballot -- dialect differences by just dropping a

17  footnote to indicate a word that was different in the

18  dialect.  Well guess what, there has been no testimony from

19  any witness identifying a word in a ballot measure and

20  saying, "This is a word in central Yup'ik that you have used

21  but this is the word in Yukon Yup'ik or Bristol Bay Yup'ik

22  or Chevak dialect," not a single term from any ballot

23  measure ever.

24         Yes, we could do that, and maybe we will if there

25  comes a time when there's a crucial difference, but there's

no evidence that that's ever been a problem in the record.
That has to matter.  It has to matter whether voters are
getting the help they need.  Mr. Tucker promises to show you
voters at the trial, but these are our arguments on summary
judgment, Your Honor.  They had an obligation to present
evidence if they wanted you to consider it at this time.
For that, we think they have a burden to show a problem that
voters are experiencing.  They haven't done that.  There are
no voters in the summary judgment with the exception of
Mr. Augustine and his declaration, which is subject to a lot
of question, and therefore, we think should be excluded.

        And I think that's everything that I have to say,
Your Honor.  Thank you.

        THE COURT:  All right.  I think the subjects have
been thoroughly exhausted today which I will say I
appreciated both sides' briefing on the topics, and I'm
going to do the following.  I'm going to take it under
advisement, but I will tentatively set a hearing time, given
our time frame here, for a decision on record that at this
point, at least, is likely to consist solely of a ruling on
the rule of law issue, but I'm hopeful that getting
direction on that will help the parties move forward, and I
am going to propose Wednesday, June 4 at 2:30 p.m.  Does
that work for the plaintiffs?  I don't need Mr. Tucker here.
Can be on the telephone; that's fine.  It's a decision on

1 record, and if we do something in writing before then, we'll
2 vacate the hearing, but that will be the plan.  Does that
3 work for plaintiffs?
4          MR. TUCKER:  Yes, Your Honor.
5          MS. LANDRETH:  That's fine, Your Honor.
6          THE COURT:  Does that work for you?
7          MS. PATON-WALSH:  That will be fine.
8          THE COURT:  We'll take the matter under advisement
9 and we'll be back Wednesday the 4th at 2:30 p.m.  And we'll
10 go off record at this time.
11          DEPUTY CLERK:  All rise.
12          (Proceedings concluded at 4:10 p.m., Excerpt
13 concluded)
14
15                    CERTIFICATE
16 I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
17      ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC
18      RECORD IN THE ABOVE-ENTITLED MATTER.
19
20      Dated this 2d day of June, 2014.
21
22                    /s/ R. Joy Stancel
                    _____
23                    R. JOY STANCEL, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER
24
25