UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

MIKE TOYUKUK; FRED AUGUSTINE; )
NATIVE VILLAGE OF HOOPER BAY; )
and TRADITIONAL VILLAGE OF )
TOGIAK, )
)
Plaintiffs, )
)
vs. )     CASE NO. 3:13-cv-137-SLG
)
MEAD TREADWELL, Lieutenant )
Governor of the State of )
Alaska; GAIL FENUMIAI, )
Director of Elections for the )
State of Alaska; MICHELLE )
SPEEGLE, Election Supervisor )
of the Fairbanks Regional )
Elections Office III; )
and BECKA BAKER, Election )
Supervisor of the Nome )
Regional Elections Office IV, )
)
Defendants. )
_____)

TRANSCRIPT OF DECISION ON RECORD

BEFORE THE HONORABLE SHARON L. GLEASON
WEDNESDAY, JUNE 4, 2014; 2:30 P.M.
ANCHORAGE, ALASKA

_____

R. JOY STANCEL, RMR-CRR
Federal Official Realtime Reporter
222 W. 7th Avenue
Anchorage, Alaska 99501

1    **FOR THE PLAINTIFFS:**

2         Native American Rights Fund
          BY: ERIN C. DOUGHERTY, MATTHEW NEWMAN
3         745 West 4th Avenue, Suite 502
          Anchorage, Alaska  99501
4

5         Wilson Elser Moskowitz Edelman & Dicker, LLP
          BY:  JAMES THOMAS TUCKER, Appearing Telephonically
6         300 South Fourth Street, 11th Floor
          Las Vegas, Nevada  89101
7

8    **FOR THE DEFENDANTS:**

9         State of Alaska, Department of Law
          BY:  AESHA R. PALLESEN
10             ELIZABETH M. BAKALAR, Appearing Telephonically
          1031 W. 4th Avenue, Suite 200
11        Anchorage, Alaska  99501

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (Call to Order of the Court)

2               THE COURT:  Good afternoon.  We're back on record

3    here in Toyukuk versus Treadwell, et al., and I have here in

4    the courtroom Ms. Dougherty; is that correct?

5               MS. DOUGHERTY:  Yes.

6               THE COURT:  And Mr. Newman with you, all right.

7    And then Mr. Tucker, I understand you're on the phone; is

8    that correct?

9               MR. TUCKER:  Yes, ma'am.

10              THE COURT:  All right, very good.  And

11   Ms. Bakalar, Ms. Pallesen -- or Ms. Pallesen is here.

12              MS. PALLESEN:  Yes, Your Honor.

13              THE COURT:  And Ms. Bakalar is on the phone, if I

14   had read my instructions correctly.  We are here for the

15   Court's decision on record.

16              I did receive the statement from the federal

17   government and had an opportunity to read that through, and

18   very recently, I received the State's response to that and

19   had an opportunity to read through that as well, both of

20   which were quite helpful.  I will say I haven't had the time

21   in the last several hours to read all the hundreds of pages

22   of attachments from both the Government and the State that

23   were appended there, but I did have an opportunity to read

24   the briefing and I saw, as well, that plaintiffs have lodged

25   a number of depositions, which is good, and a couple other

1    minor things here -- well, they're not that minor, but first
2    of all, I confirmed with our court staff that we do not
3    provide an interpreter -- so you'll need to sort that out --
4    in civil cases.

5            Secondly, after our experience the other day in
6    terms of the length of time for the case, I've decided to do
7    the following.  We have ten days of trial time allotted and
8    there is -- I believe I indicated at some point, if need
9    b,e, we could go over a bit.  But for now, what I'm going to
10   do is the following.  We'll have trial go from 8:30 to 5.  I
11   guess I'm signaling here where I'm going on the summary
12   judgment issues, but in any event, we'll have trial go from
13   8:30 to 5 every day.  And I'm figuring about an hour for
14   lunch and miscellaneous break time means that if we're doing
15   well, it would be at least six and a half hours of time for
16   the presentation of evidence and/or argument or opening
17   statements, and essentially, that leaves each side with 32
18   hours of time to spend as you see fit.  And I'm going to
19   have our deputy clerk here keep track of the time.  She'll
20   give you an allotment.

21           I don't care how you spend the time.  Keep in mind
22   that evidence is a far more useful thing to have in the
23   record than counsel's statements, which are not evidence.
24   And obviously, interpreters take twice as long.  That's just
25   the reality of the process.  And if you're doing cross,

1  that's your time, so direct is direct, your time, and any

2  time, essentially, that you are taking the floor, be it for

3  argument, like I said, or cross, or putting on your own

4  witness, that that would be time that our deputy here would

5  keep and charge against you.  She'll try to hand out an

6  accounting of that time on a daily basis, and there will be

7  a one-day right to reconsider on the accounting.  So if you

8  don't raise it with me on Day 1 or the day after you receive

9  it, then your time to challenge the time accounting is over.

10  You can't, in other words, wait until Day 9 and say, "Wait a

11  minute, we made math mistakes," which I don't think would

12  ever happen, but if they did, we need to know about it

13  sooner rather than later.

14        Questions about any of that from plaintiffs?

15        MS. DOUGHERTY:  No, Your Honor.

16        THE COURT:  From the defendant?

17        MS. PALLESEN:  No.

18        THE COURT:  It's relatively rare to give a

19  decision on record as opposed to a written decision, but

20  given our time constraints here, it is the determination

21  that I made last week, and as I made my notes here,

22  determined that it would be most useful, given the time

23  constraints that we have, and the opportunity, then, I can

24  accord to the parties to ask questions or clarifications

25  here at the end of my comments to have the decision here on

1  record.
2        So what I'm going to do is the following.  I will,
3  with regard to Docket 47, the State's motion, there was an
4  alternative motion to establish a rule of law to apply in
5  this case.  I'll grant that motion, but not with the
6  language that's been proposed by the Division.  Instead,
7  I'll be applying the law of the case as I'll endeavor to set
8  forth on the record at this time.
9        As I see it, the starting point for the analysis
10  of the case is the Fifteenth Amendment to the United States
11  Constitution which provides that the right of citizens of
12  the United States to vote shall not be denied or abridged by
13  the United States or any state on account of race, color, or
14  previous condition of servitude, and as the United States
15  has recognized, the right to vote freely for a candidate of
16  one's choice is the essence of a democratic society and any
17  restrictions on that right strike at the heart of the
18  representative government.
19        I do see -- I've considered the position of the
20  State that the Fifteenth Amendment does not apply in this
21  case because this is a case that is focused primarily on
22  limited-English proficiency and yet, given that specific
23  language that is at issue here, the one that the addressed
24  solely to Native Alaskans and American Indians, I do see
25  that the strictures of the Fifteenth Amendment do apply, and

1  Mr. Tucker's cite on the record with respect to U.S. v.

2  Blaine at 363 F.3d 897 made it clear that the Ninth Circuit

3  recognized that applicability of that Amendment to the

4  rights of Native Alaskans and American Indians to exercise

5  the right to vote.

6          The other federal courts, too, there are certainly

7  many cases that have addressed the Voting Rights Act far

8  more frequently in the context of rights of other minority

9  citizens as opposed to Native Alaskans and American Indians,

10  but one of the cases there that I found helpful was U.S.

11  versus Berks County, which was a case out of Pennsylvania,

12  and talking about issues there with respect to

13  Spanish-speaking voters, and there, the court held, quote,

14  the right to vote encompasses more than the right to gain

15  physical access to a voting booth to mark a ballot or pull a

16  lever.  Persons must have an opportunity to comprehend the

17  registration and election forms and the ballot, itself, to

18  cast an informed and effective vote.

19          The Fifteenth Amendment does have a provision as

20  well that accords to Congress the power to enforce this

21  Article by appropriate legislation, and as I see it, the

22  goal is to provide all citizens, without regard to race or

23  color, including in this case limited-English proficient

24  Alaskan Natives, with an equal opportunity to participate in

25  the electoral process.  And it's against this Constitutional

1  backdrop that Congress enacted the Voting Rights Act in
2  1965, which was most recently reauthorized in 2006.  A
3  portion of the Act that's at issue here, Section 203 was
4  actually enacted in 1975 as an amendment to the Act.

5  As I indicated, there are really very few cases
6  dealing with historically unwritten language -- languages
7  and the voting rights of American Indians and Alaska Natives
8  under Section 203.  I did have -- the parties did cite to
9  the McKinley County case, which was out of New Mexico or
10  Arizona, out of the southwest relating to the Navajo
11  language, as well as the Sandoval case from New Mexico, and
12  I reviewed as well the Apache case that was provided by the
13  plaintiffs at Exhibit 325 in the filings.

14  I will say as an aside here, and that is that
15  about a year ago, to the month, the United States Supreme
16  Court did hold that one part of the Voting Rights Act was
17  unconstitutional.  That's a portion of Section 4 of the Act.
18  It deals with pre-clearance and that is not an issue that's
19  before the Court in this case at this time.

20  Instead, what we're focused on is Section 203, as
21  I indicated, enacted in 1975.  In the opening part of
22  Section 203, Subsection A, Congress set forth its findings
23  and declaration of policy and that states that, quote,
24  through the use of various practices and procedures,
25  citizens of language minorities have been effectively

1    excluded from participation in the electoral process.

2        And then that section of the statute goes on to

3    say that the goal of that section is to, quote, eliminate

4    such discrimination by prohibiting these practices and by

5    prescribing other remedial devices.

6        And so Section 203(c), then, includes what would

7    appear Congress intended to be a remedial device designed to

8    allow language minorities that had limited-English

9    proficiency, certain language minorities, the opportunity to

10   fully participate in the electoral process.  And that

11   section applies, entire Section 203, applies whenever any

12   state has certain limited-English proficient categories,

13   including more than five percent of the Alaska Native

14   citizens of voting age that are members of a single language

15   minority and are limited-English proficient.  And it's

16   undisputed here, I believe, that the three census issue --

17   areas of issue in this case fall within that category of

18   Section 203, the census areas for Dillingham, Wade Hampton,

19   and Yukon-Koyukuk.

20       So that then triggers the Section 203(c)

21   requirements which set out certain requirements for voting

22   notices, forms, instructions, assistance, and other

23   materials and ballots and requires them to be in the

24   minority language.  And when it's a written language such as

25   Spanish, then the statute quite clearly provides that -- it

1    uses the words "any registration or voting notices, forms,
2    instructions, assistance, or other materials or information
3    relating to the electoral process, including ballots."  The
4    State is directed to, quote, or shall provide them in the
5    language of the applicable minority group, as well as in the
6    English language.

7              And then particular language in the statute
8    relating to written minority languages has been interpreted
9    quite broadly.  As an example, in U.S. versus Metropolitan
10   Dade County, a case out of Florida in 1993, the state had
11   prepared -- or actually, I think the county had prepared an
12   information pamphlet for a special election but it had not
13   translated that pamphlet into Spanish, even though there was
14   an area that was covered by Section 203.  The county had
15   argued that it was not covered, that it didn't need to
16   translate this particular pamphlet because it was not a
17   necessary procedural document that had been issued prior to
18   and during an election and said, "Well, this doesn't give
19   notice of the polling place, it's not a sample ballot, it's
20   just an informative pamphlet."  But the court there
21   disagreed and granted injunctive relief to the Government
22   and indicated that the pamphlet was covered by Section 203
23   and needed to be translated into Spanish, and there,
24   indicated that it would be sufficient to translate it into a
25   Spanish newspaper and post it either on a poster or in

1    pamphlets in the Spanish language.  The point of the case
2    really was, at least for written materials, it made it quite
3    clear that any material, voting or election material, would
4    be covered by Section 203.

5        And of interest in reviewing these cases is that
6    in that case, as in the other cases that the Court's
7    reviewed, there was really no assessment of the
8    effectiveness regarding -- or testimony about the need for
9    translation by Spanish voters.  There was -- there were no
10   individuals, at least that were evident from the record as I
11   reviewed it, that came forward and said, "We're not going to
12   be able to meaningfully participate in this election because
13   we don't have this special -- this translation of this
14   pamphlet," and instead, what really seemed to be the law was
15   looking at this as a per se violation because the material
16   had not been translated, and then looking at reasonable
17   steps of how to remedy this violation, how to get this
18   information disseminated to the voters so as to enable their
19   meaningful participation in that upcoming race.

20       And in this regard, I'll digress here to say that
21   some of the cases that the Division has cited cite to a
22   different part of the Voting Rights Act, Section 4(e), and
23   that is a standard that was put in place for Puerto Ricans
24   who were educated in Spanish in Puerto Rico and then, for
25   whatever reason, ended up in one of the United States and

1    that statute, unlike the one at issue here, said you cannot

2    deny the right to vote because the person cannot be denied

3    the right to vote, quote, because of his inability to read,

4    write, understand, or interpret any matter in the English

5    language.

6            So in a case that addressed that particular law,

7    Volusia County, Florida, in Florida, the court denied

8    summary judgment because there was a dispute in factual

9    issue there under that particular statute as to whether that

10   particular plaintiff was limited-English proficient, and so

11   I see that type of statute would support the type of

12   position advocated by the Division here that would require a

13   showing that a person that -- that they could not understand

14   the election materials because of an inability to read,

15   write, or understand.

16           But those cases, as I see it, are different

17   because the statute at issue there is really worded quite

18   differently from the statute here, which under Section 203

19   directs a state to -- that it shall provide all election

20   materials in the language of the applicable minority group

21   and without consideration of a particular plaintiff's

22   ability to read, write, or understand English.

23           And then we get to the real crux of this dispute,

24   which is the proviso at the end of this sentence of Section

25   203(c), which states that:  Provided that in the case of

1  Alaska Natives and American Indians, if the predominant
2  language is historically unwritten, the state or political
3  subdivision is only required to furnish oral instructions,
4  assistance, or other information relating to registration
5  and voting.
6          When you put that half of the sentence of 203(c)
7  next to the first half of the sentence in 203(c), it's
8  Congress deleted the terms "notices, forms, and materials"
9  from the second half.  Basically, anything that would be in
10 writing, but left in all the other components of
11 "instructions, assistance, or other information".
12         I have strived to understand each side's
13 interpretation of the statute and as I understand or as I've
14 tried to understand the Division's interpretation, the use
15 of the term "only" in that proviso would permit the State to
16 offer less in the way of voting assistance to LEP Alaska
17 Natives with an historically unwritten language than to
18 other minority groups that fall within the Act's coverage
19 that have a written language, and the State has pointed to
20 excerpts from the regulations that they assert that excerpt
21 supports that reading, and for example, there's a reference
22 repeatedly in the briefing to Section 55.2 of the regulation
23 that states that the goal, that the assistance should be to
24 enable members, and then, quote, to enable members of
25 applicable language minority groups to participate

1    effectively in the electoral process.

2           And where I part ways with the State is that I

3    don't see that the assistance that -- the regulation does

4    not say the assistance that's to be provided is to enable

5    members to participate effectively.  Rather, what the

6    regulation says is that it's the objective of the Act's

7    provisions to enable members to participate.  One could say

8    perhaps mincing words, but what I see is that the

9    Congress -- the congressional intent was an objective of

10   enabling members to participate effectively in the electoral

11   process and the means of doing it was what was set out in

12   203(c).

13          What I do read, then, as I stated at the outset,

14   203(a), the goal of the Voting Rights Act is to accord equal

15   opportunity for all citizens to participate in elections and

16   it would be, in my mind, inconsistent with that goal to have

17   a lower level of assistance provided to limited-English

18   proficient Alaska Native and American Indian citizens than

19   is provided to other individuals that fall within the

20   category that Congress identified as needing assistance in

21   elections.  So as I see it, to achieve the goal of equal

22   opportunity here in the election process, the proviso clause

23   in Section 203(c) for historically unwritten languages

24   should be interpreted as altering only the means by which

25   information relating to registration and voting is

1   communicated to limited-English proficient Alaska Natives
2   but it does not permit the Division to diminish the content
3   and extent of the information that must be provided.

4          So stated differently, I interpret Section 203(c)
5   to require the Division to provide the same or at least
6   substantially equivalent election information to LEP Alaska
7   Natives with an historically unwritten language within these
8   three census districts as would be provided or as is
9   provided to other applicable minority groups with a written
10  language that fall within the statute and as provided to
11  English-speaking citizens.

12         This was the approach that was discussed in U.S.
13  versus Sandoval from Arizona and it was one there where the
14  judge, the three-judge panel that was appointed there to
15  review the election processes there found that there were
16  continuing violations of both the Voting Rights Act and the
17  consent decree that had been put in place because the county
18  there had, quote, failed to furnish to covered voters all
19  oral instructions, assistance, and other information related
20  to voting, close quote, to the LEP American Indians at issue
21  there.  And such an interpretation, I believe, is also
22  consistent with another section of the VRA, which is set out
23  in 42 U.S.C. 1973(a), which provides that a violation of the
24  Voting Rights Act is established if it's shown by a totality
25  of the circumstances that the political processes leading to

1    the nomination or election in the public subdivision are not
2    equally open to participation by members of the class of
3    citizens due to one's race or color in that its members have
4    less opportunity than other members of the electorate to
5    participate in the political process and to elect
6    representatives of their choice.

7            And as I see it, it is to accord the same
8    opportunity to participate that is the key to the Division's
9    obligation under Section 203(c).  I also see that that
10   interpretation avoids putting state election officials in
11   the process of -- in the position of having to determine
12   what may or may not be most important or more important to
13   the limited -- to a limited-English proficient Alaska Native
14   voter to know about a particular election.

15           So based on all of the foregoing, I will find that
16   the rule of law for this case will be as follows.  First,
17   the step one of the analysis would have the initial inquiry
18   as whether the State's standards, practices, and procedures
19   provide substantially equivalent registration and voting
20   information to limited-English proficient Alaska Natives in
21   the three census districts at issue here as is communicated
22   in the English language to citizens in this state.  The
23   burden of proof would be on the plaintiff to demonstrate
24   that those standards, practices, and procedures for the
25   dissemination of election information in place for the three

census areas at issue here are not substantially equivalent
with those for English-speaking citizens in the state.

          And the second step, assuming that such standards,
practices, and procedures were in place that provided
substantially equivalent information in the three census
districts here, then the second issue would be -- put the
burden of proof on the plaintiff to demonstrate that the
State is not in substantial compliance in its implementation
of those standards, practices, and procedures.  Or stated
differently, as per the 55.2 regulation, that the State has
not taken all reasonable steps to try to implement its
standards, practices, and procedures in this regard, which
is really similar, the same basic approach that is set up in
the Sandoval case from New Mexico.

          In this regard, in looking specifically at step
two, the Voting Rights Act does not require perfection from
a Division to implement its standards and policies.
Challenges in rural Alaska, such as the small number of
speakers in a particular language, as was addressed in oral
argument with respect to Gwich'in, can help assess whether
or not there's been substantial compliance, or stated
differently, whether all reasonable steps have been taken.
And it's in that regard that the effectiveness of the
implementation could be a consideration in that second step,
where a sick poll worker or another unexpected mishap could

1    certainly still allow the Division to demonstrate
2    substantial compliance if concerted efforts to try to hire
3    or to train poll workers were presented and those efforts
4    were ultimately, for whatever reason, frustrated.
5            So in light of the foregoing, I will deny all
6    three summary judgment motions at this point, the two by the
7    State and the one by the plaintiff, so as to accord both
8    parties the opportunity to put on evidence that would apply
9    this two-part standard that I've articulated today.  I, as I
10   indicated, will grant the alternative motion for the rule of
11   law as filed by the State at Docket 47 but in the manner set
12   forth here.  And I also think in denying the summary
13   judgment there was a lot of information presented, a lot of
14   disputed facts were identified, and it would be helpful,
15   from the Court's perspective, in the event that a
16   violation -- that plaintiffs meet their burden of proof as
17   I've articulated, for the Court to have an understanding, a
18   better understanding of the election practices, make
19   findings in that regard, so if warranted, an appropriate
20   remedy could be fashioned.
21           I do expect -- I know that I was looking at the
22   pretrial order that the -- each side is to submit proposed
23   findings of fact and conclusions of law and that I would
24   expect to track the rule of law that I've set out on the
25   record here today.

1    I will say the following, and in the event we were
2  to have the case proceed to a remedy stage, as to which I
3  express no opinion today, but it's not at all clear from the
4  Court's perspective whether the statute would permit the
5  Court to order the preparation of written materials, given
6  the statute's restriction to only other means with respect
7  to the Alaska Natives and American Indians that fall within
8  the component of the second half of 203(c).  And I did find
9  the analysis of the United States in the supplemental
10 briefing at Footnote 3, their statement of issues, the
11 statement that they filed yesterday, to be helpful.  I would
12 welcome further briefing on that point, but seems to me
13 Congress was quite clear in that regard as to what the
14 requirements or the -- what were the restrictions or the
15 contemplation of Congress or directive of Congress on that
16 point.
17    Certainly the fact that there may or may not be
18 consent decrees that include provisions in that regard would
19 not be -- have any bearing on the Court with respect to an
20 order that was entered without consent of both parties.  So
21 I welcome further briefing on that, but seems the statute is
22 quite clear on that point and I would also hope that if this
23 case were to proceed to a remedy stage, here again, not
24 expressing an opinion there, but I would truly hope that the
25 State could take a lead with plaintiff in effectuating

1  remedies because it would minimize the entanglement of the
2  federal government in the administration of state elections
3  and as the Court has stated in the Seventh Circuit decision,
4  election procedures should be left to the responsible
5  sovereign unless a particular procedure is essential to cure
6  an ongoing violation of federal law, and that certainly
7  would be the approach that the Court would strive to follow
8  here.
9          All right.  I have said a lot.  Questions or
10 clarification from the plaintiffs?
11         MS. DOUGHERTY:  Your Honor, I'll defer to our
12 co-counsel, Mr. Tucker, on that.
13         THE COURT:  All right.  Mr. Tucker, questions or
14 clarification?
15         MR. TUCKER:  Yes, Your Honor.  I think you were
16 pretty clear, just -- I guess the only question I would have
17 is to the extent that you might want further briefing, is
18 that something that would be helpful in the context perhaps
19 of providing findings and conclusions of law, perhaps
20 including a pretrial brief?  So just timing wise, when it
21 would be most helpful for us to submit it?
22         THE COURT:  Let me look at your -- I've got the
23 order here.  Your trial briefs are due June 13 and with
24 proposed findings.  That would be the place where you could
25 address the points that I've raised here.

```
 1              MR. TUCKER:  Thank you, Your Honor.

 2              THE COURT:  Questions or clarification from the

 3    defendants?

 4              MS. PALLESEN:  I will ask Ms. Bakalar, Your Honor.

 5              THE COURT:  Very good.  Ms. Bakalar, questions or

 6    clarifications?

 7              MS. BAKALAR:  I don't have any questions or

 8    clarification.  I just -- a little housekeeping, whether

 9    there'll be a written transcript of this hearing available

10    so we can go and study what you've already said.

11              THE COURT:  Right, and yes is the answer.  We have

12    a court reporter in the courtroom now who's typing away and

13    should be able to get a transcript out in very short order,

14    which I recognize would be very helpful to the parties since

15    I'm doing the decision on record.

16              MS. BAKALAR:  Okay.  That will be on PACER,

17    available on PACER, or who do we call for that?

18              THE COURT:  Do you have the name of our court

19    reporter?  You can call her directly.

20              MS. BAKALAR:  Okay.  I don't.

21              THE COURT:  All right.  Why don't you do this,

22    after the hearing, call my office and we'll get the phone

23    number and you can call my judicial assistance, Anne, and

24    she'll have that information for you.

25              MS. BAKALAR:  Okay.  We'll have someone do that.
```

1    Thank you, Your Honor.

2            THE COURT:  And certainly you can do the same.

3    All right, anything further?  No?  All right, we'll go off

4    record.

5            DEPUTY CLERK:  All rise.

6            (Proceedings concluded at 3:05 p.m.)

7

8                         CERTIFICATE

9    I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

10        ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC

11        RECORD IN THE ABOVE-ENTITLED MATTER.

12

13       Dated this 4th day of June, 2014.

14

15                       /s/ R. Joy Stancel
                    _____
16                      R. JOY STANCEL, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25