UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

MIKE TOYUKAK; FRED AUGUSTINE;   )
NATIVE VILLAGE OF HOOPER BAY;   )
and TRADITIONAL VILLAGE OF      )
TOGIAK,                         )
                                )
          Plaintiffs,           )
                                )
      vs.                       )      CASE NO. 3:13-cv-137-SLG
                                )
MEAD TREADWELL, Lieutenant      )
Governor of the State of        )
Alaska; GAIL FENUMIAI,          )
Director of Elections for the   )
State of Alaska; MICHELLE       )
SPEEGLE, Election Supervisor    )
of the Fairbanks Regional       )
Elections Office III;           )
and BECKA BAKER, Election       )
Supervisor of the Nome          )
Regional Elections Office IV,   )
                                )
          Defendants.           )
_____)


TRANSCRIPT OF FINAL PRETRIAL CONFERENCE)


BEFORE THE HONORABLE SHARON L. GLEASON
THURSDAY, JUNE 19, 2014; 1:30 P.M.
ANCHORAGE, ALASKA

_____

R. JOY STANCEL, RMR-CRR
Federal Official Court Reporter
222 W. 7th Avenue
Anchorage, Alaska 99501

**FOR THE PLAINTIFFS:**

    Native American Rights Fund
    BY: NATALIE A. LANDRETH
    745 West 4th Avenue, Suite 502
    Anchorage, Alaska  99501

    Wilson Elser Moskowitz Edelman & Dicker, LLP
    BY:  JAMES THOMAS TUCKER
    300 South Fourth Street, 11th Floor
    Las Vegas, Nevada  89101

    Bingham McCutchen, LLP
    BY:  RICHARD DE BODO
    1601 Cloverfield Boulevard, Suite 2050 North
    Santa Monica, California  90404

**FOR THE DEFENDANTS:**

    State of Alaska, Department of Law
    BY:  MARGARET A. PATON-WALSH
        ELIZABETH BAKALAR
        KEVIN WAKLEY (Appearing Telephonically)
        AESHA PALLESEN
    1031 W. 4th Avenue, Suite 200
    Anchorage, Alaska  99501

    Proceedings recorded by mechanical stenography,

transcript produced by computer.

```
 1              (Call to Order of the Court)

 2         THE COURT:  Good afternoon.  We're on record in

 3    Toyukuk versus Treadwell, and I have Mr. Tucker,

 4    Mr. De Bodo, Ms. Landreth here for the plaintiffs and

 5    Ms. Pallesen is here with Ms. Paton-Walsh for the

 6    defendants, and I understand, Mr. Wakley, are you on the

 7    phone, sir?

 8         MR. WAKLEY:  Yes, Your Honor, I am.

 9         THE COURT:  Very good.  It's the time that's been

10    set for yet another final pretrial conference in the hopes

11    that maybe we could resolve some additional issues today.

12    So first, this is in no particular order here, I have some

13    issues to take up and then I can hear from the parties.  But

14    maybe I'll ask plaintiffs first, what's the status with

15    regard to an interpreter at trial?

16         MS. LANDRETH:  We believe -- does Your Honor mind

17    if I speak from the table?

18         THE COURT:  No, that's fine.

19         MS. LANDRETH:  Thank you, Your Honor.  There will

20    be two from the Alaska Immigration Justice Project.  They

21    run the Language Interpreter Center of Alaska.  We can

22    certainly provide, through the consent of the defendants, if

23    they agree, we can provide the Court more information on

24    that center, but as of right now, there are two under

25    contract to be here for the entire trial and they will
```

1  relieve each other for testimony that goes on for a
2  particularly long time.  So we have two.
3       THE COURT:  All right.  Ms. Paton-Walsh, is that
4  acceptable to defendants?
5       MS. PATON-WALSH:  Yes, Your Honor.  We know there
6  aren't that many alternates, so as far as we can tell, these
7  people are fine.
8       THE COURT:  All right, very good.  I don't know if
9  the State's in the loop on this but there were issues with
10  regard to Dr. Dybdahl and getting her testimony squared away
11  that I've not been involved in but I know our IT Department
12  was working with your office, and she didn't want to drive
13  somewhere.  That's my knowledge of these stories.  So what's
14  our update there?
15       MS. LANDRETH:  We're working on the technology.  I
16  think there was a concern about the accessibility of getting
17  into an open courtroom in the Southern District of New York
18  in Manhattan on a Monday afternoon.  So I think that was the
19  main concern, and working on an alternative in White Plains
20  or using the apple TV functionality through an i-Pad.
21       THE COURT:  Anyway, that's underway?
22       MS. LANDRETH:  Yes, it is, Your Honor.
23       THE COURT:  All right.  I would like, from each
24  side, a copy of the proposed findings that you submitted on
25  a disk, or you could send it to proposed order, my proposed

1  orders box, probably the best, as a Word document so that I

2  have those to work W that would be helpful.

3        MS. PATON-WALSH:  Your Honor, could you clarify?

4  You have a proposed order box, is that something my

5  assistant would know about?

6        THE COURT:  Your assistant would know, so would

7  mine.  They have the address; I don't.  It's where we get

8  proposed orders and can --

9        MS. PATON-WALSH:  Oh, that's where we email?

10       THE COURT:  Yes.

11       MS. PATON-WALSH:  Then I'm sure we know how to do

12  that.

13       THE COURT:  All right, very good.  Are any of the

14  exhibits that have been filed by each side overlapping,

15  meaning are there any that are numbered by the plaintiffs

16  and also lettered by the defense, or are they two totally

17  distinct sets?

18       MS. PATON-WALSH:  I believe the answer to that

19  question is there is some overlap but they're not -- not in

20  a straightforward their 25 is our D and they can be

21  substituted for each other.  I think they're not in an

22  identical form.  So I'm not sure that we can simplify it in

23  that way, unfortunately.

24       MR. TUCKER:  Your Honor, part of the challenge is

25  that we used some of the exhibits that have been designated

1  in deposition like that, so to the extent the State may want

2  to supplement it with additional information, there may be

3  some overlap but there may simply be no other way to do it

4  without potentially having multiple exhibit numbers, one

5  referring to deposition, one referring to trial exhibit.

6          THE COURT:  All right.  Well, if either side has

7  any way to address that that would be helpful to the Court,

8  like a chart that says Exhibit R, Page 5, is the same as

9  Exhibit 300, Page 4, that would be helpful.

10          All right.  Up that same alley, I know that both

11  sides brought me a copy of the exhibits and I was talking to

12  our deputy and I don't know if anybody apprised you of this,

13  but what we'd also like is a clean copy of all the exhibits

14  that are admitted so that we have a clean copy for the

15  official record.  Meaning, I like to mark up exhibits, which

16  is not a good option if we need an official record, and so

17  what I've discussed with the in-court deputy is the

18  following, and that is that first of all, it's fine that you

19  can leave everything here in the courtroom during that time,

20  so -- but we'd like you to bring in a clean copy, or really

21  the original of your exhibits and leave them here, but when

22  they're admitted, we'll put them --

23          DEPUTY CLERK:  There's a table right in front of

24  you.

25          THE COURT:  At the table just below me that I

can't see, but we'll put them on the table there so that
everybody will have access to them.  From my standpoint,
it's fine if you wanted to use a copy of the exhibit and not
the original when you're questioning a witness, but we'll
have the admitted exhibits gathered up here and leave them
here and then we'll have a set that is an official record.
And also, you can both feel free to review with the in-court
deputy her exhibit list and bring up any concerns you have
where you think we've overlooked something or have something
incorrect.

I will go through, and I haven't, the objections
to the exhibits.  I will just make an observation on that
topic before I embark on that this weekend, and that is that
if you were to roughly add up the number of objections that
have been filed, more by the State it looked like than the
plaintiffs, but let's just say the total is over 200
objections and we were to say three minutes per objection to
get that resolved, which would be expeditious, in my mind,
that that's 600 minutes.  Do the math.  That's ten hours of
time in a bench trial focused on exhibit issues.

Now, I say that but sometimes, and actually in my
brief review of this, it's sometimes the case that once a
ruling is made on a generalized topic that a lot of --
either everything falls into place one way or the other, and
perhaps that looks like it could be the case, but I will

1   say, as is always the case, there are going to be documents

2   admitted that each side is unhappy with and doesn't feel

3   should be part of the record, but on the other hand, like I

4   say, it's a bench trial and my responsibility would be to

5   read the document to determine whether or not I should

6   consider the document.  That takes time and it's a process

7   that I think works very, very well in the context of a jury

8   that never reads and considers the document and is a bit

9   cumbersome in the context of a bench trial.  So I'll leave

10  you to ponder all of that.  And like I said, I'll go through

11  those, but it is time that, if need be, will be spent on

12  sorting out exhibits, but to that same end, I would say that

13  it may be helpful if -- and I'll leave the parties to

14  consider this -- sometimes in a bench trial of some duration

15  with a lot of exhibits, it's helpful to both sides to get a

16  listing the day before of the exhibits that each side plans

17  to use that day.  That's helpful for me, too, because I will

18  review those exhibits and we're not then spending time in

19  court with me reviewing the exhibit while you're trying to

20  present the testimony of your witnesses.  So from the

21  plaintiffs' standpoint, is that something that plaintiffs

22  would agree to do, which is to say, provide, by the close of

23  business the day before, or I guess that would be by this

24  Friday for Monday, the exhibits that you plan to use and the

25  State likewise, within reason?  On cross, I think there can

1  be a little more -- not quite a precision required but

2  certainly when the State is putting on its case in chief,

3  same requirement.  Ms. Landreth, is that agreeable, or

4  Mr. -- somebody?

5          MS. LANDRETH:  We have no objection to that, Your

6  Honor.

7          THE COURT:  And like I say, there's certainly some

8  laxness on the rule for purposes of impeachment on cross,

9  but otherwise, then, that's what we'll do.  So tomorrow, can

10  you get that over to the -- for Friday, for Monday?

11          MS. LANDRETH:  For Monday, yes, Your Honor.

12          THE COURT:  All right, very good.  And the State

13  can do the same and then just file it as a notice and then

14  I'll have it and I'll review those documents as well and

15  that will certainly save us some time.

16          MS. PATON-WALSH:  Your Honor, could I just --

17          THE COURT:  Certainly.

18          MS. PATON-WALSH:  We're certainly happy to do

19  that.  It would be helpful to us to know how far the

20  plaintiffs think they're going to get through their witness

21  list on Monday in order for us to be able to do that for

22  Friday for Monday's witnesses.

23          THE COURT:  All right.  What's the estimation

24  there?

25          MS. LANDRETH:  We would love to be able to do

1   that, but it depends on, I think, the length of cross

2   examination, so we're not quite sure.

3          THE COURT:  Well, let's do the following, I think

4   everybody can provide the list of witnesses the day

5   before -- or you already have provided them, but what you

6   think you're going to accomplish, and you can, in making

7   your estimation, assume that the other side's cross is the

8   same length as your direct, as a rough rule of thumb.  So

9   use that rule of thumb.

10          And on opening statements, what's the plaintiffs'

11   estimation of time for that?  Have you given that thought?

12          MS. LANDRETH:  Perhaps 20 minutes, at most?  Do

13   you want to correct me?

14          MR. TUCKER:  Yeah, I think that's right.  We're

15   trying to keep it as abbreviated as possible because we

16   understand certainly in light of the oral arguments on the

17   cross motions for summary judgment, you know, we don't want

18   to basically retread the same ground that we've already

19   covered previously.

20          THE COURT:  All right.  20 to 30 minutes?

21          MS. PATON-WALSH:  Yeah, that's more than accurate,

22   Your Honor.

23          THE COURT:  Very good.  So with that time frame,

24   then, by Friday at 5:00, both sides will indicate exhibits

25   that they intend and the plaintiff will indicate how far

 1    they expect to get on their witness list on Monday.

 2            All right, and certainly if both sides agree, you

 3    could go further down the week, although there's often

 4    unpredictability as you go down the week, but in any event,

 5    that approach we'll try for now.

 6            All right, any other issues on exhibits or those

 7    types of trial nuts and bolts before I get to some of these

 8    pending witness objections?

 9            MS. PATON-WALSH:  I just wanted to clarify

10    something.  I think that your comments have clarified this

11    in my mind but I don't want there to be any uncertainty

12    about it.

13            THE COURT:  Go ahead.

14            MS. PATON-WALSH:  It seemed to us from some of the

15    plaintiffs' objections that they -- and I wanted to

16    understand the status of exhibits that have already been

17    marked ADM and to clarify that exhibits need to be admitted

18    into the record through witness testimony as opposed to

19    there being essentially a stack of documents being handed to

20    you for review aside from any other -- from testimonial

21    introduction.

22            THE COURT:  Well, it's a good question and it's

23    come up and as I recall, and I haven't looked at it

24    recently.  There's some ambiguity in our local rule on this

25    topic.

1          MS. PATON-WALSH:  That's why we were concerned.

2    We had not understood that agreeing to authenticity

3    necessarily meant that stuff would be admitted into the

4    record without any further testimony or relation to it.  Our

5    concern is primarily there is -- this is true with some

6    exhibits more than others, that we think that context is

7    essential for understanding the meaning of these documents,

8    and it's particularly true with emails that involve people

9    who are not witnesses and who need to be identified for the

10   Court to understand what's going on.  So there are a variety

11   of issues like that and that's why we've made a sort of a

12   relatively blanket objection on the email front because

13   we're obviously concerned about that but we also wanted to

14   understand ADM, whether it was in the record whether anybody

15   mentioned it at all.

16          THE COURT:  What's the State's proposal on that.

17   Then essentially, as I'm hearing it, that ADM means there's

18   no dispute as to authenticity but that the document has not

19   yet been admitted, it needs to be formally admitted on the

20   record?

21          MS. PATON-WALSH:  That was what we were expecting,

22   Your Honor.  It may be that there are some of those, some of

23   the exhibits that were marked ADM that we could stipulate

24   to, but that wasn't what we had understood was happening and

25   so we would want an opportunity to review that.  And we can

discuss that with the plaintiffs if you'd like to have some, some exhibits that aren't just automatically admitted, but certainly there's a lot of exhibits here that we think need to be admitted through testimony in order to be properly understood.

THE COURT: All right. Well, what's the plaintiffs' position on that?

MR. TUCKER: Well Your Honor, I think part of it is that as I understand it, there may be additional emails in the email chain that we didn't produce because we just didn't think it was germane but the State does. Our position is that the email is authentic, the State produced it. In many cases, they're party admissions that they should come in, and if the State wants to provide additional amplifying emails in that chain, they're of course free to do so, but it shouldn't affect whether or not the emails come in.

Our concern is just simply that there are so many documents that we're talking about and we don't necessarily want to get bogged down to a point where we're spending hours having to go through and just get documents introduced into the record.

THE COURT: Well, so I'm hearing there may be a disagreement on this and really, I did look at this issue. I know it was a number of months ago and it's not a model of

clarity. Was that our determination at the end of the day?

And so what I would have you do is the following. First, meet and confer before Monday as to which exhibits there's no objection to admission, meaning admission in its clearest sense, it's admitted, nobody has to say anything about it. And then with the others -- and then we'll take up those on record and I will formally admit them when I have that list.

Then with regard to the others, we'll follow the State's proposal, which I believe is consistent with at least some portion of the local rule on this, which is to say that authenticity is established but they do need to have a presentation through a witness and moving to admit them, and then each side accorded an opportunity to object either on relevance or incompleteness or whatever other bases there may be. I do realize that that could bog you down, time wise, but hopefully you'll be able to meet and confer and address these.

I will say I, having not gone through the emails in their entirety, which here again come back to this topic, bench trial, I'm reviewing all these documents to determine admissibility. That's a different hat, I understand that, and yet that's the reality here. And in any event, if there's a concern that's been identified by the State that the email chain is incomplete, seems to me that could be

readily resolved by adding the rest of the email chain, even if plaintiff thought it was unnecessary. That would address that objection. And on attachments, same thing. If the attachment is made -- and I get curious, too, if there's an attachment, what was it. So helpful to make the documents complete.

On the other hand, if the attachment is 40 pages long and it's Exhibit 24 that you could just say, this is the same as Plaintiffs' Exhibit 24, as opposed to giving me five copies of the same document. So I hope you can make some headway to narrow down those disputes, but if not, the admitted ones will be formally admitted at the beginning of the proceedings on Monday and the balance will be taken up through the course of witness testimony.

Good topic for that local rules committee to address because I know there's ambiguity on this in the rules. So questions about that, Ms. Paton-Walsh, from the State?

MS. PATON-WALSH: No, Your Honor. That's satisfactory.

THE COURT: Questions about that from the plaintiffs?

MS. LANDRETH: No. We were just -- before Your Honor moved to decisions on witnesses, we had an update to provide when you get to that point.

```
1            THE COURT:  Very good.  Let's hear the update.

2            MS. LANDRETH:  Frank Logusak will be here because

3    Mr. Andrew Franklin's wife has had a serious accident.  He

4    is caring for her at home, and we do not want to leave

5    Togiak unrepresented.  So Mr. Logusak will suspend fishing

6    Saturday evening and be here Sunday and ready to testify

7    next week.  He will replace him presumably at the same

8    number so we don't screw up the order.

9            THE COURT:  Any objection to that?

10           MS. PATON-WALSH:  So Mr. Franklin won't be here;

11   is that correct?

12           THE COURT:  Mr. Franklin will not be here;

13   Mr. Logusak will substitute in place of Mr. Franklin.

14           MS. LANDRETH:  That's correct, Your Honor.

15           THE COURT:  Very good.  That sounds very good then

16   on that particular motion.  As I understood the State, there

17   was no objection to Flora Paukan; is that correct?

18           MS. PATON-WALSH:  Yes, Your Honor, that's correct.

19           THE COURT:  So I will grant 125 with respect to

20   Ms. Paukan.  And with regard to Mr. Augustine, that was

21   disputed and it's unclear to me the status of that alternate

22   deposition transcript.  So I don't think I have that in the

23   record.  There was a discussion of getting an interpreter to

24   revisit the deposition transcript?

25           MS. LANDRETH:  Yes, Your Honor.  The deposition
```

```
 1    was originally audio recorded, specifically for an
 2    eventuality like this, and so that audio was provided to
 3    plaintiffs from State defendants, given to Dr. Charles,
 4    actually, who's a witness you'll be hearing from on Monday,
 5    and asked to not summarize, as appeared to have been done in
 6    the transcript, but to provide verbatim what Mr. Augustine
 7    was actually saying.  We've provided that transcript last
 8    Monday, I believe.  The defendants were courteous to enough
 9    to give us an extra seven days.
10            THE COURT:  It's not been filed; is that correct?
11            MS. LANDRETH:  That's correct.  We at least wanted
12    to provide an opportunity if defendants either presumably
13    they wanted to file an objection to that activity, the
14    providing of the second transcript, or to have another
15    translator verify the contents.  I didn't want to be
16    presumptive and simply give it to the Court without leaving
17    some time period for that.
18            THE COURT:  All right.  So now that you've
19    received this version, what's the State's position on
20    Mr. Augustine?
21            MS. PATON-WALSH:  Well Your Honor, just to be
22    clear, what we received were corrections to the transcript.
23    So actually, it's not a different transcript.  It's
24    something that has to be read in combination with the
25    original transcript and it's a little bit difficult to
```

understand.  It also contains commentary by Dr. Charles
about stuff that we think is inappropriate.  And it's also
it's not clear to us -- I mean, we still object to this
essentially because if the translator's translations of
Mr. Augustine's deposition were not accurate at the time,
that affects the State's ability to ask follow-up questions
and we think that Mr. Augustine could be -- he could appear
telephonically.

We understand he's not well.  We don't want to
create a problem, but we do think that there's a problem
here that we're not being given a proper opportunity to
cross examine him with a full understanding of what it is
he's saying at the time that he's saying it.

THE COURT:  All right.  So what's the plaintiffs'
response to that?  Is having Mr. Augustine telephonic a
possibility here?

MS. LANDRETH:  No, it's not.  We have inquired
into that and one of the reasons is that we actually told
defendants very early on in the case that that would be an
option with other witnesses but very difficult to do for him
because he's hard of hearing.  He's not only a limited
English proficient voter, he's a special needs voter.  And
so the thought was that the deposition would be substituting
for him and of course we realize this has created a
significant problem, but the challenge is, of course, that

1   he's the exact kind of voter that this kind of case is

2   supposed to help and so we thought his voice, at least, was

3   relevant, although given what Your Honor has said about this

4   being a bench trial, if this were a jury trial, we wouldn't

5   make such a strident offer but considering it's a bench

6   trial we think it should be ID'd at this point and the Court

7   can decide what weight it should be given, if any, but we

8   think it should be provided to the Court.

9           THE COURT:  I'm in a bit of a vacuum because I

10  haven't seen the revised annotated version, but I did look

11  at Exhibit PP, which was filed with the summary judgment

12  motion and just excerpts of the depo and I think the -- it

13  would be hard-pressed in my mind to call that a deposition,

14  which is to say that it's in the third person that the

15  interpreter or translator is speaking, and I found quite

16  persuasive the State's observation that the opportunity to

17  cross examine was not meaningful under the circumstances in

18  which the deposition was held.

19          And so I would put this on the list for the

20  parties to address and the State had two proposals.  One

21  was -- and I've done this before -- well I haven't, but

22  parties have, is to do a deposition in the middle of trial.

23  Nobody likes that, but that's Option 1.  And then, which I

24  saw the State observed, proposed, I suppose.  It's a

25  stronger term.  I can't say there was enthusiasm there, but

the other, telephonic, I will say, does sound challenging

and the benefit of the testimony at the end of the day would

probably be of relatively low magnitude under the

circumstances that have been described here.  So but

certainly if the parties -- I could see that it would be

helpful if Mr. Augustine could be deposed, and there are

lots of lawyers here, so I've seen that occur before where

people have done that.  And if you did go through that

exercise, it would be helpful, too, if it could be

videotaped.  I mean, if there's a way to do that, that would

be -- from my perspective, would enable me to get the best

understanding of this witness' perspective.  So that would

seem to be the best option as opposed to telephonic.

        If not, the -- from what I'm hearing about the

revised version, it is not going to address the problems

that were identified with the first go-round with the

witness.  So I'll leave you to ponder whether a deposition

for Mr. Augustine could be effectuated in the near term

before the record is closed, and we'll take that up on

Monday after you've each had an opportunity to address that.

        I will, incidentally, just to clean the record, go

back and there was the motion to strike the State's reliance

on Exhibit PP, and I'll deny that as moot, given my rulings

on the cross motions for summary judgment.  That was at

Docket 115, but is really unrelated -- well, it does relate

```
1    to this question, but in any event, separate motion before

2    the Court.

3             Questions or clarification with regard, then, to

4    Docket 125 and the three witnesses there from plaintiffs?

5    No?

6             MS. LANDRETH:  No, Your Honor.

7             THE COURT:  Ms. Paton-Walsh?

8             MS. PATON-WALSH:  No, Your Honor.

9             THE COURT:  Then I saw next at Docket 129 the

10   State filed objections to Fred Joseph and Myron Naneng and

11   it sounded as if -- do plaintiffs intend to call either one

12   of these individuals?

13            MS. LANDRETH:  We didn't intend to call them, Your

14   Honor.  We designated them for any purpose in case any of

15   their statements were referred to, we'd have them on file

16   with the Court and we would be able to respond from their

17   depositions.  That was the purpose.

18            THE COURT:  That addresses your concern?  If an

19   issue is brought up with regard to one of these witnesses,

20   then you can make application if you object to it, but I'm

21   not hearing an intent to call either individual to testify.

22            MS. PATON-WALSH:  That was my understanding of the

23   rule is that they can use the deposition for any purpose if

24   they were -- if that person was going to be a witness, but

25   if they're not going to be a witness, then I'm not sure
```

1  that -- I thought the rule did not apply.

2          THE COURT:  Well, let's -- if there is a basis

3  that plaintiffs assert to consider either one of those

4  depositions, before I do, we'll certainly take up each

5  side's perspective on that.

6          MS. PATON-WALSH:  Okay.

7          THE COURT:  All right, very good.  Then Mr. -- or

8  Professor McCool, I have read the defendant's objection to

9  his testimony.  I have read the report of Professor McCool

10  that was appended to the State's motion, in its entirety.  I

11  have read -- that came in earlier today I believe -- the

12  opposition that the plaintiffs filed.  So did the State want

13  to weigh in with a reply on that issue?

14          MS. PATON-WALSH:  Your Honor, all I would say is

15  that, you know, the plaintiffs' response essentially

16  suggests that because we've identified a couple examples of

17  problems, that those might be the only examples.  And I'd

18  just like to say we filed a motion with an appropriate sense

19  of the length.  That doesn't mean it's the only -- that

20  we've identified the only problems with Professor McCool's

21  handling of evidence in this case, and I think that, you

22  know, the issue here goes to -- we haven't made an argument

23  that qualitative methods is somehow not an area of

24  expertise, per se, but that Professor McCool has no

25  background in Alaska.  He's spent essentially a month

1  working on this and he didn't do a very good job.  His

2  application of the qualitative methods is completely

3  unreliable because he simply didn't read things carefully

4  enough to report on them.  That's where we think he's

5  objectionable.

6        There are other examples we could have provided

7  the Court.  We provided just a few because that -- you know,

8  we didn't want to write a report that was as long as

9  Professor McCool's report.  We still object to him.  We

10 think he's improper.  We don't believe he is an expert for

11 anything that he is being offered for here.

12       THE COURT:  All right.  Well, I intend to proceed

13 as follows with the witness, and that is to first have a

14 generic voir dire, if you will, meaning not discuss the

15 report specifically, but the methods and background of the

16 witness, allow the State to cross examine at that stage and

17 I can then make a ruling with regard to his qualifications

18 as a witness to address the subject before we get to the

19 subject matter.  If I were to determine that sufficient

20 reliability was established to permit the testimony to go

21 forward, then I would allow Professor McCool to testify.

22 And then after cross would be my intent to make a finding as

23 to -- or my findings of fact as to the reliability of the

24 witness based on my understanding of Ninth Circuit precedent

25 on this topic.

1    And I looked, interestingly enough, at the U.S. v

2 Blaine decision which addressed Professor McCool somewhat --

3 well, among three other witnesses, but I'll tell you where I

4 would appreciate more input from the parties, and that is on

5 this issue of -- and it was addressed in the State's

6 objection and we don't need to resolve it today, but I'll

7 give you a heads up that this is an area that I would

8 appreciate greater input from counsel and that is on this

9 ultimate legal conclusion versus ultimate issue of fact,

10 which is to say that I, as I indicated, read the conclusions

11 of Professor McCool's report and is an opinion as to whether

12 or not there exists intentional discrimination, one that

13 goes to an ultimate issue of fact or one that goes to an

14 ultimate issue of law, and as I read the Ninth Circuit case

15 law, it precludes an expert from testifying on an ultimate

16 legal conclusion.  It permits an expert to testify on an

17 ultimate issue of fact.  And I'm not quite clear how to

18 parse that in the context of this particular issue.  So I'm

19 sure I'll hear both sides' perspectives on that and it's

20 helpful for me to have whatever case law either side sought

21 to bring to my attention on that.

22    I will say I am, being in the Ninth Circuit,

23 strongly focused on Ninth Circuit case law and so bringing

24 me case law from other circuits is considerably less

25 helpful, realizing sometimes there's just no Ninth Circuit

```
 1    case law, but to the extent you can focus on our particular
 2    circuit, that's very helpful.
 3            All right.  Those were my topics, so we'll go
 4    forward with calling Professor McCool, but allow the State
 5    to interpose questions and objections in the course of that
 6    presentation.
 7            All right.  Actually, I had one more note here at
 8    the bottom of my notes.  It says, "Status of settlement,"
 9    and then there are eight question marks.  So Ms. Landreth,
10    Mr. Tucker, Mr. De Bodo, what from the plaintiffs'
11    perspective is the answer to that question?
12            MS. LANDRETH:  I have eight answers for you, Your
13    Honor.
14            THE COURT:  I'm sorry?
15            MS. LANDRETH:  I said I have eight answers for
16    you, Your Honor.  I'm just being facetious.  There has been
17    no movement toward settlement at all, no overtures made or
18    received.
19            THE COURT:  Any disagreement with that state of
20    affairs?
21            MS. PATON-WALSH:  No, Your Honor.  We expect to go
22    to trial.
23            THE COURT:  Fair enough.  That's what our system's
24    for.
25            All right, then, moving on to plaintiff, topics
```

1  you wanted to be sure to address today?

2          MR. TUCKER:  Your Honor, I think there's just one

3  additional topic and that is in the defendant's pretrial

4  brief, they've laid out three issues that they think the

5  Court needs to consider.  The last of those deals with

6  proportion -- congruence and proportionality.  They're

7  raising that as a defense.  We think that's inappropriate,

8  for a few reasons.  First of all, it's inconsistent with the

9  Court's ruling on the State's own motion to establish the

10  law of the case.  You know, specifically, the Court has

11  already found that the first two factors that the State has

12  identified in their pretrial brief are the ones that need to

13  be addressed in the context the of Section 203.  To the

14  extent that they're asserting that that's somehow germane to

15  the 14th and 15th Amendments that's simply not true.  Under

16  Washington versus Davis, the standard is very

17  straightforward.  You have to prove purpose and effect.

18  What they seem to be doing is they're referring to the City

19  of Boerne versus Flores and talking about congruence and

20  proportionality in the context of challenges to the Voting

21  Rights Act, itself.  And given the fact that that is not an

22  issue that was ever raised as a counterclaim, that has not

23  been asserted, we have not done any discovery in contrast to

24  Shelby County, itself, where the District Court allowed for

25  about 12 months of discovery just on the issue that they're

1    trying to assert as affirmative defense for the first time

2    in the pretrial brief.  We don't think it's appropriate

3    under those circumstances and we respectfully ask the Court

4    that we simply follow the law of the case as the Court has

5    established it pursuant to the State's own request.

6                THE COURT:  All right.  Ms. Paton-Walsh, go ahead.

7                MS. PATON-WALSH:  Your Honor, I believe that in

8    our Answer, we raised or flagged as a possible defense a

9    constitutional defense.  In our --

10               THE COURT:  In where did you raise it?

11               MS. PATON-WALSH:  I believe it's in our Answer.  I

12   think it's one of our affirmative defenses.  I'm almost a

13   hundred percent certain that we did that.

14               THE COURT:  All right.

15               MS. PATON-WALSH:  And I just want to be clear

16   about the point that we're making here.  You know, you've

17   established the law of the case.  We plan to try to that --

18   to that ruling.  But that ruling has some -- there are some

19   areas, there are words in your ruling that could be

20   interpreted in different ways.  There are ways in which that

21   standard could be applied.  There's room for interpretation

22   of your ruling and we think that, in fact, if you look at in

23   plaintiffs' own trial brief they recognize that the law

24   doesn't require anything that is impossible or unreasonable.

25   It would be possible for the Court to apply its standard in

1    a more rigid way, a less rigid way.

2          We think that it's -- that it would be possible

3    for the Court to rule in this case in a way that we think

4    would place an impossible burden on us.  Obviously, we hope

5    that you're not going to do that, Your Honor, but we want to

6    retain, for our appeal purposes, the ability to raise an

7    argument that the standard as you have applied it is not

8    congruent and proportional under the 14th and 15th

9    Amendments.  So that's what that's there for and we think

10   it's appropriate for us to -- I mean, we also think it goes

11   to your step two, is a question about how, how the Division

12   has attempted to implement its plan and what the problems

13   and difficulties are and whether we've taken all reasonable

14   steps, and whether -- it's just a question of preserving our

15   ability to argue that, that those steps you've suggested we

16   have to take are not actually reasonable or congruent and

17   proportional under the 14th and 15th Amendment.  And we

18   think we offered that defense in our Answer.  We think it's

19   appropriately before the Court and that's -- that's what

20   it's there for.

21          THE COURT:  So am I correct that the -- it's

22   offered in the context that if the State were to see the

23   concept of substantial compliance in a -- well, maybe let me

24   back up and say, if the State were to view the Court's

25   interpretation of substantial compliance as being

```
1     unattainable, that this is what that third feature is in
2     your trial brief?
3               MS. PATON-WALSH:  Yes, Your Honor.
4               MR. TUCKER:  And Your Honor, if I may just
5     briefly?
6               THE COURT:  Certainly, go ahead.
7               MR. TUCKER:  In Docket 22, which is the State's
8     Answer, I would just point to the Court's attention that
9     their affirmative defense in Paragraph 5 just simply states,
10    quote, the bail-in provisions of Section 3 of the Voting
11    Rights Act would be unconstitutional as applied to Alaska.
12              The context within which the State has raised
13    congruence and proportionality is the context of Section
14    203, itself.  So under those circumstances the State really
15    did assert this for the first time in the pretrial brief.
16              With that being said, it may be possible at this
17    point, frankly, just to withhold a judgment or withhold a
18    ruling in terms of what direction the Court wants to go with
19    that until we actually get to a remedy phase, but at least
20    for purposes -- our position is, you know, for purposes of
21    the Section 203 claims that, you know, given the law of the
22    case as the Court has established it, it simply would not be
23    germane to anything that the Court needs to consider under
24    that test.
25              THE COURT:  All right.  Well, I think I understand
```

```
 1    each side's perspective on this to some degree, and I'll
 2    look at the Answer as well, but I'm hearing we can table
 3    that issue that's been identified for the time being; is
 4    that a fair perspective?
 5            MR. TUCKER:  Yes, Your Honor.  Thank you.
 6            MS. PATON-WALSH:  Yes, Your Honor.
 7            THE COURT:  All right, very good.  Other issues
 8    from plaintiff at this point?
 9            MR. TUCKER:  No, Your Honor.
10            THE COURT:  All right.  Any from the State?
11            MS. PATON-WALSH:  We had a couple of questions,
12    Your Honor.  First, we wondered about sequestration and
13    whether the Court was going to order or the plaintiffs were
14    going to request that witnesses be sequestered.  A number of
15    our witnesses are actually parties to this case but not all
16    of them are.  Whether we have people in town will depend on
17    whether -- you know, we don't want to have Division
18    witnesses kicking their heels outside if they can be either
19    inside or we can send them away and they can be doing their
20    jobs.  So we have -- that's one issue.
21            And a sort of related issue is we don't yet have
22    from plaintiffs an indication about when they think they
23    might call Division witnesses, and some of them are coming
24    from out of town.  You know, we don't want to -- we want
25    these witnesses to be available for the Court when they're
```

1    called, but if we don't know when that's likely to be, it's

2    impossible for us to bring people in from out of town and

3    just, you know, I don't want to have them just hanging

4    around.  So we wondered, first of all, about sequestration,

5    and then secondly, whether defendants plan to call Division

6    witnesses and if so --

7                THE COURT:  Plaintiffs.

8                MS. PATON-WALSH:  Yes, plaintiffs plan to call

9    Division witnesses and if so, if they could give us some

10   sort of idea because right now, we have no idea when these

11   people would be needed.

12               THE COURT:  So on the plaintiffs' witness list,

13   who are the Division employees that reside out of the

14   Anchorage area?

15               MS. PATON-WALSH:  Becca Baker and Shelly Growden

16   reside, and Gail -- Gail Fenumiai actually will be here the

17   entire time.  So she's not at issue.  We have an agreement

18   about Michelle Speegle because she's not well, so she's a

19   telephonic witness, but -- so there's Becca Baker and Shelly

20   Growden.  Dorie Wassilie and Bryan Jackson are not Division

21   employees so we don't have the same ability to produce them.

22   I mean, obviously if they want to call them, we can work to

23   try to help those witnesses be here at that time, but we

24   don't -- it's not like they're State employees and we can

25   just send them travel arrangements.

 1          THE COURT:  It's Ms. Baker and Ms. Growden that

 2   are your biggest concern?

 3          MS. PATON-WALSH:  Yes, Your Honor.

 4          THE COURT:  Is it possible to pick a designated

 5   time for them to testify and we take them out of order?

 6          MR. TUCKER:  Your Honor, we should have a better

 7   idea -- I'm sure we could probably get back to them with a

 8   better idea tomorrow with an estimate, and again it's just

 9   going to be a ballpark, consistent with how the Court ruled

10   earlier, which witnesses we'll get through on a given day.

11          THE COURT:  It is, let me say again, a bench trial

12   and so one way to do this is have these two individuals

13   start at 8:30 one morning, and even if we're in the middle

14   of another witness, and I'll leave you to ponder that.  That

15   might be helpful for them, and really for everybody.

16          So the next question or the first question the

17   State raised was is the -- are the plaintiffs seeking to

18   invoke the rule that requires witnesses not to be here in

19   the courtroom until after they've testified, and that's the

20   rule I understand you're referring to.  We're not talking

21   about putting people up in hotels.

22          MS. PATON-WALSH:  No, no, Your Honor.  It's just a

23   question of whether non-party witnesses, whether they were

24   planning to ask them to be sequestered.

25          THE COURT:  Right, right.

```
 1              (Discussion off record)

 2              THE COURT:  And I believe either side has that

 3    right, so let's --

 4              MR. TUCKER:  Your Honor, I think after conferring

 5    with co-counsel, I think we are going to invoke the rule.

 6    We understand it's a two-way street, so the rule would

 7    equally apply to our witnesses as well.

 8              THE COURT:  Right.  Except let's read the rule,

 9    which is 615, so we're all on the same page.  It does not

10    apply to a party who is a natural person.  That person can

11    remain in the court.  It does not apply to an officer or

12    employee of a party that is not a natural person, after

13    being designated as the party's representative by its

14    attorney.  So that would be the next one.  And that it does

15    not apply to a person who's presence a party shows to be

16    essential to presenting the party's claim or defense.

17              So we'll apply the rule and I'll expect each side

18    to instruct individuals accordingly that the rule is in

19    place, that they're not to be here in the courtroom.

20    Typically, I do allow people, if they're interested, to

21    remain in the courtroom after they've been called, and yet

22    if you're talking about having some people testify both in

23    plaintiffs' case in chief and defendant's case in chief,

24    that may not be workable.  But in any event, we'll apply the

25    rule, 615, here and each side can be responsible for
```

```
 1   notifying the Court if there's a concern that arises.  So
 2   does that address that issue?
 3               MS. PATON-WALSH:  Yes, Your Honor.
 4               THE COURT:  All right.  Questions about that?  No?
 5   All right.
 6               Anything else from defendants at this point,
 7   Ms. Paton-Walsh?
 8               MS. PATON-WALSH:  No, Your Honor.
 9               THE COURT:  All right.  Then, I guess we're set
10   for --
11               MS. PATON-WALSH:  Actually, I'm sorry, my
12   co-counsel just pointed out something.  I believe we have an
13   agreement with the plaintiffs with respect to an affidavit
14   that we wanted to add to one of our exhibits.  The exhibit
15   is a series of voter histories and it's basically a printout
16   with a bunch of numbers that don't really mean anything
17   unless they're explained.  They could be explained by one of
18   our witnesses, but in order to make them understandable to
19   the Court the first time they're used, we'd like to add that
20   exhibit, and I think maybe we can add it to the set of
21   originals we could give to you, but I think maybe you
22   already have a copy.  So that's why I wanted to raise it
23   now.  I don't know if you have a copy of exhibits that we
24   should add that to or if we can just show up on Monday with
25   the affidavit.
```

1          THE COURT:  Why don't you do a notice of filing

2    and just file it tomorrow.  Then we'll have -- do you have a

3    copy of this?

4          MR. TUCKER:  We do, Your Honor, but we just also

5    want to make it clear, we want to have an opportunity to

6    review it and discuss it and basically get back with you.

7          MS. PATON-WALSH:  That's fine, okay.

8          THE COURT:  Don't file it, then, until you've had

9    an opportunity to sort it out.  We can take it up on Monday.

10          MS. PATON-WALSH:  Okay, thank you.

11          THE COURT:  All right, very good.  If there's

12    nothing else then, we'll go off record and resume on Monday

13    at 8:30.

14          DEPUTY CLERK:  All rise.

15          (Proceedings concluded at 2:22 p.m.)

16

17                    CERTIFICATE

18          I, R. Joy Stancel, Federal Official Realtime Court
     Reporter in and for the United States District Court for the
19    District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the
20    original stenographic record in the above-entitled matter
     and that the transcript page format is in conformance with
21    the regulations of the Judicial Conference of the United
     States.  Dated this 16th day of July, 2014.

22

23                              /s/ R. Joy Stancel
                              _____
24                              R. JOY STANCEL, RMR-CRR
                              FEDERAL OFFICIAL COURT REPORTER

25