Natalie A. Landreth (Bar no. 0405020)
Megan R. Condon (Bar. no. 1810096)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, Alaska 99501
Telephone: (907) 276-0680
Facsimile: (907) 276-2466
Email: landreth@narf.org
   mcondon@narf.org

James Thomas Tucker (*pro hac vice*)
WILSON ELSER MOSKOWITZ EDELMAN& DICKER LLP
6689 Las Vegas Blvd. South, Suite 200
Las Vegas, Nevada 89119
Telephone: (702) 727-1246
Facsimile: (702) 727-1401
Email: james.tucker@wilsonelser.com

*Attorneys for Plaintiffs*

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| MIKE TOYUKAK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KEVIN MEYER, et al.,<br><br>Defendants. | Case No. 3:13-cv-00137-SLG |

**PLAINTIFFS' MOTION TO EXTEND STIPULATED JUDGMENT AND ORDER**

**I.     INTRODUCTION**

Plaintiffs Mike Toyukak et al. ("Plaintffs"), by and through undersigned counsel, move for an extension of the Stipulated Judgment and Order ("Stipulated Order") pursuant to Section V(B) of that Stipulated Order. *See* Dkt. 282 at 32. Defendants Lieutenant

Governor Meyer and the Division of Elections have made many changes to their conduct of elections since this case first began, which is no mean feat. In order to assist them, the Plaintiffs relinquished all of their office translators to the Defendants to aid them in language translations. However, four years later, reviewing documents provided entirely by federal observers and Defendants themselves, it is clear that Defendants are not close to compliance with the purpose of the Stipulated Order. Court supervision needs to be extended until they reached compliance, either by order of this Court or by agreement of the parties.

## II. LEGAL STANDARD

The Stipulated Order expressly provides for extension of the term of the Order "[e]ither by agreement between the Parties or pursuant to a determination by the Court, the term of the Order shall be extended if 'time and experience have demonstrated' that the Order 'has failed to accomplish the result' that it was 'specifically designed to achieve.'"[1] Dkt. 282, Stipulated Order at 32 (quoting *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 249 (1968)). In *United Shoe*, the government sought to modify a decree in an antitrust case to impose more stringent relief, alleging that the decree was designed to establish workable competition and after ten years it had failed to achieve that result. 391 U.S. at 247, 249. The Supreme Court concluded that because "time and experience ha[d] demonstrated" that the decree had failed to satisfy this result, it was appropriate to

---

[1] Under the Order, if any party, before December 31, 2020, seeks relief pursuant to the Order, including extending its duration, the Court "retain[s] jurisdiction over this case until all issues relating to such proceedings have been fully resolved." Stipulated Order at 9.

*Toyukak v. Meyer*, 3:13-cv-00137-SLG     2

"prescribe other, and if necessary more definitive, means to achieve the result." *Id.* at 249, 252. Under the standard set out in *United Shoe*, courts have extended orders where "a change in circumstances thwarted the basic purpose and intent of the decree," where there were "pervasive violations" of a decree, and where a "party was in substantial non-compliance with the decree." *Holland v. New Jersey Dep't of Corr.*, 246 F.3d 267, 284 (3d Cir. 2001) (collecting citations).

The record—comprised of federal observer reports and Defendants' own documents—establishes that the "time and experience" from Defendants' actions in elections since the Court entered the Stipulated Order have "failed to accomplish the result" that the Stipulated Order was "specifically designed to achieve," namely compliance with Section 203 of the Voting Rights Act ("VRA"). *Id.* (quoting *United Shoe Mach. Corp.*, 391 U.S. at 249). As a result, extension of the Stipulated Order is warranted.

Because the Stipulated Order specifically provides that parties may extend the order by agreement among themselves, Plaintiffs have reached out to Defendants to discuss extension and a joint motion to extend response deadlines for this motion may be filed in order to allow more time for negotiation. This Motion is being filed at this time in order to comply with the deadline in the Stipulated Order.

### III. THE COURT'S DECISION FINDING DEFENDANTS VIOLATED SECTION 203 OF THE VOTING RIGHTS ACT.

Plaintiffs alleged that Defendants failed to provide effective language assistance to LEP Alaska Native voting-age citizens in the Dillingham Census Area ("DCA"), Kuslivak Census Area (formerly known as the Wade Hampton Census Area, or "WHCA"), and

*Toyukak v. Meyer*, 3:13-cv-00137-SLG     3

Case 3:13-cv-00137-SLG   Document 311   Filed 12/30/20   Page 3 of 18

Yukon-Koyukuk Census Area ("YKCA") of Alaska. Dkt. 282 at 1-2. Plaintiffs are two individual LEP Yup'ik-speaking Alaska Native U.S. citizens of voting-age who are registered to vote or are eligible to register to vote and reside in the DCA and WHCA and four tribal councils in the DCA, WHCA, and YKCA that are the elected governments for their respective villages, which include LEP Yup'ik-speaking or Gwich'in-speaking Alaska Native voting-age U.S. citizens who are registered to vote or are eligible to register to vote in federal and state elections. *Id.* at 2. Defendants, in their official capacities, are the Lieutenant Governor of the State of Alaska, the Director of the Division of Elections for the State of Alaska, and the Region III and Region IV Supervisors who are responsible under Alaska law for conducting elections in the DCA, WHCA, and YKCA (collectively "Division" or "Defendants"). *Id.*

Plaintiffs filed this action to enforce the statutory guarantee of language assistance for limited-English proficient (LEP) Alaska Native, U.S. voting-age (18 years of age and older) citizens under Section 203 of the VRA, 52 U.S.C. § 10503 (redesignated from 42 U.S.C. § 1973aa-1a) (Section 203), among other relief. Dkt. 282 at 1. Following the Court's decision on the law of the case [Dkt. 124], this case proceeded through a two-week trial that concluded on July 3, 2014, and resulted in a partial Decision on Record issued by the Court on September 3, 2014 ("Decision") [Dkt. 223]. The Court found in its Decision that Plaintiffs "demonstrated by a preponderance of the evidence that the Division's standards, practices, and procedures … in place for the three census areas … are not designed to transmit substantially equivalent information in the applicable minority … languages…" *Id.* at 6-7.

The Division provided to LEP voters in the three areas only "a limited subset of the election materials that the Division provides to English-speaking citizens." *Id.* at 7. It was "significant to the Court that the English version of the official election pamphlet ["OEP"] that is mailed in English to every household in the state with a registered voter a few weeks before the election is not available in any language, English or otherwise, at the polling site due to statutory restrictions on campaigning at the polling place." *Id.* at 8-9. The evidence did not support the Division's contention that "outreach workers that it has hired in certain communities" would "provide the bulk of the election information that's in the official election pamphlet to the [LEP] voters prior to each election." *Id.* at 9. The outreach materials and "the written training materials that were introduced at trial support the conclusion that the outreach workers are not providing the substantial equivalent of voter information to LEP voters in their community." *Id.* at 11-12.

The Court made several additional findings regarding the shortcomings of the Division's training, outreach and availability of in-person bilingual poll workers on Election Day. First, "it's not clear that the outreach workers are in all of the covered communities. Second, it does not appear that the outreach workers are receiving adequate training and that they have not been trained that they are expected to provide substantial equivalent information to [LEP] Native Alaska voters in the three census areas, and are not trained on how to do that." *Id.* at 18. Translations were not provided in the Yup'ik dialects or Gwich'in language for information in the Division's official election pamphlet. *Id.* at 13-15. Bilingual poll workers were unavailable at all polling places in the three covered areas, such as in Dillingham where it was "unclear" to the Court "why the interpreter was

*Toyukak v. Meyer*, 3:13-cv-00137-SLG 5

always on call and not present at the voting site." *Id.* at 17. The Court also expressed concerns about the lack of clarity of election information in the covered languages including "the readability of the public service announcements" and the availability of "language or other assistance while voting" including the right "to bring a person of your choice to assist you." *Id.* at 16-17.

### IV. THE COURT'S REQUIREMENTS IN THE STIPULATED ORDER FOR REMEDYING DEFENDANTS' SECTION 203 VIOLATIONS.

The Parties responded to the Decision by negotiating the Stipulated Order entered by the Court. *See* Dkt. 282. The Stipulated Order made several adjustments to the Court's Interim Order [Dkt. 226], such as expanding the language information identified in the OEP, certificates of outreach "to add in confirmation that the outreach worker" is "available to translate the OEP, knows how to translate and agrees to translate the OEP, and has conducted at least one information meeting with voters in their village or met with voters on a one-on-one basis," requiring the translation of the entire OEP "into written Gwich'in and Yup'ik," and requiring "at least one trained bilingual outreach worker and one bilingual poll worker ... for each village..." Dkt. 282 at 10-14.

The Court accepted the Parties' agreement on the languages and dialects in which Defendants are to provide translations of all information in the OEP and other voting materials. Yup'ik translations are to be provided in the DCA and WHCA in Bristol Bay Yup'ik, Central Yup'ik, Hooper Bay/Chevak Yup'ik, Norton Sound Yup'ik, Yukon Yup'ik, and if requested by a tribal council in the WHCA the Nunivak dialect of Yup'ik.

*Id.* at 14.  In the YKCA, Defendants were to "use Gwich'in in its translations of all voting materials and election information."  *Id.* at 15.

The Stipulated Order further provides for the written materials and translations to be available for outreach and in polling places on Election Day, including:  glossaries of election terms; a toll-free number for language assistance; all translations required in the Court's Interim Order including the OEP; "the official ballot, sample ballot, and glossary"; "pro/con statements, neutral summaries, and summary of statement of costs"; and audio translations of these materials.  *Id.* at 15-18.  Covered villages to receive these materials and translations include "Yup'ik language assistance in all villages of the DCA and WHCA" and "Gwich'in language assistance in the following villages in the YKCA:  Arctic Village, Beaver, Birch Creek, Chalkyitsik, Circle, Fort Yukon, and Venetie."  *Id.* at 18.

The Division is required to "make all poll workers aware of language assistance requirements in its regular training sessions."  *Id.* at 19.  The Division must provide "[m]andatory in-person training" to "[a]ll bilingual election workers."  *Id.*  "If a bilingual outreach worker or bilingual poll worker fails to attend in-person training, wherever feasible the Division must reschedule training for that worker or replace that worker who will be scheduled to attend the next in-person training."  *Id.*  In-person training is required for "every even-numbered year and for elections in odd-numbered years in which a special ballot measure appears… During odd-numbered years in which there is no ballot measure, telephonic training shall be conducted."  *Id.* at 20.  Comprehensive language training includes at least 17 topics on "language assistance and practicing available translations."  *Id.* at 20-21.  "Distance or phone training" is limited to "exceptional cases" and must be

*Toyukak v. Meyer*, 3:13-cv-00137-SLG                                                                                              7

done at least one day before the election, last at least two hours, and cover the topics in the regular training. *Id.* at 22. The Division is required to keep all records of the training. *Id.* at 23.

Critically, to ensure that translations of the OEP and other voting materials and information are provided to LEP voters in all covered villages, the Division "shall provide at least ten hours of outreach for each election in which there is no pamphlet, and between twenty to thirty hours of outreach for each election for which there is a pamphlet."[2] *Id.* at 18. The Division is required to follow up with those hired as outreach workers. "If the Division learns that a person scheduled to work as a bilingual outreach worker has not performed or cannot perform their assigned tasks, where feasible the Division shall recruit and train a replacement bilingual outreach worker." *Id.* at 19. If the Division fails to have a bilingual outreach worker in a covered village, then information that is essential for LEP voters to know and understand what is on the ballot would not be provided because the OEP "is not available in any language, English or otherwise, at the polling site due to statutory restrictions on campaigning at the polling place." Dkt. 223 at 8-9.

For that reason, the Stipulated Order includes comprehensive requirements for pre-election outreach. "Pre-election outreach must include informational meetings" that "may be through one or more community-wide informational meeting(s), small group meeting(s), or one-on-one meetings." Dkt. 282 at 23. Those meetings "shall be to register

---

[2] A pamphlet, or OEP, is provided "[b]efore each state general election, and before each state primary, special, or special runoff election at which a ballot proposition is scheduled to appear on the ballot…" ALASKA STAT. § 15.58.010 (2016).

*Toyukak v. Meyer*, 3:13-cv-00137-SLG     8

voters" and to provide in the covered language and dialect several election topics before the election such as: election deadlines; election dates and a summary of everything that will appear on the ballot; language assistance to complete voter registration forms; absentee ballot application and voting process; early voting process, including dates and locations; voter identification requirements; "all of the information in the OEP"; review of the sample ballot; a description of "the availability of language assistance before Election Day and on Election Day, including the name of the person(s) and dates and locations where it will be provided"; meetings to discuss the election information; and a "question and answer session in the language and dialect regarding the election or voting process." *Id.* at 23-25. At least 25 days before the election, the Division is required to "follow up with the outreach workers to confirm that they have received the outreach materials and that they agree that they will perform the outreach in a timely manner." *Id.* at 25.

For all villages in the DCA and WHCA and those identified above for the YKCA, the Division must have "at least one trained bilingual outreach worker and one bilingual poll worker…" *Id.* at 13.

On and before Election Day, the Division must provide each polling place with several translated materials. "Touch-screen voting machines shall be available at all polling places on Election Day when there are federal races on the ballot" and must include "one language and dialect" for translations "for all audio information and instructions provided on the machine in English. All poll workers shall be trained on how to use the audio language assistance available on the machines." *Id.* at 27-28. Written bilingual sample ballots translated in the appropriate language and dialect shall be provided "to tribal

*Toyukak v. Meyer*, 3:13-cv-00137-SLG 9

councils, outreach workers, and poll workers," who "may provide copies of the written bilingual sample ballots to voters before the election." *Id.* at 28. The Division must post a sign "in the applicable language and dialect … identifying the availability of voter registration forms, language assistance to register, and the name and phone number of the bilingual register," if any, or "the Division's toll-free number for language assistance." *Id.* The Division must provide voters using questioned ballots "instructions on the questioned ballot process in the applicable language and dialect…" *Id.* at 29.

To facilitate the Court's oversight over the Division's compliance efforts, if any, the Division is required to keep records and submit reports to the Court. *Id.* at 29-30. Furthermore, "[p]ursuant to Section 3(a) of the VRA, 52 U.S.C. § 10301(a) (redesignated from 42 U.S.C. § 1973a(a)), during the term of this Order, Election Observers are appointed and are authorized to attend and observe elections and election activities that federal law authorizes, including training, in the DCA, WHCA, and YKCA." *Id.* at 8. As discussed below, federal observers have filed reports for all elections that they have observed during the term of the Stipulated Order.

## V. THE OBJECTIVE RECORD SHOWS DEFENDANTS HAVE NOT MET THE STIPULATED ORDER'S REQUIREMENTS FOR MANDATORY TRAINING, OUTREACH, & ELECTION DAY BILINGUAL MATERIALS & ASSISTANCE.

The information in this section is based solely on federal observer reports, Defendants' own documents and an expert report summarizing both sets of documents. Plaintiffs have not gathered independent information, nor engaged in subjective analysis such as an assessment of the quality of translations. Rather, the following sections focus

exclusively on three areas for which the Defendants objectively are not in compliance: mandatory training, pre-election outreach, and Election Day materials and assistance.

### A. Mandatory Training

At the time of trial in 2014, approximately 66 percent of poll workers were trained. Since then, that percentage has not increased, but declined. Federal observer reports show that in 2016, only 40 percent of poll workers were trained that year and 47 percent had never been trained at all. In 2018, the percentage of poll workers trained that year increased to 49 percent and 64 percent for the REAA elections in 2019. Exhibit A, McCool Report (Ex. A) at 8-9, table 1. Throughout the supervisory period, the percentage of poll workers trained never increased beyond this 64 percent, and never came close to full compliance.

The manner in which the Division provides training has also declined. In the 2016 General Election, for example, half of poll workers were trained in-person, but the other half had no training at all. By 2019, training had declined, only 27 percent of poll workers were being trained in-person, 19 percent were trained by DVD, and 27 percent by telephone. Ex. A, table 2. As the Stipulated Order makes clear in limiting distance training to "exceptional cases" [Dkt. 282 at 22] this is no substitute for in-person training, yet it appears to have become the default for Defendants.

The Stipulated Oder also specified items that were to be included in the training. Dkt. 282 at 20-23. Defendants appear not to have documented whether the trainings included a number of provisions required under the Stipulated Order, such as "[p]ractice performing available translations" and "[p]racticing the translation of the ballot with each translator[.]" *Id*.at 21. Therefore, it cannot be demonstrated that they actually complied

*Toyukak v. Meyer*, 3:13-cv-00137-SLG                                                                                               11

Case 3:13-cv-00137-SLG   Document 311   Filed 12/30/20   Page 11 of 18

with terms of the Stipulated Order specific to training components. The federal observer reports are not keyed to the Stipulated Order but instead cover more general aspects, such as whether poll workers were trained and how. Many comments on observer forms indicate that there was no bilingual training or any "minority language specific training." Ex. A at 11; *see id.* at 11-14 (collecting quotes from observer forms).

Overall, it appears that the percentage of poll workers trained has declined since trial and never approached full compliance. Additionally, there is an increasing reliance on distance methods, such as DVD and phone to train poll workers for their critical tasks. And the training that Defendants provide does not appear to include the elements required in the Stipulated Order, or at least Defendants have not provided records of that.

The reason in-person training is mandatory is to ensure that all poll workers know about the language assistance requirements in Section 203, and all bilingual poll workers receive instruction on how to provide language assistance and opportunity to practice the translations needed to make that assistance effective. Poll workers also need to know what translated bilingual materials the Division will be providing and how to use them, both before an election and on Election Day. The impact that the lack of in-person training has had is evident in the lack of pre-election outreach and the absence of language materials and assistance in polling places in many villages.

### B. Pre-Election Outreach

Pre-election outreach is critical because during trial, there was testimony to the effect that whereas an English-speaking voter received a 100+ page election pamphlet before the election, Native language speakers learned only of the date, time and location of

the election. Because closing this gap is key to an effective remedy, the Stipulated Order devotes four pages to pre-election outreach and mandates 10 hours of outreach if there is no Official Election Pamphlet (OEP) and 20-30 hours if there is one.

The information on compliance with pre-election outreach is collected by village in Appendix B to the McCool report. Ex. A, Appendix B. In 2016, for example, there were no pre-election announcements on the required elements for numerous villages (Kotlik, Pilot Station, Mountain Village, Napakiak, Tuluksak and Kotlik). Although there was an OEP for 2016, a number of villages fell far short of the required number of hours to convey information. Moreover, for the 2016 Primary, only six villages had outreach certificates at all. In one particularly abysmal showing, in the 2018 statewide election, there was no outreach at all in Region 3 (all the Gwich'in-speaking areas). This is not the result of one uncommitted outreach worker—this kind of failure indicates Defendants did not secure outreach workers for these locations at all or did not properly advise them of their duties. Equally important, the Defendants failed to correct instances in which their outreach workers were failing to perform by securing backup or replacement outreach workers. As noted by Dr. McCool, in twelve villages over all election years the outreach worker put in eleven hours or less. Ex. A at 15. In 2018, a year with a statewide gubernatorial election, the forms submitted show 60 hours *total across all villages.* Ex. A, table 4.

The documents provided by Defendants do not demonstrate that they have complied with the pre-election requirements in the Stipulated Order. Though documents are missing, the documents that Defendants provided show significant gaps remain. This cannot be

*Toyukak v. Meyer*, 3:13-cv-00137-SLG 13

Case 3:13-cv-00137-SLG   Document 311   Filed 12/30/20   Page 13 of 18

considered compliance with the Stipulated Order, which set out objective requirements for each election that Defendants have failed to meet.

### C. Election Day materials and assistance

The third major area of the remedies is language assistance at the polls. This consists of three broad categories: bilingual poll workers, the translated materials, and voting machines with translations.

With respect to the first category, the federal observers report that in the 2016 Primary, 15 percent of the precincts they observed did not have bilingual poll workers. In the 2016 General Election, the percentage rose to 25 percent of the observed precincts that did not have bilingual poll workers. Federal observer reports also note that bilingual poll workers often left the polling places for a period of time while the polls were still open. Ex. A at 17-18. These absences replicate the concern that the Court expressed in its Decision about the Dillingham polling place not having a bilingual poll worker present during election hours.

The Stipulated Order also required a number of written materials and compliance with these is detailed at pages 19-25 of Exhibit A. In many instance, there are no signs in the Native language in polling places. Ex. A, table 5. The "I voted" stickers and even the language glossary were also largely absent from polling places. Ex. A, tables 6 and 7. In the 2018 Primary, 87 percent of precincts did not have the required language glossary. Ex. A, table 7. The most important written material may be the sample ballot used for in-person translations, but in the 2016 elections, 40 percent of precincts did not have sample ballots and in 2018 that rose to 53 percent of precincts. Ex. A, table 8. Defendants provided the

*Toyukak v. Meyer*, 3:13-cv-00137-SLG 14

precincts with sample ballots in November 2018 but again in 2019, 60 percent lacked sample ballots. Ex. A, table 9. This is perhaps the most disturbing number of them all because this is *the sole document* relied on to completely and accurately translate the ballot to LEP voters. It should never be missing. Keep in mind moreover, that this accounts for the percentage of materials missing just in precincts with federal observers; the real number may be much higher. Throughout this period, there were polling places that never had any written materials in the Native language at all.

The third category of Election Day assistance is voting machines enabled with translated audio. No observed precinct had them in the 2016 Primary, and by the General Election that year, 43 percent of observed precincts were still without them. In 2018, the situation worsened and 60 percent of precincts did not have voting machines enabled with translated audio for the primary or general election. It is not clear why Defendants are not providing these machines for audio translation when there are federal offices on the ballot, as provided by the Stipulated Order.

It is likely that many of the shortfalls in polling places are linked to the lack of in-person training completed for a large percentage of the poll workers. But regardless of the cause, the documented absence of language materials and assistance in so many of the covered villages has left LEP voters in those villages in the same place they were when Plaintiffs first brought this litigation: without the voting materials and information in their Native languages that all voters in Alaska receive in English.

## VI. CONCLUSION

This period of supervision was intended to ensure that the remedies ordered after two weeks of trial, over 20 witnesses, and thousands of pages of exhibits were not lost. The remedies ordered impact tens of thousands of voters and are too important. This period was also meant to allow Defendants time to adapt and improve. While Plaintiffs have great respect for the fact that conducting elections and maintaining a corps of trained poll workers can be a challenge in rural Alaska, the state has now been covered by Section 203 of the Voting Rights Act for more than 40 years. There has been plenty of time to learn and adapt to the needs of the voters. Unfortunately, Defendants have not shown an upward trajectory in their efforts to comply with the Stipulated Order – much less substantial compliance. Instead, Defendants provided incomplete records, demonstrating stasis and decline in several places. This is not compliance with the Stipulated Order. Defendants are not there yet.

For the foregoing reasons and those detailed in the accompanying exhibit, Plaintiffs respectfully request that the Court order the extension of the supervisory period for an additional four years to allow for two more federal/state election cycles. This is a common time period in election cases of this kind, and clearly warranted here.

DATED this 30th day of December 2020

                                        Respectfully,

                                        *s/nlandreth*

                                        Natalie A. Landreth
                                        Megan R. Condon
                                        NATIVE AMERICAN RIGHTS FUND

745 West 4th Avenue, Suite 502
Anchorage, Alaska 99501
Telephone: (907) 276-0680
Facsimile: (907) 276-2466
Email: landreth@narf.org
      mcondon@narf.org

James Thomas Tucker (*pro hac vice*)
WILSON ELSER MOSKOWITZ
EDELMAN& DICKER LLP
6689 Las Vegas Blvd. South, Suite 200
Las Vegas, Nevada 89119
Telephone: (702) 727-1246
Facsimile: (702) 727-1401
Email: james.tucker@wilsonelser.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on December 30, 2020, I electronically filed and served the foregoing document by using the District of Alaska CM/ECF system.

                                        */s/ Natalie Landreth*
                                        Natalie Landreth